```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE EASTERN DISTRICT OF TEXAS

 3                      BEAUMONT DIVISION

 4   CHRISTINE JONES                )
                                    )
 5            Plaintiff,            )
                                    )
 6   VS.                            )   C.A. NO. 1:14-CV-00103
                                    )
 7   TAMARA SPIKES AND BEAUMONT     )
     INDEPENDENT SCHOOL DISTRICT    )
 8   POLICE DEPARTMENT              )
                                    )
 9            Defendants.           )

10

11       ***********************************************
                ORAL AND VIDEOTAPED DEPOSITION OF
12
                    CHRISTINE BRADLEY JONES
13
                       December 4, 2014
14       ***********************************************

15

16       ORAL AND VIDEOTAPED DEPOSITION of CHRISTINE BRADLEY

17   JONES, produced as a witness at the instance of the

18   Defendant, and duly sworn, was taken in the above-styled

19   and numbered cause on the 4th of December, 2014, from

20   10:11 a.m. to 3:16 p.m., before Dianna L. Edwards, CSR

21   in and for the State of Texas, reported by machine

22   shorthand at the offices of BUSH LEWIS, P.L.L.C., 595

23   Orleans Street, Suite 500, Beaumont, Texas, pursuant to

24   the Federal Rules of Civil Procedure and the provisions

25   stated on the record or attached hereto.
```

EXHIBIT
D1

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFF(S) CHRISTINE JONES:
          Mr. Stephen L. Townsend
 3        BUSH LEWIS, P.L.L.C.
          595 Orleans Street, Suite 500
 4        Beaumont, Texas 77701

 5   FOR THE DEFENDANT(S) TAMARA SPIKES:
          Mr. James E. Byrom
 6        Ms. Veronica Garcia
          WALSH, ANDERSON, GALLEGOS, GREEN & TREVINO P.C.
 7        10375 Richmond Avenue, Suite 750
          Houston, Texas 77042-4196
 8
     FOR THE DEFENDANT(S) BEAUMONT INDEPENDENT SCHOOL
 9   DISTRICT POLICE DEPARTMENT:
          Mr. Christopher B. Gilbert
10        Ms. Frances R. Broussard
          THOMPSON & HORTON, L.L.P.
11        3200 Southwest Freeway, Suite 2000
          Houston, Texas  77027
12
     VIDEOGRAPHER:
13        Mr. Chris Wilson
          ACCURATE LEGAL VIDEO SERVICES
14        Century Tower
          550 Fannin Street, Suite 220
15        Beaumont, Texas 77701

16   ALSO PRESENT:
          Ms. Tamara Spikes
17        Mr. Trent Bond

18

19

20

21

22

23

24

25
```

Electronically signed by Dianna Edwards (101-372-712-7285)

372856ba-1f31-4869-890b-63533c7f043d

1                    P R O C E E D I N G S

2                    (BY AGREEMENT OF COUNSEL, DEPOSITION IS

3    BEING TAKEN PURSUANT TO FEDERAL RULES AND IN PART BY THE

4    LOCAL RULES OF THE EASTERN DISTRICT OF TEXAS.)

5                    THE VIDEOGRAPHER:  We're on the record.

6    Beginning of tape 1.  Time is 10:11.

7                    CHRISTINE BRADLEY JONES,

8    having been first duly sworn, testified as follows:

9                          EXAMINATION

10   BY MR. BYROM:

11       Q.   Could you state your full name, please, ma'am?

12       A.   Christine Bradley Jones.

13       Q.   Ms. Jones, I introduced myself to you a minute

14   ago when you first came in.  My name is Jim Byrom, and

15   you understand I represent Tamara Spikes?

16       A.   Yes.

17       Q.   We have not met before today, have we?

18       A.   No, we have not.

19       Q.   Okay.  I want to have some agreements with you

20   that I think will make this smoother -- what we're going

21   to do today a little more smooth for you and for us.

22   So, number one, there's a court reporter here; and I'm

23   sure you've been told she's taking down everything

24   that's being said, correct?

25       A.   Yes.

1        Q.   And your testimony is under oath -- well, let

2    me ask it first.  You understand what your oath was a

3    while ago, right?

4        A.   Yes.

5        Q.   To tell the truth?

6        A.   Yes.

7        Q.   Okay.  And -- and that's what you intend to

8    do?

9        A.   Yes.

10       Q.   Okay.  And your testimony under oath is when

11   you look at the video, you don't know that Officer

12   Spikes is a police officer?

13       A.   No.

14       Q.   Do you know that she's a police officer now?

15       A.   Now after everything has transpired.

16       Q.   When did you discover that she really was a

17   police officer?

18       A.   I don't recall.

19       Q.   Was it soon after the ac -- the incident that

20   we're here about today that you discovered she was a

21   police officer?

22       A.   No.

23       Q.   It was some later time?

24       A.   Much later.

25       Q.   Do you remember when -- what day this

Electronically signed by Dianna Edwards (101-372-712-7285)                                        372856ba-1f31-4869-890b-63533c7f043d

1    occurred -- this event occurred?

2         A.   Yes.

3         Q.   What day?

4         A.   Thursday, May the 2nd, 2013.

5         Q.   Okay.  So, we're about a year and a half or

6    so, a little more than a year and a half from when it

7    occurred.  Is that your understanding?

8         A.   A little more than a year and a half, I would

9    think.

10        Q.   Okay.  And when during that year and a half or

11   a little more than a year and a half did you first

12   discover that Officer Spikes was, in fact, a police

13   officer?

14        A.   I don't really recall knowing her as being an

15   officer other than when I got served the papers for this

16   suit.

17        Q.   Okay.  So, the suit you're talking about is

18   not the same one we're here about today; but you

19   actually were sued in another court by Ms. -- by Officer

20   Spikes, right?

21        A.   I'm not understanding your question.

22        Q.   Okay.  You said when you were served with

23   papers --

24        A.   Yes.

25        Q.   -- that's when you understood that Officer

1    Spikes was a police officer.

2         A.    Yes.

3         Q.    And is that -- papers were served on you in

4    the case where you are a defendant?

5         A.    Yes.

6         Q.    Okay.   Not -- not specifically this case that

7    we're here about today but another case in Beaumont.

8         A.    Yes.

9         Q.    Okay.   And you understand that at -- that at

10   this time there's two different cases going on, right?

11        A.    Yes.

12        Q.    Okay.   And in the other case is when -- when

13   you were served with those papers is the first time you

14   were able to -- to determine that Officer Spikes was a

15   police officer.

16        A.    Yes.

17        Q.    Did you doubt that she was a police officer?

18        A.    I never thought that she was a police officer.

19        Q.    Never heard that she was?

20        A.    Never heard that she was.

21        Q.    Did you believe she was a police officer?

22        A.    No, I did not.

23        Q.    So, from May the 3rd of 2013 until you were

24   served with papers, you had no understanding that

25   Officer Spikes was a police officer.

Electronically signed by Dianna Edwards (101-372-712-7285)                    372856ba-1f31-4869-890b-63533c7f043d

```
 1        A.    Correct.

 2        Q.    You were arrested and taken to jail.

 3        A.    Correct.

 4        Q.    Do you know what you were charged with?

 5        A.    I was never verbally told what I was being

 6   charged with even after I asked what I was being charged

 7   with.

 8        Q.    Okay.  At the police station were you told?

 9        A.    No.

10        Q.    Did you ever know what charges were being

11   considered against you?

12        A.    When I got booked, that's when I found out

13   what the charges were.

14        Q.    And what were the charges when you got booked?

15   Do you remember?

16        A.    It was a misdemeanor and a felony assault.

17        Q.    Okay.  Felony assault of a police officer?

18        A.    It just said felony assault.

19        Q.    When -- when Officer Spikes -- and we'll talk

20   more about this in a minute.  But when she had her gun

21   out, you didn't know she was a police officer?

22        A.    No.

23        Q.    Did you believe her to be a police officer at

24   that time?

25        A.    No.
```

1          Q.    Who did you think she was?

2          A.    I don't know.

3          Q.    Did you think she was just some random

4    individual that had a gun?

5          A.    I don't know who she was.  She never

6    identified herself to me.

7          Q.    We'll come back to that in a little bit.

8    Okay?

9                     I know -- I know you're married because

10   I've seen that in the documents in this case.  What is

11   your husband's name?

12         A.    Steven, with a V.

13         Q.    S-t-e-v-e-n?

14         A.    Yes.

15         Q.    Does he have a middle name?

16         A.    Darren.

17         Q.    How do you spell Darren?

18         A.    D-a-r-r-e-n.

19         Q.    Okay.  Steven Darren Jones.

20         A.    Jones, yes.

21         Q.    Okay.  What does he do?

22         A.    He's a dispatch supervisor.

23         Q.    For who?

24         A.    Beaumont Transit.

25         Q.    How long has he been there?

```
 1        A.    Yes.

 2        Q.    Have you sought any counseling for that?

 3        A.    No.

 4        Q.    Have you sought counseling even -- well, first

 5   of all, let me ask this way.  You haven't sought any

 6   counseling from a licensed psychologist or psychiatrist,

 7   correct?

 8        A.    Correct.

 9        Q.    Have you had to take any medication because of

10   it?

11        A.    No.

12        Q.    Have you talked to any other kind of counselor

13   as a result of the incident we're here about today?

14        A.    Could you clarify that?

15        Q.    Sure.  Have -- have you talked to any other

16   counselor as a result of any incident that occurred at

17   Beaumont ISD on or about May the 3rd of 2000 -- May the

18   2nd or 3rd of 2013?

19        A.    I would say as far as counselor -- as for

20   paying a counselor, to see someone, no.

21        Q.    Okay.  You haven't paid to see anybody?

22        A.    No.

23        Q.    Okay.  Sometimes people talk to a -- a friend

24   or a pastor or somebody like that.  Anything like that

25   that you've done?
```

1          A.    Not necessarily a pastor or a friend, just my

2    personal dealings with God.

3          Q.    Okay.  Let me ask it another way, and I hope

4    this will clarify it for you.  You haven't talked to

5    anybody -- any professional about your emotional issues.

6          A.    No.

7          Q.    Okay.  Based on what you've told me, it sounds

8    to me like you haven't incurred any medical, emotional,

9    psychological expense as a result of what happened at

10   Beaumont ISD at Vincent in May of 2013.  Am I right?

11         A.    No.

12         Q.    Okay.  What?

13         A.    There's emotional.

14         Q.    What I was asking you -- you haven't paid any

15   money to anybody for treatment of any kind.

16         A.    No, I have not paid any money.

17         Q.    Okay.  I did see what has been produced as

18   a time detail --

19         A.    Uh-huh.

20               MR. BYROM:  Let's make this an exhibit.

21               (EXHIBIT NO. 3 MARKED.)

22               MR. BYROM:  Do you -- this is your --

23   here you go, Steve.

24         Q.    (BY MR. BYROM)  I want to hand you what's been

25   marked as Exhibit 3 and ask you, first of all, have you

Electronically signed by Dianna Edwards (101-372-712-7285)                    372856ba-1f31-4869-890b-63533c7f043d

1    further.

2         Q.   How do you want me to clarify it?  How can I

3    help you?

4         A.   (No response.)

5         Q.   How can I help you?

6              MR. TOWNSEND:  Can I meet and confer with

7    my client?

8              MR. BYROM:  Go ahead.

9              THE VIDEOGRAPHER:  Going off the -- off

10   the record at 11:17.

11             (RECESS FROM 11:17 A.M. TO 11:19 A.M.)

12             THE VIDEOGRAPHER:  Back on the record at

13   11:19.

14        Q.   (BY MR. BYROM)  Ms. Jones, we took a little

15   break there, I think, to help clarify this issue that

16   we've been talking about about wages.  And -- and, so,

17   my question to you is:  Do you now have an answer about

18   how many days that you think you're going to claim in

19   lost wages being a result of the Vincent Middle School

20   incident?

21        A.   Yes.

22        Q.   What's your answer?

23        A.   The current four days.

24        Q.   The four that are listed on --

25        A.   Four that's listed.

```
 1        A.   No.

 2        Q.   Where -- what street is it located on?

 3        A.   It's over there off of Dowlen, you know, by

 4   the Walmart.

 5        Q.   Is his name on the door?

 6        A.   I don't know.

 7        Q.   Okay.  But you're -- you're confident it's

 8   a -- it's a Texas State Optical office?

 9        A.   Yes.

10        Q.   Have you ever read -- I want to hand you

11   what's been marked as Exhibit 4.  Do you recognize that

12   document?

13        A.   Yes.

14        Q.   Okay.  Did you read that?

15        A.   Yes.

16        Q.   Did you participate in answering that?

17        A.   Yes.

18        Q.   If you would turn to the next page, please,

19   ma'am.

20        A.   (Complying.)

21        Q.   Keep going.  Sorry.

22        A.   (Complying.)

23        Q.   Okay.  Is that your signature?

24        A.   Yes.

25        Q.   In signing that document, were you saying that
```

```
 1   it was true and correct to the best of your knowledge?

 2        A.   Yes.

 3        Q.   Okay.  Have you ever -- I'm going to hand you

 4   what's been marked as Exhibit 5.  Have you ever seen

 5   that document?

 6        A.   No.

 7        Q.   Have you ever read the documents that your

 8   counsel has filed in this case on your behalf?

 9        A.   No.

10        Q.   Any reason why not?

11        A.   They're my attorneys.

12        Q.   But you haven't read them at all?

13        A.   No.

14        Q.   So, you don't know whether they're accurate or

15   not?

16        A.   No.

17        Q.   You would hope they would be accurate.

18             MR. TOWNSEND:  Objection; form.

19        Q.   (BY MR. BYROM)  Right?

20        A.   Right.

21        Q.   Why don't you go ahead and take some time and

22   read Exhibit 5 for me.

23             MR. GILBERT:  This is the amended

24   complaint, right?

25             MR. BYROM:  Yeah.
```

1          Q.    (BY MR. BYROM)    And -- and I'll -- I'll direct

2    you a little bit so you don't have to read the whole

3    thing.   Look at the statement that starts with the

4    "Facts."

5          A.    (Complying.)

6          Q.    Is there -- is there a part that starts with

7    "Facts"?

8                    MR. TOWNSEND:    She's started on it, Page

9    2.

10                   MR. BYROM:    I'm sorry.

11         Q.    (BY MR. BYROM)    Okay.   Have you read it?

12         A.    Yes.

13         Q.    Okay.   Do you need to review Exhibit -- which

14   one was that?   What number is that on the front?

15                   MR. GILBERT:    (Indicating 4.)

16         Q.    (BY MR. BYROM)    4?

17         A.    5.

18         Q.    (BY MR. BYROM)    Do you need to read -- that's

19   5?

20         A.    5.

21         Q.    Do you need to read No. 4 to refresh your

22   memory of your declaration, or do you think you know

23   what it says?

24         A.    I think I know what this --

25         Q.    All right.

1          Q.    Okay.  So, nobody forced you out of the car.

2          A.    Correct.

3          Q.    You -- you got out on your own.

4          A.    Yes.

5          Q.    And then you were put on the ground.

6          A.    No.

7          Q.    Okay.

8          A.    I got out on my own; and then when the other

9    officer was coming up, they say get on my knees.  I was

10   on my knees.  And they say "Lay down on the ground," and

11   I was laying on the ground.  And he came behind me and

12   pushed his knee in my back.

13         Q.    Okay.  Do you know who that was?

14         A.    That was the motorcycle cop.

15         Q.    Okay.  Was that the same cop that you saw at

16   the tree?

17         A.    Yes.

18         Q.    So, you did know who he was.

19         A.    Yes.

20         Q.    Did you know him by name?

21         A.    No.

22         Q.    So, I guess what I'm hearing you say is --

23   well, first, you're saying you disagree because they

24   didn't have to get you out of the car; you were already

25   out.

1        A.    Correct.

2        Q.    But I also hear in what you're saying that --

3    that when they gave you instructions, you complied.

4        A.    Yes.

5        Q.    They said "Get on your knees"; you got on your

6    knees.

7        A.    Yes.

8        Q.    And then they said "facedown"; you got

9    facedown.

10       A.    Yes.

11       Q.    Did you ever say anything to them?

12       A.    Yes.

13       Q.    What did you say?

14       A.    When he came behind my back, he knocked my

15   phone and my keys out of my hand.  And he stripped my

16   keys, and my phone fell on the ground, and I asked him

17   to please pick up my phone.

18       Q.    Did you ever say anything else to him?

19       A.    No.

20       Q.    Did you immediately comply with their

21   instructions, or did they have to help you?

22       A.    I complied with their instructions.

23             THE VIDEOGRAPHER:  We've got about five

24   minutes left on this tape.

25             MR. BYROM:  Okay.

1              THE VIDEOGRAPHER:  Back on the record.

2    Beginning of tape 3.  Time is 12:18.

3         Q.  (BY MR. BYROM)  Ms. Jones, we took a little

4    break because we had to change the videotape because we

5    were running out.  Have you continued to read it -- read

6    that part?

7         A.  Yes.

8         Q.  Tell me if there's anything else that you saw

9    that -- that you think needed to be changed.

10        A.  Number 13 says, "Spikes then came to the

11   driver's side of plaintiff's car and was still talking

12   on her shoulder radio."  She didn't come to the driver's

13   side of my car.  She was still at the front of my car

14   off to the side.

15        Q.  Okay.

16        A.  And that's --

17        Q.  So, she wasn't at the window; she was in front

18   of that --

19        A.  She was on -- on the side of my car, the top

20   of the car in front of it on the side.

21        Q.  Anything else that you've seen, now that

22   you've had a chance to read it?

23        A.  And it's -- and when there was an opening like

24   I asked her -- I say -- I pointed that I was going to

25   move my vehicle in the opening.

1        Q.    Okay.  And where -- where does it end?  You're

2   already anticipating where I'm going.

3        A.    I'm sorry.

4        Q.    Where does it end?

5        A.    8 through 15.

6        Q.    What paragraph is the next one?  Would be 9?

7        A.    No, sir.

8        Q.    Tell me what it goes through.

9        A.    It goes to section F.

10       Q.    Okay.  Thank you.  May I see it back now,

11   please, ma'am.  Now I want you to do the same thing with

12   your -- with that declaration.  You said you probably

13   didn't need to read it as closely because you've seen it

14   before, right?

15       A.    Correct.

16       Q.    So, I want you to tell me if there's anything

17   in there that now looks wrong to you.

18       A.    No.

19       Q.    Okay.  All right.  Well, let's talk about that

20   day, May the 2nd, 2013.  And we probably will use that

21   drawing a little bit.  Okay?

22                 When did you first see Officer Spikes on

23   May the 2nd, 2013?

24       A.    When she came to my driver's side window.

25       Q.    And you've got marked -- go ahead and close

Electronically signed by Dianna Edwards (101-372-712-7285)                372856ba-1f31-4869-890b-63533c7f043d

1      Q.   And was your vehicle where you have it marked

2    with your initials and the arrow on Exhibit 6 when you

3    first saw Ms. Spikes -- Officer Spikes?

4      A.   Yes.

5      Q.   Tell me what you saw when you first saw her?

6    What did you see?

7      A.   She approached my window, and she tells me

8    that, you know, "They don't want y'all turning in from

9    the left-hand side."

10     Q.   Okay.  And you've said it with -- I don't know

11   any other way to say it but attitude.

12     A.   Yes.

13     Q.   Is that a fair way to say it?

14     A.   Yes.

15     Q.   Okay.  Did she walk up to you?

16     A.   All I can say is when I turned to look, she

17   was there.

18     Q.   All right.  So, you didn't actually see her

19   coming to you.  She was right there at the window?

20     A.   Right.

21     Q.   How far is that from you?

22     A.   She was right there at my window.

23     Q.   What did she -- what did she have on?

24     A.   I didn't notice what she had on.

25     Q.   What did you notice?

1          A.    I noticed her attitude.

2          Q.    Okay.

3          A.    And --

4          Q.    And --

5          A.    I looked to see -- I'm like "Who is this?"

6     And I looked and saw the name tag said "Spikes."

7          Q.    Okay.

8          A.    That's the only thing I -- I was able to

9     identify on her.

10         Q.    How else besides -- besides seeing her name

11    tag, what else did you see about her clothing?

12         A.    I didn't notice anything else about her

13    clothing.

14         Q.    Was she wearing a blue uniform?

15         A.    I didn't notice.

16         Q.    And you didn't notice that it was a police

17    uniform?

18         A.    I didn't notice.

19         Q.    Now you know it was a police uniform, right?

20         A.    Yes.

21         Q.    Did you notice her badge?

22         A.    I didn't notice a badge.

23         Q.    Did you notice any gun?

24         A.    I didn't notice a gun.

25         Q.    Even without seeing all that, did you have any

Electronically signed by Dianna Edwards (101-372-712-7285)                372856ba-1f31-4869-890b-63533c7f043d

1   question in your mind that she was a police officer?

2        A.    Her attitude was like aggression, and I

3   just -- I didn't know who she was.

4        Q.    So, is it your testimony under oath that at

5   the time you first saw Officer Spikes at your window you

6   did not know she was a police officer?

7        A.    Correct.

8        Q.    Was your window up or down?

9        A.    It was partially, midway.

10       Q.    Was it down when you first saw her, or did you

11   roll it down to talk to her?

12       A.    It was down when I drove in.

13       Q.    Okay.  You drove in with it that way?

14       A.    Yes.

15       Q.    How long had you been driving with your window

16   partially open?

17       A.    Since I left home.

18       Q.    Now, this is a time of day when there are

19   multiple vehicles out there, right --

20       A.    Yes.

21       Q.    -- at this location in Exhibit 6?

22       A.    Uh-huh.

23       Q.    How many vehicles were out there?  Do you have

24   any idea?

25       A.    I don't know.

1   to talk to him.

2         Q.   And you're saying that, with the window up,

3   she was yelling so loudly that your husband couldn't

4   hear you?

5         A.   Correct.

6         Q.   What did he say she said?

7         A.   I don't think he -- he said anything about

8   what she said.

9         Q.   He's never told you what he heard her say?

10        A.   No.  He didn't hear her say anything as far as

11  I know because he kept saying "Who's screaming in the

12  back?"

13        Q.   What did you hear her say?

14        A.   I don't know.  I don't recall.

15        Q.   And are you sure this was in the second

16  conversation?

17        A.   I'm not sure if it's in the second

18  conversation.

19        Q.   Okay.  And that -- that's why I'm asking.  I'm

20  just trying to be clear about it.  Did you ever ask to

21  speak to her supervisor?

22        A.   No.

23        Q.   You had your driver's license with you, didn't

24  you?

25        A.   Yes.

Electronically signed by Dianna Edwards (101-372-712-7285)          372856ba-1f31-4869-890b-63533c7f043d

1       Q.    Did you ever provide it to her?

2       A.    No.

3       Q.    Why not?

4       A.    I asked her what the problem was, and she

5    became more irate, and then she walked to the top of my

6    vehicle and radioed in.

7                   MR. BYROM:   For purposes of the record,

8    I'm going to object that that's not responsive to my

9    question.

10      Q.    (BY MR. BYROM)  My question to you is:   Why

11   didn't you give her your driver's license?

12      A.    Because she walked away from me.

13      Q.    Is that the only reason you didn't give it to

14   her?

15      A.    Yes.

16      Q.    Did she ever tell you not to move your car?

17      A.    No.

18      Q.    Did you see her walk toward the front of your

19   car?

20      A.    Yes.

21      Q.    What was she doing?   Do you know?

22      A.    She was on her radio, and she was trying to

23   look at the tags.

24      Q.    Do you know why?

25      A.    No.

1           A.    Yes.

2           Q.    So, instead of looking where you were -- where

3    you were planning to go, you were looking at her.

4           A.    I saw her, yes.

5           Q.    My question was:  Instead of looking where you

6    were planning to go, you were looking at her.

7           A.    Yes.

8           Q.    Did she ever fall down to the ground?

9           A.    No.

10          Q.    Did she ever move to the side as if she had

11   tripped or slipped or anything else?

12          A.    No.

13          Q.    Okay.  Did you ever see her on the ground?

14          A.    No.

15          Q.    Or get up from the ground?

16          A.    No.

17          Q.    Did she verbally tell you that you hit her?

18          A.    She verbally was screaming that I hit her.

19          Q.    Did you deny to her that you hit her?

20          A.    No.

21          Q.    Why not?

22          A.    I didn't say anything to her.

23          Q.    Your testimony is you did not hit Officer

24   Spikes with your car, right?

25          A.    I would say my testimony is that she states

1   that I hit her with my car.

2        Q.   My question is:  Did you hit her with your

3   car?

4        A.   No.

5        Q.   Did you nudge her with your car?

6        A.   No.

7        Q.   Did your car come into contact with Officer

8   Spikes at all?

9        A.   No.

10       Q.   How do you know that?

11       A.   She was standing very clearly on the side of

12  my vehicle where I had enough space and time to move my

13  vehicle over.  I did not give gas or anything.

14       Q.   Okay.  And that would include your mirror

15  wouldn't hit her?

16       A.   Yes.

17       Q.   All right.  And your testimony is that your --

18  the scratches on the bumper don't have anything to do

19  with -- or the scratches on the fender don't have

20  anything to do with her?

21       A.   It's not on the fender.  It's on the side --

22       Q.   Okay.

23       A.   -- where the mirror was.  There was a -- a

24  mark there.

25       Q.   And your testimony is that that mark does not

```
1        Q.    Remember we talked about that earlier?
2        A.    Yes.
3        Q.    At that time, was she talking on her radio?
4        A.    I don't recall.
5        Q.    When is the first time you remember her
6   talking on her radio?
7        A.    When she went to the front of my vehicle --
8        Q.    Okay.
9        A.    -- she radioed in that she needed some
10  assistance.
11       Q.    Okay.
12       A.    And she was trying to call in my license, but
13  they told her it was paper tag; she couldn't get that.
14       Q.    Okay.  Did you hear all that exchange?
15       A.    Yes, I heard all that exchange.  And then
16  she -- I don't know they -- she got quiet; and then when
17  the traffic started moving, I motioned to -- that I was
18  going to move my vehicle; and she sticks her leg out in
19  front of my vehicle; and then she radios in that she had
20  been hit.
21       Q.    Okay.  Now, let's go back a step just to make
22  sure I've got this in sequence.
23       A.    Uh-huh.
24       Q.    The first time you -- when was the first time
25  you noticed she had a radio?
```

1       A.    When she called it in.

2       Q.    Okay.  So, when she first came up to your car

3    the first time, your window was half down.

4       A.    Correct.

5       Q.    And you have a conversation.

6       A.    Correct.

7       Q.    You didn't notice her radio at that time.

8       A.    No.

9       Q.    All right.  Second time she came to the

10   window, you notice -- and then went to the front, that's

11   when you noticed the radio.

12      A.    Right, because she was using the radio.

13      Q.    Okay.  And what did you hear her say?

14      A.    She was calling in the paper tags.

15      Q.    Calling in to who?

16      A.    The -- to whoever is on the other end of the

17   radio.

18      Q.    Okay.  Do you -- did you hear the voice from

19   the other end of the radio?

20      A.    I did hear the voice.

21      Q.    All right.  At that time, with her standing

22   there using her radio, did you have any doubt she was a

23   police officer?

24      A.    I didn't think of anything.

25      Q.    So, even though she's talking into her radio

1    and hearing a response, that doesn't trigger with you

2    that she's an officer?

3        A.   I didn't think of it.

4        Q.   Have you had other experiences where you've

5    seen people who were not police officers talking into a

6    radio on their collar?

7        A.   No.

8        Q.   And when we say "radio," we're talking about

9    something that's on the lapel.

10       A.   Right.

11       Q.   Can you put your hand up on your lapel to show

12   me where it was.

13       A.   Right here (indicating).

14       Q.   And how -- is that the motion she would have

15   made?

16       A.   Yes, she was like that.

17       Q.   Okay.  And -- and did she turn her head to

18   talk into that mic -- into the radio right there?

19       A.   I don't recall.  I know it was there, and she

20   was -- she had her hand up there.

21       Q.   And -- and have you ever seen somebody who

22   wasn't a police officer do that with a radio on their

23   collar like that?

24       A.   I don't recall seeing anyone with that.

25       Q.   How many -- okay.  We're going to talk about

1   directly at me.

2        Q.   Okay.  Did she -- and -- and then -- then did

3   she tell you to get out of your car?

4        A.   Yes.

5        Q.   Did you say anything?

6        A.   No.

7        Q.   Did you get out of your car?

8        A.   No.

9        Q.   Why not?

10       A.   A gun pointed at me.  She's already threatened

11  to discharge her firearm.

12       Q.   Okay.  So -- so, you don't know whether she's

13  an officer or not.

14       A.   No.

15       Q.   And you're going to choose to just stay in

16  your car despite being ordered by somebody in a blue

17  uniform with a gun to get out.

18       A.   Yes.

19       Q.   Did you reach into your purse, after --

20       A.   No.

21       Q.   -- Officer Spikes told you, to get your phone,

22  to get your keys, to get anything?

23       A.   No.

24       Q.   Get your driver's license?

25       A.   No.

```
 1        A.   Uh-huh.

 2        Q.   -- did she -- did Officer Spikes say anything

 3   else to you at all?

 4        A.   All I recall is when the other officer was

 5   running to me, he said "Get on the ground.  Lie

 6   facedown."

 7        Q.   Okay.  I'm going to ask that question in a

 8   second.  But the question I'm asking you now is:  Did

 9   Officer Spikes say anything else to you?

10        A.   No.

11        Q.   Okay.  And you've just told me that Officer

12   Custer told you to lie down.

13        A.   Yes.

14        Q.   Did you comply with that?

15        A.   Yes.

16        Q.   Did you hesitate at all?

17        A.   No.

18        Q.   And you told me earlier that he had never told

19   you on previous occasions -- Officer Custer had never

20   told you on previous occasions the same type of

21   information that Officer Spikes did when she said

22   "You're not supposed to come in that direction."

23        A.   Yes.

24        Q.   Correct?

25        A.   Correct.
```

Electronically signed by Dianna Edwards (101-372-712-7285)          372856ba-1f31-4869-890b-63533c7f043d

1    of the events.

2         Q.   Okay.  Did you hear her side?

3         A.   I heard some of her side, but then the officer

4    who walked me across the yard comes on the passenger --

5    driver's side, turns the air conditioning on full blast

6    and rolls the windows up in the car.

7         Q.   You think he did that on purpose so you

8    couldn't hear?

9         A.   He states that he was coming to check on me

10   and that he wanted to give me some air.

11        Q.   Who was that?

12        A.   I don't know who -- his name.

13        Q.   What did he look like?

14        A.   He was a little, short, black man.  He had a

15   motorcycle helmet on.

16        Q.   Okay.  He was obviously a police officer.

17        A.   Yes.

18        Q.   You don't know him to this day?

19        A.   No, I do not.

20        Q.   And what did he specifically say to you?

21        A.   When -- as we were walking across, he asked me

22   if I was hurt; and I was a little quiet.  And I said,

23   "What do you mean?"  He said "Physically hurt."  I said

24   "No."  And I felt myself get -- started to get more

25   upset.

Electronically signed by Dianna Edwards (101-372-712-7285)          372856ba-1f31-4869-890b-63533c7f043d

1           A.    She acted as though she got hit.

2           Q.    Can you say she didn't get knocked over?

3           A.    All I can say is she reacted.

4           Q.    My question -- you said you can't say that she

5     got hit; and I'm saying "Can you say she didn't get

6     hit?"  Under oath can you testify that she didn't get

7     hit?

8           A.    All I can say is she reacted as though she

9     hit -- she got hit.

10          Q.    Let me ask it this way, Ms. Jones.  For

11    purposes of this question, I'm not asking you whether

12    you meant to hit anybody.  Okay?  You understand what

13    I'm saying?

14          A.    I understand.

15          Q.    Is it possible you accidentally hit Ms. --

16    Officer Spikes?

17          A.    I can't say if I hit her.

18          Q.    Okay.  And you can't say you didn't hit her

19    either, can you?

20          A.    What I can say is when I turned to check my

21    surroundings and I turned back, she's already stating

22    that I hit her.

23          Q.    You cannot testify under oath that you did not

24    hit Officer Spikes with your vehicle, can you?

25          A.    I cannot testify that I hit her.

1          Q.     Why would Ms. Spikes make whole -- this whole

2     story up?

3          A.     I don't know.

4                 MR. TOWNSEND:  Objection; form.

5          Q.     (BY MR. BYROM)  You don't have any reason to

6     believe she made it all up, do you?

7          A.     I don't know.

8          Q.     Just to be real clear, you cannot testify that

9     you did not hit Officer Spikes, correct?

10                MR. TOWNSEND:  Objection; form.

11                MR. BYROM:  What's the objection?

12                MR. TOWNSEND:  It's -- the question, I

13    think, is confusing; and I think it's already been a --

14    asked and answered.  And that's what I --

15                MR. BYROM:  Okay.

16         Q.     (BY MR. BYROM)  Can you answer the question?

17                MR. TOWNSEND:  Can you repeat it for her,

18    please?

19         Q.     (BY MR. BYROM)  You cannot testify under oath

20    that you did not hit Officer Spikes with your vehicle on

21    May the 2nd, 2013, correct?

22         A.     I can only testify that when I turned from

23    checking my side, she's already screaming that I hit

24    her.

25         Q.     So, do you deny you hit her?  That's my

Electronically signed by Dianna Edwards (101-372-712-7285)                372856ba-1f31-4869-890b-63533c7f043d

 1   question.

 2        A.   I can't answer that.

 3        Q.   Okay.  Why can't you answer that?  You don't

 4   know?

 5        A.   Because when I turned to look around, she's

 6   already hollering that I hit her.

 7        Q.   Does the video appear to show her being

 8   knocked over --

 9        A.   The video --

10        Q.   -- what you watched?

11        A.   The video appears to show her reacting.

12        Q.   But you don't have any reason that she would

13   have reacted that way other than the fact that your

14   vehicle hit her, right?

15        A.   I don't know if my vehicle hit her.

16        Q.   I know.

17        A.   I can't say that.

18        Q.   No.  I know.  But you can't say that that

19   reaction was caused by anything other than getting hit

20   by a vehicle either, can you?

21        A.   I don't know.

22        Q.   Okay.  Did you see on the video any time when

23   it looked like Officer Spikes was limping?

24        A.   No.

25        Q.   I want you to find that spot for me on the

1        A.    She was right here walking up.

2                    (VIDEOGRAPHER INSTRUCTING REGARDING

3    MICROPHONE.)

4        Q.    (BY MR. BYROM)   How far was she --

5        A.    I don't know --

6        Q.    -- when she started walking up?

7        A.    -- the distance.

8        Q.    Do you see anywhere in that video where she's

9    pointing the gun at you?

10       A.    Yes.

11       Q.    And that's as she's walking up to you?

12       A.    Yes.

13       Q.    And as she's walking up to you, she tells you

14   she's going to shoot you?

15       A.    She's going to discharge her firearm.  She's

16   going to shoot me.

17       Q.    All right.  It's certainly possible that you

18   struck Officer Spikes with your car, isn't it?

19       A.    I can't answer that.

20       Q.    You can't deny it and you can't say it

21   happened, right?

22       A.    Right.

23       Q.    I told you before for purposes of -- of the

24   question I wasn't -- I'm not talking about -- I just

25   want to make sure it's real clear.  I'm not talking

Electronically signed by Dianna Edwards (101-372-712-7285)                     372856ba-1f31-4869-890b-63533c7f043d

1        A.     No, I don't.

2        Q.     -- police matters?

3        A.     No, I don't.

4        Q.     Okay.  Do you have any idea what training

5    Officer Custer had or didn't have with regard to police

6    matters?

7        A.     No, I don't.

8        Q.     Do you have any idea or any knowledge of any

9    training that any of the officers involved in the event

10   had or didn't have with regard to police matters?

11       A.     No, I don't.

12       Q.     Take a look at section H on Damages.  And

13   Mr. Byrom's already asked you a lot about damages; so, I

14   just have a couple of questions about some things that

15   are in here.  This is paragraph 23.  And it says,

16   "Defendant's violations of plaintiff's civil rights

17   caused her to sustain in varying degrees" -- and then A

18   says, "Physical harm during and after the events in

19   issue."  What physical harm did you suffer as a result

20   of the violation of your rights?

21       A.     My wrists were sore from the cuffs; and when I

22   was on the ground, my knee got scraped.

23       Q.     Okay.  Other than that, any other physical

24   harm?

25       A.     No.

Electronically signed by Dianna Edwards (101-372-712-7285)                    372856ba-1f31-4869-890b-63533c7f043d

1        Q.   It talks about physical pain, disability.   Did

2    you suffer any disabilities as a result of this

3    incident?

4        A.   No.

5        Q.   Talks about disfigurement.   Did you suffer any

6    disfigurement as a result of any of the incidents --

7        A.   No.

8        Q.   -- involved in this lawsuit?

9        A.   No.

10       Q.   B talks about "Emotional and mental harm

11   during and after the events in issue, including fear,

12   humiliation, and mental anguish, which plaintiff is

13   certainly certain to continue to suffer to some degree

14   for some time into the future."   Tell me about the

15   emotional and mental harm that you've suffered as a

16   result of the events that we've been talking about

17   today.

18       A.   Well, stressful; and then I had to report to

19   my boards.

20       Q.   Which boards is that?

21       A.   Board of Nursing.

22       Q.   Okay.   Did anything happen as a result of you

23   reporting that to the Board of Nursing?

24       A.   They have to -- I have to submit a letter to

25   them telling who my legal counsel was and then update

1    them on if any charges were brought up against me.  And

2    then once those charges was dropped, then I have to -- I

3    had to write them a letter letting them know that those

4    charges were dropped; and then they sent me a letter

5    back telling me that they weren't taking any action

6    against me.

7         Q.    Okay.  So, you submitted all that information

8    to the nursing board.

9         A.    Yes.

10        Q.    And they have sent you a letter saying that,

11   as far as they're concerned, this is a closed matter?

12        A.    Yes.

13        Q.    Okay.  Other than what you've told us, how

14   else did you suffer emotional or mental harm as a result

15   of the incidents we've talked about today?

16        A.    This -- the stress of this.  You know, my

17   Boards -- not knowing, you know, what the outcome would

18   be.  I would have to take off and go talk to counsel

19   about what the plans was, potentially even having to go

20   in front of a Grand Jury.

21        Q.    Okay.  I'm not going to ask you how stressful

22   it was to talk to counsel but --

23                   MR. TOWNSEND:  It wasn't.

24        Q.    (BY MR. GILBERT)  How are you doing today?  Is

25   it still stressful, this incident, or --

1          A.    Still emotional.

2          Q.    Still emotional?  Do you think about it every

3     day or is it something that just comes into your mind

4     when -- when things come up like this deposition?

5          A.    When these things come up, I don't sleep at

6     night.

7          Q.    Okay.  Did you sleep last night?

8          A.    (Shakes head side to side.)

9          Q.    Paragraph C says, "The reasonable value of any

10    health care expenses reasonably needed and actually

11    obtained."  And I think we've already determined you

12    didn't actually obtain any --

13         A.    Right.

14         Q.    -- health care, correct?

15         A.    Correct.

16         Q.    Okay.  I'm going to skip D for a second.  E

17    says, "Reasonable value of any property damage or

18    destroyed."  What property did you have that was damaged

19    or destroyed as a result of this incident?

20         A.    I no longer wear that outfit --

21         Q.    You no longer --

22         A.    -- that I wore that day.

23         Q.    Oh, the outfit you were wearing that day?  All

24    right.  Other than the outfit -- now, that wasn't

25    actually damaged or destroyed --

```
 1        A.   No.

 2        Q.   -- correct?

 3        A.   I don't have it no more.

 4        Q.   Okay.  But nothing that Officer Spikes or any

 5   of the other BISD --

 6        A.   No.

 7        Q.   -- police officers did damaged or destroyed

 8   that outfit, correct?

 9        A.   No.

10        Q.   You're choosing not to wear that.

11        A.   Yes.

12        Q.   Okay.  Other than that outfit, is there any

13   other property of yours that was damaged or destroyed as

14   a result of what we've talked about today?

15        A.   No.

16        Q.   F says, "Reasonable value of legal services

17   needed and actually obtained by plaintiff to defend and

18   clear herself of criminal charges."  You told Mr. Byrom

19   in answer to some of his questions that you had written

20   a check for $7500 and then a second one for

21   380-something -- $398, correct?

22        A.   Yes.

23        Q.   Was there -- was there more that you paid your

24   attorney or criminal attorney regarding the criminal

25   charges, or were those the two checks that you wrote?
```

Page 199

1   THE STATE OF TEXAS:

2   COUNTY OF JEFFERSON:

3       I, DIANNA L. EDWARDS, a Certified Shorthand
    Reporter in and for the State of Texas, hereby certify
4   that the foregoing testimony was given before me after
    the Witness had been first duly sworn.

5
        I further certify that this deposition was typed
6   under my direction and is a complete and correct
    transcript of the proceedings; and that it is being
7   filed with the Court in accordance with the Stipulation
    of Counsel contained in this deposition.

8
        I further certify that I am neither attorney for,
9   related to, nor employed by any of the parties to the
    lawsuit in which this deposition was taken.  Further, I
10  am neither related to nor employed by any attorney of
    record in this cause; nor do I have a financial interest
11  in the matter.

12      GIVEN UNDER MY HAND AND SEAL OF OFFICE this 12th
    day of December, 2014.

13

14

15                      DIANNA L. EDWARDS, Texas CSR 3584
                        Expiration Date:  12-31-15
16                      Jan Girouard & Associates
                        Firm Registration No. 99
17                      550 Fannin, Suite 108
                        Beaumont, Texas  77701
18                      (409) 832-2721

19

20

21

22

23

24

25

Electronically signed by Dianna Edwards (101-372-712-7285)                    372856ba-1f31-4869-890b-63533c7f043d

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

CHRISTINE JONES                    §

VS.                                §        CIVIL ACTION NO. 1:14-CV-00103
                                   §
TAMARA SPIKES and                  §        Judge Keith Giblin
BEAUMONT INDEPENDENT               §
SCHOOL DISTRICT POLICE             §
DEPARTMENT                         §

DECLARATION OF CHRISTINE JONES

1.    "My Name is Christine Jones. I have personal knowledge of the facts set forth in this Declaration and know them to be true and correct. I am over the age of eighteen, am of sound mind, and am capable of making this Declaration.

2.    On May 2, 2013 I was waiting in line to pick my child up from Vincent Middle School in Beaumont, Texas.

3.    I had turned into the school's driveway. There were cars already lined up on the right hand side of the school's driveway. I was on the left side. There was a space on the right hand side, but I could not fit my vehicle in it. There was a gray vehicle a few car lengths ahead of me on the left side, and a vehicle directly behind me. The driver in the gray vehicle had exited his car and went into the school.

4.    A lady, who I later recognized as Spikes, came to my driver's side window and told me that, "They don't want you pulling in from the left hand side." At that time, she had not identified herself as a police officer. All I could see was a nametag that said "Spikes." She seemed very irritated. I told the lady, "Okay."

5.    She proceeded to tell me that the reason was because there had been a lot of accidents. I responded, "Okay."

6.    She told me to pull up. I told her there was nobody in the gray car in front of me and that he had went into the building. I asked her if she could go look in the vehicle to make sure. She did not acknowledge what I had told her, and she walked away towards the back of my vehicle.

7.    She came back up to my vehicle and asked me to pull up again. I told her that I did not want to pull up too close to the gray vehicle since the driver was not in it and I did not want to get trapped in behind him. She had still not identified herself as a police officer.



8.  She then asked me for my license and insurance.  I asked her if there was a problem.  She walked to the side of my vehicle to look at the vehicle identification number.  She then walked toward the front of the vehicle to look at the license plate.

9.  She then walked to the back of the vehicle to look at the license plate.  I still did not know she was a police officer.

10.  She then went towards the front side of my vehicle.  At that time, the traffic in the driveway began moving.  I told her that I could pull over to the side because the gray vehicle and the truck next to it had moved.  I began to pull forward.  She was not standing in front of my vehicle, but stuck her leg out, and I stopped.  My vehicle did not touch her.  She stood at the front side of my vehicle.  I turned my head to make sure it was clear for me to pull forward.  She then hollered that I had hit her.  She had not moved from the front side of my vehicle.  She was not knocked to the ground.  She had still not identified herself as a police officer.

11.  I pulled forward into the open spot in order to get out of the way of the vehicles behind me.  I attempted to get out of my vehicle when she came to my window with her gun pointing at my head.

12.  Her first words to me with her gun to my head where, "I'm going to shoot, I'm going to fire my gun."  She still had not identified herself as a police officer.  With her gun pointed at my head, she began hollering at me to get out of the car.

13.  I got out of the vehicle as other police arrived on the scene.  Officer Spikes was the only officer to have her gun drawn, still pointing at my head.  They ordered me to my knees and had me lay face down.  One officer put his knee in my back as they handcuffed me and brought me to a police car.

14.  All the while this was going on, children from the middle school and elementary students were walking around.  Many of the kids were in the line of fire, and I heard Mrs. Douglas, the Attendance Clerk at the school, attempt to get the kids inside.  The other officers arrived on the scene, but they did not have their weapons drawn.  My daughter saw me on the ground.  She saw me get handcuffed and hauled away.  Her friends had seen the event happen.

15.  I had suffered abrasions and pain on my knees and wrists.  My back was sore from the officer putting a knee into it.

16.  I am a Registered Nurse.  I was required to report the incident to the Board of Nursing.

17.  The event has caused me a lot of depression.  During the event, I feared for my life.  I had never had a gun pointed at my head with someone yelling that they were going to shoot.  I had never gotten into any kind of altercations.  Up to that day, the

2

worst trouble I had gotten into in my life with the authorities was a few traffic violations.

18.     Criminal charges were filed against me for an alleged felony aggravated assault against a public servant and a misdemeanor failure to identify by giving false or fictitious information.  Both the criminal charges were dismissed.

By my signature below, I declare under penalty of perjury that the foregoing is true and correct."

EXECUTED on _September 11_, 2014.

Christine Jones

3