1 (Pages 1 to 4)

**Page 1**

```
          IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
                    BEAUMONT DIVISION
CHRISTINE JONES                |
                               |
VS.                            | CIVIL NO. 1:14CV00103
                               |
TAMARA SPIKES AND              | JUDGE KEITH GIBLIN
BEAUMONT INDEPENDENT           |
SCHOOL DISTRICT POLICE         |
DEPARTMENT                     |

*****************************************************

              ORAL AND VIDEOTAPED DEPOSITION OF

                      MATTHEW CUSTER

                    November 21, 2014

*****************************************************

    ORAL AND VIDEOTAPED DEPOSITION OF MATTHEW CUSTER,
produced as a witness at the instance of the plaintiff,
and duly sworn, was taken in the above styled and
numbered cause on November 21, 2014, from 9:06 a.m. to
10:31 a.m., before Tonya Jackson, CSR-CRR, in and for
the State of Texas, reported by machine shorthand
recording, at the law offices of Bush Lewis, 595
Orleans, Suite 500, Beaumont, Texas, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached therein.
```

**Page 2**

```
                         INDEX
                                                   PAGE
 Appearances                                          3

 Examination by Mr. Lewis                             4
 Examination by Mr. Byrom                            60
 Reexamination by Mr. Lewis                          74
 Reexamination by Mr. Byrom                          77
 Further Reexamination by Mr. Lewis                  78

 Changes and Signature Page                          80

 Reporter's Certificate                              82


                        EXHIBITS

 Exhibit 1 - Supplemental Case Report                 5
 Exhibit 2 - Photograph                              27
 Exhibit 3 - Google Earth picture                    28
 Exhibit 4 - Google Earth picture                    28
 Exhibit 5 - Affidavit for Arrest Warrant            40
```

**Page 3**

```
APPEARANCES
FOR THE PLAINTIFF:
    KENNETH W. LEWIS
    STEPHEN L. TOWNSEND
    Bush Lewis
    595 Orleans, Suite 500
    Beaumont, Texas 7701

FOR DEFENDANT TAMARA SPIKES:

    JAMES E. BYROM
    Walsh, Anderson, Gallegos, Green & Trevino
    10375 Richmond Avenue, Suite 750
    Houston, Texas 77042

FOR DEFENDANT BEAUMONT INDEPENDENT SCHOOL DISTRICT:

    FRANCES R. BROUSSARD
    Thompson & Horton
    3200 Southwest Freeway, Suite 2000
    Houston, Texas 77027

THE VIDEOGRAPHER:

    PAUL ROBICHAU
    Complete Litigation Support
    490 Park Street, Suite 205
    Beaumont, Texas 77701
```

**Page 4**

```
              P R O C E E D I N G S:
              THE VIDEOGRAPHER: We're on the record at
9:06.
              (Witness sworn.)
              THE REPORTER: State your agreement for
the record.
              MR. LEWIS: Pursuant to the federal and
local federal rules.
              THE REPORTER: What about signature?
              MS. BROUSSARD: Yes.
              THE COURT: Okay.
              MATTHEW CUSTER,
having been first duly sworn, testified as follows:
                        EXAMINATION
BY MR. LEWIS:
    Q.  Are you Matthew Custer?
    A.  Yes, sir.
    Q.  Are you currently a police officer with the
Beaumont Independent School District Police Department?
    A.  Yes, sir.
    Q.  Were you also an officer for BISD Police
Department on May 2nd, 2013?
    A.  Yes, sir.
    Q.  Were you the first police officer to arrive at
the scene of the incident at Vincent Middle School in
```

Jan Girouard & Associates, LLC   409.832.2721

EXHIBIT D2

2 (Pages 5 to 8)

---

**5**

1  Beaumont involving BISD Officer Tamara Spikes and a
2  parent named Christine Jones after Officer Spikes called
3  for assistance on the afternoon of May 2nd, 2013?
4      A.   Yes, sir.
5      Q.   Is Exhibit A a copy of the police report that
6  you prepared after that incident?
7      A.   It's a copy of my supplement, yes, sir.
8      Q.   Was there some other report besides the
9  supplement that you did?
10     A.   The arresting officer does the initial report.
11     Q.   Okay.  So, the supplement just means that it
12  was not done by the arresting officer, wrote by someone
13  else?
14     A.   Correct.
15     Q.   Were you accurate and truthful in that report?
16     A.   Yes, sir.
17     Q.   Did you in that report include what you thought
18  were the most important things that you observed and did
19  at the scene?
20     A.   Yes, sir.
21     Q.   You also observed, when you got to the scene,
22  that Officer Spikes had her gun drawn, correct?
23     A.   Yes, sir.
24     Q.   You also observed a black female, which you
25  later learned was Mrs. Jones, standing partially in the

---

**6**

1  driver's side of a white SUV vehicle next to Officer
2  Spikes and partially on the pavement, correct?
3      A.   Yes, sir.
4      Q.   Did you also hear Officer Spikes order the
5  black female to exit the vehicle and get on the
6  pavement?
7      A.   Yes, sir.
8      Q.   And can we agree that I can now call the black
9  female "Mrs. Jones" because you know that's who she is
10  now?
11     A.   Yes, sir.
12     Q.   Did you then draw your gun and also order
13  Mrs. Jones to get on the ground or the pavement?
14     A.   Yes, sir.
15     Q.   Was it your belief at that time that drawing
16  your weapon at that time, place, and situation was in
17  compliance with the customs and policies of the BISD
18  Police Department?
19     A.   Yes, sir.
20     Q.   Was it your belief that Officer Spikes having
21  her weapon drawn at that time and in that situation was
22  in compliance with the customs and policies of the BISD
23  Police Department?
24     A.   Yes, sir.
25     Q.   Were you ever disciplined for drawing your

---

**7**

1  weapon during that incident?
2      A.   No, sir.
3      Q.   Are you aware of any discipline of Officer
4  Spikes for drawing her weapon during that incident?
5      A.   No, sir.
6      Q.   Are you aware of there being any discipline or
7  investigation of Officer Spikes for anything she did
8  during the incident at Vincent Middle School on May 2nd,
9  2013?
10     A.   Not that I'm aware of.
11     Q.   Based on your training and experience in law
12  enforcement, what's your understanding of when it is
13  appropriate for an officer to draw a gun?
14     A.   In that situation, believing --
15     Q.   Well, excuse me.  I'm not asking about that
16  situation.  What I'm asking is:  When is it appropriate
17  in general for an officer to draw a gun?
18     A.   When in fear of their life or the lives of
19  others.
20     Q.   Did you draw your gun at the scene of the
21  incident on May 2nd, 2013, because you thought Officer
22  Spikes might have put Mrs. Jones at risk of the use of
23  unlawful deadly force?
24          MR. BYROM:  Objection, form.
25     A.   Can you rephrase that?

---

**8**

1      Q.   (By Mr. Lewis)  Sure.  When you drew your gun at
2  the scene on May 2nd, 2013, was it because you thought
3  that Mrs. Spikes had put Mrs. Jones at risk by drawing
4  her weapon?
5      A.   I believed that -- my weapon was drawn in
6  defense of officer safety.
7      Q.   Your safety?
8      A.   Officer safety.
9      Q.   Which officer?
10     A.   Police officer in general.
11     Q.   Okay.  Was it your safety that you drew the gun
12  for?
13     A.   Both myself and Officer Spikes.
14     Q.   What were you at risk of in that situation?
15     A.   If the vehicle would have come toward me, my
16  safety would have been jeopardized.
17     Q.   I thought you told me when you arrived on the
18  scene, that Mrs. Spikes [sic] was standing half in the
19  vehicle and half out of the vehicle.
20     A.   Mrs. Jones was partially in the vehicle, not
21  Mrs. Spikes.
22     Q.   I'm sorry.  Mrs. Jones.  Was she not standing
23  partially on the pavement and partially in the vehicle?
24     A.   Partially in the vehicle.
25     Q.   Did you get in front of the vehicle?

---

3 (Pages 9 to 12)

Page 9

```
 1   A.  No, sir, I was not directly in front of the
 2   vehicle.
 3   Q.  Why was there a risk of that vehicle striking
 4   you?
 5   A.  It -- a vehicle can turn its wheels and
 6   accelerate at the drop of a hat.
 7   Q.  Without a driver?
 8   A.  "Partially in a vehicle" still has partial
 9   control of the vehicle.
10   Q.  Did you point your weapon at Mrs. Jones?
11   A.  No, sir.
12   Q.  So, you drew your weapon because you feared for
13   the safety of yourself and Officer Spikes from that
14   vehicle?
15   A.  Correct.
16   Q.  Wouldn't it have been prudent just to approach
17   from the side and the vehicle couldn't have been turned
18   toward you?
19       MS. BROUSSARD:  Objection, form.
20       MR. BYROM:  I join.
21       MS. BROUSSARD:  You can answer.
22   Q.  (By Mr. Lewis)  You can answer.
23   A.  Until the situation is secure, officer safety
24   is the primary objective.
25   Q.  Well, that's not my question.  My question is:
```

Page 10

```
 1   Couldn't you have approached the vehicle from the side
 2   so that it couldn't have turned towards you?
 3   A.  When I approached the scene, I was not in a
 4   position to approach the side of the vehicle.  When I
 5   approached the scene, I was to the front driver's side.
 6   Q.  If Officer Spikes had been shooting at
 7   Mrs. Jones, would you have also shot at Mrs. Jones?
 8       MR. BYROM:  Objection, form.
 9       MS. BROUSSARD:  Objection, form.
10       You can answer.
11   A.  If the situation would have warranted, yes.
12   Q.  (By Mr. Lewis)  How would you have determined if
13   the situation warranted it?
14   A.  The direct threat on the safety of myself,
15   Officer Spikes, or others.
16   Q.  So, just because she was shooting at
17   Mrs. Jones, you wouldn't necessarily have shot at
18   Mrs. Jones, too?
19   A.  Correct.
20   Q.  If you had thought that Mrs. Jones was unarmed
21   and was not a threat and was being shot by Officer
22   Spikes, would you have opened fire on Officer Spikes?
23       MR. BYROM:  Objection, form.
24       MS. BROUSSARD:  Objection, form.
25   Q.  (By Mr. Lewis)  You can answer.  They're just
```

Page 11

```
 1   doing that -- that's what lawyers do.
 2   A.  I can't hear what they're saying.  I can just
 3   hear something.
 4       No, sir.
 5   Q.  You would not have opened fire on Officer
 6   Spikes if you thought that she was unlawfully shooting
 7   at Mrs. Jones?
 8       MR. BYROM:  Objection, form.
 9   A.  No, sir.
10   Q.  (By Mr. Lewis)  Why would that be?
11   A.  I do not -- I cannot speculate on her reasoning
12   for open fire.  I can't second-guess another officer's
13   decision at the time it takes place.
14   Q.  Did Officer Spikes appear to have trouble
15   standing or walking when you arrived at the scene at
16   Vincent Middle School that day?
17   A.  Not that I recall.
18   Q.  How many civilian parents and students do you
19   estimate were in the area outside Vincent Middle School
20   at the time that you and Officer Spikes had your weapons
21   drawn?
22   A.  I couldn't even begin to guess.  There was --
23   had to be at least 20.  Probably more.
24   Q.  Well, school had let out, correct?
25   A.  Yes, sir.
```

Page 12

```
 1   Q.  And parents were picking up kids?
 2   A.  Yes, sir.
 3   Q.  And there was significant parent traffic there,
 4   correct?
 5   A.  Yes, sir.
 6   Q.  And there were kids standing under the awning
 7   and along the walk there, right?
 8   A.  Yes, sir.
 9   Q.  And how far was Mrs. Jones' vehicle from the
10   walk area where the students were?
11   A.  To the best of my memory, it was against the
12   curb.
13   Q.  Did you ever have any indication at the scene
14   that Mrs. Jones had any weapon before or after you drew
15   your weapon?
16       MR. BYROM:  Objection, form.
17   A.  My personal opinion, a vehicle can be
18   considered as a weapon.
19   Q.  (By Mr. Lewis)  So, everybody that was picking
20   up a child that day had a weapon?
21   A.  I guess you could say that.
22   Q.  Other than her vehicle, did you see any
23   indication that Mrs. Jones had a weapon that day before
24   or after you drew your weapon?
25   A.  No, sir.
```

4 (Pages 13 to 16)

Page 13

Q. Did you see Mrs. Jones make any aggressive movement toward Officer Spikes?
A. No, sir.
Q. Did you ever see Officer Spikes and Mrs. Jones wrestle?
A. Mrs. Jones was assisted to the ground by I believe Officer Spikes and myself and secured with handcuffs.
Q. Did you ever see Officer Spikes and Mrs. Jones wrestle?
A. I would not call it wrestling, no, sir.
Q. When you ordered Mrs. Jones to get on the ground, she did so, correct?
A. Not immediately, no, sir.
Q. Could I get you to look at your report?
A. Yes, sir.
Q. About a fourth of the way down, you say that "I drew my weapon and issued commands to get on the ground. The female complied and laid down on the ground, at which time I assisted Officer Spikes in securing the female."
A. Yes, sir.
Q. Is that what you wrote?
A. Yes, sir.
Q. If you had had any trouble getting her to the

Page 14

ground, you would have written it down, wouldn't you?
A. Like I said, we assisted her to the ground.
Q. Well, in your report you said that she complied --
A. Yes, sir.
Q. -- and laid down, at which time you assisted Officer Spikes.
       Am I reading that correctly?
A. Yes, sir.
Q. And if you had had any problems getting her to lay down, you would have written it in your report, wouldn't you?
A. Correct.
Q. So, is it fair to assume there was no problem getting her to comply with lying down?
A. Other than having to issue multiple commands.
Q. How long from the time you issued your first command until she got on the ground do you think it was?
A. I couldn't tell you.
Q. Less than a minute?
A. I don't recall.
Q. Is it correct that you were not there when Officer Spikes was allegedly assaulted with Mrs. Jones' vehicle?
A. Correct.

Page 15

Q. Did you ever hear Officer Spikes ask Mrs. Jones to identify herself or furnish identification while you were there?
A. No, sir.
Q. Did you ever tell Mrs. Jones she was under arrest?
A. I don't recall if it was me or Officer Spikes.
Q. You don't recall -- do you recall whether anybody told her she was under arrest?
A. I feel quite sure somebody did whenever she was placed in cuffs and taken to the patrol car.
Q. Well, when you're getting her out of the vehicle, did you tell her she was under arrest?
A. I didn't, no, sir.
Q. Do you recall hearing Officer Spikes say that?
A. I don't recall.
Q. Did you tell Mrs. Jones anything after you told her to get out of the vehicle and get on the ground, that you remember?
A. Not that I recall.
Q. You indicated that you assisted Officer Spikes in securing the female. You said, "I used two sets of handcuffs and double locked both pair on the female's wrist." Could you explain what's meant by "double locked"?

Page 16

A. Can I get my cuffs out and show you?
Q. Sure.
A. Basically this is single lock (demonstrating). You move around; they can tighten up on you. Whenever you double lock a set of handcuffs, you put them on. There's a little slot right here. Take your key, flip a latch, they won't tighten up on your wrist (demonstrating).
Q. And that's to prevent her from hurting herself --
A. Correct.
Q. -- if she tries to move?
A. Correct. I mean, if you squirm or wiggle around, it prevents them from tightening up and causing injuries.
Q. When you say you used two sets of handcuffs, what do you mean by that?
A. Due to Mrs. Jones' size, you put one pair -- put a cuff on one wrist, lock the cuffs together, and put a cuff on the other wrist. That way your wrists are farther apart instead of being --
Q. Okay. And that's because she's somewhat big around and that's more comfortable?
A. Yes, sir.
Q. Okay. Thank you. I thought that was the case,

15 (Pages 57 to 60)

**57**

1  A.  That's depending on the situation. It can
2  escalate, or it can de-escalate.
3  Q.  And that's one of the reasons that drawing a
4  weapon is something that needs to be considered very
5  carefully in the situation that's involved, isn't it,
6  because of the fact that it can work either way? It can
7  escalate or de-escalate the situation.
8  A.  Correct.
9  Q.  And, in fact, it can cause people to get really
10 nervous and react irrationally, can't it?
11         MR. BYROM: Objection, form.
12         MS. BROUSSARD: Objection, form.
13 A.  Firearms have different -- I mean, different --
14 firearms can cause different reactions in different
15 people, yes.
16 Q.  (By Mr. Lewis) Is it typical for laypeople to
17 be frightened or alarmed when a weapon is drawn?
18         MS. BROUSSARD: Objection, form.
19         MR. BYROM: Objection, form.
20 A.  Some, yes; some, no.
21 Q.  (By Mr. Lewis) Your determination that Officer
22 Spikes was the victim in this situation was based on
23 what?
24 A.  Her statements, her saying that the lady had
25 hit her with the car. There appeared -- there was what

**58**

1  appeared to be the holster rub on the front quarter
2  panel of the car.
3  Q.  And how did you know that that was holster rub?
4  A.  It appeared to be. There was a black mark that
5  was consistent with the color of the holster and Spikes'
6  statements.
7  Q.  What was Spikes' statement?
8  A.  That the lady had hit her with the car.
9  Q.  And did -- I know I asked this awhile ago. I
10 don't remember what the answer was. Did she tell you
11 that the woman had steered into her?
12 A.  She said the lady turned toward her.
13 Q.  Okay. And you actually thought that she was
14 talking about the woman turning left to leave the spot
15 where the car was when you got there?
16 A.  Correct.
17 Q.  So, she didn't make you aware that what
18 happened is is that the lady turned to the right to go
19 into the parking place where she had earlier asked her
20 to go?
21         MR. BYROM: Objection, form.
22 A.  No.
23 Q.  (By Mr. Lewis) On page 158, at the bottom of
24 the policies, there is -- at the end of them there's
25 something that's labeled "Legal Disclaimer." It says

**59**

1  (reading) the policy is for departmental use only and
2  does not apply in any criminal or civil proceedings.
3  Department policy should not be construed as a creation
4  of higher legal standard of safety or care in an
5  evidentiary sense with respect to third-party claims.
6  Violations of this policy will only form the basis for
7  departmental administrative sanctions. Violations of
8  law will form the basis for civil and criminal sanctions
9  in a recognized judicial setting.
10        Did I read that correctly?
11 A.  Yes, sir.
12 Q.  Do you understand that to mean that whoever
13 wrote these policies and procedures is saying that "We
14 can use these policies and procedures but nobody can use
15 them against us"?
16        MR. BYROM: Objection, form.
17 A.  The way I understand it, it can be used for
18 administrative actions; and for court proceedings or
19 anything like that, there has been to be a violation of
20 the law. That's the way I understand it.
21 Q.  (By Mr. Lewis) Did you think that the Beaumont
22 Police Department has the authority to decide that -- I
23 mean, the BISD Police Department?
24 A.  That -- I'm temporarily a corporal. That's way
25 above my pay grade.

**60**

1  Q.  Okay.
2  A.  I have never been an administrator and don't
3  really want to be one.
4  Q.  You mentioned the holster mark. Did you see
5  any other indications that supported Mrs. Spikes'
6  story -- I mean, Officer Spikes?
7  A.  Not that I recall.
8  Q.  Okay. Did you see any visible injuries on her?
9  A.  Not that I recall.
10 Q.  Okay. Have we covered everything that you
11 recall about this incident?
12 A.  To the best of my memory.
13 Q.  Okay. Thank you very much. I appreciate your
14 time.
15              EXAMINATION
16 BY MR. BYROM:
17 Q.  My name is Jim Byrom. I met you for the first
18 time when I walked in --
19        THE VIDEOGRAPHER: Sir, excuse me. Can
20 you get a mic?
21        MR. BYROM: Can I have a mic? Can I have
22 somebody's microphone?
23        Thanks. Let me start over.
24        Are you ready?
25        THE VIDEOGRAPHER: Yes, sir.

16 (Pages 61 to 64)

**61**

1  MR. BYROM: All right.
2  Q. (By Mr. Byrom) My name is Jim Byrom, and I
3  represent Tamara Spikes. I met you for the first time
4  when I walked in today. Is that your understanding as
5  well?
6  A. Correct.
7  Q. Okay. I just want to ask you a few things. A
8  lot of things have already been asked, but I want to
9  talk to you about your report that you have in front of
10 you that has been marked as Exhibit 1.
11 A. Yes, sir.
12 Q. And you talked a little bit about this, but I
13 want to ask a few other follow-up questions about it.
14     When you approached the scene, you said
15 Mrs. Jones was partially in her vehicle and partially
16 out.
17 A. Correct.
18 Q. I'm just trying to get in my head my
19 understanding of what you're talking about. She had --
20 was it something like -- and you correct me where I
21 misstate this, please -- she had one foot on the ground
22 and one leg in or she was turned to get out or --
23 A. The best I can remember, her door was open and
24 she was turned to get out.
25 Q. Okay. So, her body -- but most of her body was

**62**

1  still in the vehicle?
2  A. Correct.
3  Q. All right. And did you say to her, "Get out of
4  the vehicle"?
5  A. Yes, sir. I started issuing commands when I
6  heard Officer Spikes issuing commands.
7  Q. All right. And if she was already out of the
8  vehicle or already, you know, stepping out, you know,
9  toward getting away, there was no reason to say to her
10 "Get out of the vehicle," was there?
11 A. I would have issued commands until she was
12 completely out and prone.
13 Q. Okay. At the time you gave the first command,
14 was she still mostly in the vehicle?
15 A. Yes, sir.
16 Q. All right. And you -- did you tell her, once
17 she got out of the vehicle, to get on the ground?
18 A. Yes, sir.
19 Q. Did you have to put your hands on her?
20 A. I believe we assisted her to the ground.
21 Q. Okay. When you say "assisted her" -- and I'm
22 not talking about throwing her down or anything like
23 that because there's -- as far as I know, there's no
24 evidence of that.
25    MR. LEWIS: Objection, form.

**63**

1  Q. (By Mr. Byrom) You touched her --
2  A. Right.
3  Q. -- you grabbed her?
4  A. Right.
5  Q. How would you describe it?
6  A. I would say grabbing and bringing down to the
7  ground.
8  Q. And in some sense you might have to push her or
9  you might let her down, and I'm asking you which one it
10 was. Did you ease her down; or did you have to help
11 her, push her down?
12 A. We basically assisted her down as far as
13 bringing her to the ground.
14 Q. Okay. And do you recall her resisting at all?
15 A. I don't recall.
16 Q. You don't recall one way or the other?
17 A. No, sir.
18 Q. Just so it's not misunderstood, if somebody was
19 to say you said there was no resistance from Mrs. Jones,
20 that wouldn't be true?
21 A. No. I don't recall.
22 Q. Okay. Do you remember her saying anything?
23 A. Mrs. Jones?
24 Q. Yes, sir.
25 A. No, sir.

**64**

1  Q. You're here today in your uniform.
2  A. Yes, sir.
3  Q. Is that how you were dressed on the day of this
4  incident?
5  A. Yes, sir.
6  Q. Okay.
7  A. Different shirt, but yes, sir.
8  Q. Okay. Were you a lieutenant then?
9  A. Never have been.
10 Q. Okay. Well, you've got the -- what's the --
11 A. Corporal.
12 Q. Corporal. I apologize.
13    Were you a corporal then?
14 A. I don't think I had made corporal yet. I don't
15 remember my exact promotion date.
16 Q. All right. When you say you had on a different
17 shirt, what did it look like?
18 A. Basically looked like the same. It was
19 standard uniform shirt.
20 Q. Okay. We've got the video here.
21 A. Yes, sir.
22 Q. But just kind of turn to the side and -- on the
23 side at your shoulder it says "police."
24 A. Yes, sir.
25 Q. Below it, it has a couple of things.

17 (Pages 65 to 68)

Page 65

```
 1   A.   Yes, sir.
 2   Q.   And that's the same on both sides.
 3   A.   Yes, sir.
 4   Q.   What would the stripes have looked like if you
 5  weren't a corporal?
 6   A.   There wouldn't be any stripes.
 7   Q.   No stripes at all.
 8   A.   (Moving head up and down.)
 9   Q.   The microphone on your collar would have been
10  there?
11   A.   Correct.
12   Q.   The badge was there?
13   A.   Correct.
14   Q.   You have another symbol there.  What is that?
15   A.   That's motor wings.
16   Q.   Motor wings.
17   A.   Yes.
18   Q.   That's for a motorcycle police officer?
19   A.   Yes, sir.  They weren't there.
20   Q.   All right.  Do you mind standing?  Can we get
21  on the video --
22   A.   Yeah.
23   Q.   So, in looking at you, it looks as if maybe you
24  have a -- some kind of vest on as well?
25   A.   Yes, sir.
```

Page 66

```
 1   Q.   What is that?
 2   A.   Ballistic vest.
 3   Q.   Okay.  On what is your right side, the left
 4  side of the camera, you have a baton?
 5   A.   Yes, sir.
 6   Q.   You have a gun?
 7   A.   Yes, sir.
 8   Q.   You have mace?  Is that what that is?
 9   A.   Pepper spray.
10   Q.   Pepper spray.  What is in the front?
11   A.   Magazines.
12   Q.   For the gun?
13   A.   For the weapon, yes, sir.
14   Q.   Okay.  Set of keys?
15   A.   Yes, sir.
16   Q.   You have on the -- what is that?
17   A.   Taser.
18   Q.   Taser?
19   A.   Yes, sir.
20   Q.   Okay.  And on the far side?  Your radio?
21   A.   Radio, flashlight, handcuffs (indicating).
22   Q.   All right.  And that's the way you were
23  dressed, along with -- we won't show them, but you have
24  on motorcycle boots.
25   A.   Yes, sir (indicating).
```

Page 67

```
 1   Q.   Okay.  Thank you.  Please sit down.
 2        And that's how you were dressed, except for you
 3  said the difference in the shirt --
 4   A.   Yes, sir.
 5   Q.   -- on the date that this incident occurred?
 6   A.   Yes, sir.
 7   Q.   Did Mrs. Jones ever indicate to you that she
 8  didn't know you were a police officer?
 9   A.   No, sir.
10   Q.   Tamara Spikes was also dressed much like you
11  were, correct?
12   A.   To the best of my memory, yes, sir.
13   Q.   She was not motorcycle, was she?
14   A.   No, sir.
15   Q.   So, she wouldn't have had the wings.
16   A.   No, sir.
17   Q.   Or the high boots.
18   A.   Correct.
19   Q.   Would she have had on the gun?  Did she?
20   A.   Yes, sir.
21   Q.   The baton, all of the things you showed around
22  your belt?
23   A.   I don't believe she has a Taser.  I don't know
24  if she carries a baton, and I don't know if she carries
25  a flashlight.
```

Page 68

```
 1   Q.   Okay.  Would she have had the microphone?
 2   A.   Yes, sir, similar to this.  Not this exact one.
 3   Q.   And would she have had "police" on each
 4  shoulder?
 5   A.   Yes, sir.
 6   Q.   Have you ever had anybody, when you're dressed
 7  that way, tell you they don't know you're a police
 8  officer?
 9   A.   Had several people say we're rent-a-cops but --
10   Q.   Because you work for the school?
11   A.   Yes, sir.
12   Q.   Okay.  But has anybody misunderstood that
13  you're a peace officer?
14   A.   Like I said, several people don't believe we're
15  actual police.
16   Q.   I got you.  I got you.  You certainly are
17  dressed like a police officer.
18   A.   Yes, sir.
19   Q.   And that was the way that Tamara Spikes was
20  dressed that day?
21        MR. LEWIS:  Objection, form.
22   A.   To the best of my memory, yes, sir.
23   Q.   (By Mr. Byrom) Okay.  You also note in your
24  report that you did talk to Mrs. Jones' husband.
25   A.   Yes, sir.
```

Page 77

```
 1   A.   No.
 2   Q.   -- based on what you saw?
 3        So, it was the fact that she had her weapon
 4   drawn that caused you to draw yours?
 5   A.   Correct.
 6   Q.   That's all I have.  Thank you very much.
 7                    REEXAMINATION
 8   BY MR. BYROM:
 9   Q.   Just a couple other things.
10        You did come up and draw, as you've --
11   A.   Correct.
12   Q.   -- just described?
13        You didn't ever point your gun at Mrs. Jones,
14   did you?
15   A.   No.
16   Q.   What do you do with it?
17   A.   It's in what's called the "low ready," and
18   basically -- I'm not going to draw but you have the
19   weapon down and finger is not on the trigger and you're
20   ready to react if you need to.  It's less reaction time
21   than having to (demonstrating).
22   Q.   And that's per policy and procedure as well,
23   the low ready and the --
24   A.   Yes, sir.
25   Q.   And Tamara Spikes' gun was in low ready as
```

Page 78

```
 1   well, correct?
 2   A.   Yes, sir.
 3   Q.   Did you ever see her point the gun at
 4   Mrs. Jones?
 5   A.   Not that I remember.
 6   Q.   For now I think I'm done with you.  Thank you.
 7                FURTHER REEXAMINATION
 8   BY MR. LEWIS:
 9   Q.   Officer Spikes -- I mean -- excuse me.  I'm
10   sorry.
11        Officer Custer, about how many days a year have
12   you averaged missing while you're working for the BISD
13   Police Department?
14   A.   The first year I missed about 16 because I had
15   my gallbladder out; and then since then, as little as
16   possible.
17   Q.   Can you give me an estimate of that about,
18   ballpark?
19   A.   Are you talking vacations, or are you talking
20   about --
21   Q.   No, not vacation.
22   A.   Sick, injured?
23   Q.   Sick, injured, unexcused.
24   A.   Oh, zero unexcused.  We get 12 days a year.
25   I've got 596 hours of time built up.  So, not much.
```

Page 79

```
 1   Q.   Not much.  Okay.
 2        Thank you very much.  I appreciate it.
 3        MR. BYROM:  Thank you, sir.
 4        MS. BROUSSARD:  Thank you.
 5        THE VIDEOGRAPHER:  We're off the record at
 6   10:31.
 7
 8        (Deposition concluded.)
```

Page 80

```
 1              CHANGES AND SIGNATURE
 2   WITNESS NAME:  MATTHEW CUSTER
 3   DATE OF DEPOSITION:  November 21, 2014
 4   PAGE LINE      CHANGE              REASON
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25        I, MATTHEW CUSTER, have read the foregoing
```

21 (Pages 81 to 84)

---

**Page 81**

```
 1  deposition and hereby affix my signature that same is
 2  true and correct, except as noted above.
 3
 4         _____
                      MATTHEW CUSTER
 5
 6
 7  THE STATE OF _____)
 8  COUNTY OF _____)
 9     Before me, _____, on this day
10  personally appeared MATTHEW CUSTER, known to me (or
11  proved to me under oath or through
12  _____) (description of identity
13  card or other document) to be the person whose name is
14  subscribed to the foregoing instrument and acknowledged
15  to me that they executed the same for the purposes and
16  consideration therein expressed.
17     Given under my hand and seal of office this
18  _____ day of _____, _____.
19
20         _____
                 NOTARY PUBLIC IN AND FOR
21               THE STATE OF _____
                 COMMISSION EXPIRES: _____
22
23
24  _____ No Changes Made   _____ Amendment Sheet(s) Attached
25          Christine Jones vs. Tamara Spikes and BISD
```

---

**Page 82**

```
 1         IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF TEXAS
 2                 BEAUMONT DIVISION
 3  CHRISTINE JONES         |
                            |
 4  VS.                     | CIVIL NO. 1:14CV00103
                            |
 5  TAMARA SPIKES AND       | JUDGE KEITH GIBLIN
    BEAUMONT INDEPENDENT    |
 6  SCHOOL DISTRICT POLICE  |
    DEPARTMENT              |
 7  ***************************************************
 8              REPORTER'S CERTIFICATION
 9              DEPOSITION OF MATTHEW CUSTER
10                 November 21, 2014
11
12     I, TONYA JACKSON, Certified Shorthand Reporter in
13  and for the State of Texas, hereby certify to the
14  following:
15     That the witness, MATTHEW CUSTER, was duly sworn by
16  the officer and that the transcript of the oral
17  deposition is a true record of the testimony given by
18  the witness;
19     That the original deposition transcript was
20  delivered to Kenneth W. Lewis.
21     That a copy of this certificate was served on all
22  parties and/or the witness shown herein on
23  _____.
24     I further certify that pursuant to FRCP Rule
25  30(f)(1) that the signature of the deponent:
```

---

**Page 83**

```
 1  _XXX_ was requested by the deponent and that the
 2  signature is to be before any notary public and returned
 3  within 30 days from date of receipt of the transcript.
 4  If returned, the attached Changes and Signature Page
 5  contains any changes and the reasons therefore;
 6  _____ was not requested by the deponent or a party
 7  before the completion of the deposition.
 8     I further certify that I am neither counsel for,
 9  related to, nor employed by any of the parties or
10  attorneys in the action in which this proceeding was
11  taken, and further that I am not financially or
12  otherwise interested in the outcome of the action.
13     Certified to by me on this the 24th day of November,
14  2014.
15
16
17         _____
                 TONYA JACKSON, Texas CSR No. 4898
18               Expiration Date: 12/31/14
                 Jan Girouard & Associates
19               Firm Registration No. 99
                 550 Fannin Street, Suite 108
20               Beaumont, Texas 77701
                 (409) 832-2721
21
22
23
24
25
```

---

**Page 84**

```
 1  COUNTY OF JEFFERSON   )
 2  STATE OF TEXAS        )
 3     I hereby certify that the witness was notified on
 4  _____, 2014, that the witness has 30 days or
 5  (____ days per agreement of counsel) after being notified
 6  by the officer that the transcript is available for
 7  review by the witness and if there are changes in the
 8  form or substance to be made, then the witness shall
 9  sign a statement reciting such changes and the reasons
10  given by the witness for making them;
11     That the witness' signature was/was not returned as
12  of _____.
13     Subscribed and sworn to on this, the ____ day of
14  _____, 2014.
15
16
17         _____
                 TONYA JACKSON, Texas CSR No. 4898
18               Expiration Date: 12/31/14
                 Jan Girouard & Associates
19               Firm Registration No. 99
                 550 Fannin, Suite 108
20               Beaumont, Texas 77701
                 (409) 832-2721
21
22
23
24
25
```