# Exhibit

# A

<pre>
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                      BEAUMONT DIVISION

 4    CHRISTINE JONES                    )
                                         )
 5            Plaintiff,                 )
                                         )
 6    VS.                                )   C.A. NO. 1:14-CV-00103
                                         )
 7    TAMARA SPIKES AND BEAUMONT         )
      INDEPENDENT SCHOOL DISTRICT        )
 8    POLICE DEPARTMENT                  )
                                         )
 9            Defendants.                )

10

11      *********************************************
                ORAL AND VIDEOTAPED DEPOSITION OF
12
                  CHRISTINE BRADLEY JONES
13
                      December 4, 2014
14      *********************************************

15

16      ORAL AND VIDEOTAPED DEPOSITION of CHRISTINE BRADLEY

17    JONES, produced as a witness at the instance of the

18    Defendant, and duly sworn, was taken in the above-styled

19    and numbered cause on the 4th of December, 2014, from

20    10:11 a.m. to 3:16 p.m., before Dianna L. Edwards, CSR

21    in and for the State of Texas, reported by machine

22    shorthand at the offices of BUSH LEWIS, P.L.L.C., 595

23    Orleans Street, Suite 500, Beaumont, Texas, pursuant to

24    the Federal Rules of Civil Procedure and the provisions

25    stated on the record or attached hereto.
</pre>

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFF(S) CHRISTINE JONES:
         Mr. Stephen L. Townsend
 3       BUSH LEWIS, P.L.L.C.
         595 Orleans Street, Suite 500
 4       Beaumont, Texas 77701

 5   FOR THE DEFENDANT(S) TAMARA SPIKES:
         Mr. James E. Byrom
 6       Ms. Veronica Garcia
         WALSH, ANDERSON, GALLEGOS, GREEN & TREVINO P.C.
 7       10375 Richmond Avenue, Suite 750
         Houston, Texas 77042-4196
 8
     FOR THE DEFENDANT(S) BEAUMONT INDEPENDENT SCHOOL
 9   DISTRICT POLICE DEPARTMENT:
         Mr. Christopher B. Gilbert
10       Ms. Frances R. Broussard
         THOMPSON & HORTON, L.L.P.
11       3200 Southwest Freeway, Suite 2000
         Houston, Texas  77027
12
     VIDEOGRAPHER:
13       Mr. Chris Wilson
         ACCURATE LEGAL VIDEO SERVICES
14       Century Tower
         550 Fannin Street, Suite 220
15       Beaumont, Texas 77701

16   ALSO PRESENT:
         Ms. Tamara Spikes
17       Mr. Trent Bond

18

19

20

21

22

23

24

25
```

1                    I N D E X

2                                                    Page

3   Appearances...................................    2

4   Stipulations..................................    4

5   CHRISTINE BRADLEY JONES

6         Examination by Mr. Byrom................    4

7         Examination by Mr. Gilbert.............   175

8         Examination by Mr. Townsend............   196

9         Reexamination by Mr. Byrom.............   196

10        Reexamination by Mr. Gilbert...........   197

11  Reporter's Certificate........................   199

12                    EXHIBITS

13  NO.       DESCRIPTION                          PAGE

14   1        Response to Subpoena Duces Tecum
             attached to Notice of Deposition        8

15
     2        Notice of Deposition with Subpoena
16            Duces Tecum attached                   10

17   3        Seven pages of time sheet from employer  32

18   4        Three-page document entitled,
             "Declaration of Christine Jones"        37
19
     5        Nine-page document entitled,
20            "Plaintiff's Amended Complaint"         37

21   6        Diagram drawn by witness during
             deposition                              95
22
     7        Video DVD                             174
23

24

25

P R O C E E D I N G S

(BY AGREEMENT OF COUNSEL, DEPOSITION IS BEING TAKEN PURSUANT TO FEDERAL RULES AND IN PART BY THE LOCAL RULES OF THE EASTERN DISTRICT OF TEXAS.)

THE VIDEOGRAPHER:  We're on the record. Beginning of tape 1.  Time is 10:11.

CHRISTINE BRADLEY JONES, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. BYROM:

Q.    Could you state your full name, please, ma'am?

A.    Christine Bradley Jones.

Q.    Ms. Jones, I introduced myself to you a minute ago when you first came in.  My name is Jim Byrom, and you understand I represent Tamara Spikes?

A.    Yes.

Q.    We have not met before today, have we?

A.    No, we have not.

Q.    Okay.  I want to have some agreements with you that I think will make this smoother -- what we're going to do today a little more smooth for you and for us. So, number one, there's a court reporter here; and I'm sure you've been told she's taking down everything that's being said, correct?

A.    Yes.

1      A.    Yes.

2      Q.    Have you sought any counseling for that?

3      A.    No.

4      Q.    Have you sought counseling even -- well, first

10:42:31  5  of all, let me ask this way.  You haven't sought any

6   counseling from a licensed psychologist or psychiatrist,

7   correct?

8      A.    Correct.

9      Q.    Have you had to take any medication because of

10:42:39  10  it?

11     A.    No.

12     Q.    Have you talked to any other kind of counselor

13  as a result of the incident we're here about today?

14     A.    Could you clarify that?

10:43:01  15     Q.    Sure.  Have -- have you talked to any other

16  counselor as a result of any incident that occurred at

17  Beaumont ISD on or about May the 3rd of 2000 -- May the

18  2nd or 3rd of 2013?

19     A.    I would say as far as counselor -- as for

10:43:53  20  paying a counselor, to see someone, no.

21     Q.    Okay.  You haven't paid to see anybody?

22     A.    No.

23     Q.    Okay.  Sometimes people talk to a -- a friend

24  or a pastor or somebody like that.  Anything like that

10:44:09  25  that you've done?

1    A.    Not necessarily a pastor or a friend, just my

2    personal dealings with God.

3    Q.    Okay.  Let me ask it another way, and I hope

4    this will clarify it for you.  You haven't talked to

10:44:36  5    anybody -- any professional about your emotional issues.

6    A.    No.

7    Q.    Okay.  Based on what you've told me, it sounds

8    to me like you haven't incurred any medical, emotional,

9    psychological expense as a result of what happened at

10:44:57  10    Beaumont ISD at Vincent in May of 2013.  Am I right?

11    A.    No.

12    Q.    Okay.  What?

13    A.    There's emotional.

14    Q.    What I was asking you -- you haven't paid any

10:45:13  15    money to anybody for treatment of any kind.

16    A.    No, I have not paid any money.

17    Q.    Okay.  I did see what has been produced as

18    a time detail --

19    A.    Uh-huh.

10:45:42  20         MR. BYROM:  Let's make this an exhibit.

21         (EXHIBIT NO. 3 MARKED.)

22         MR. BYROM:  Do you -- this is your --

23    here you go, Steve.

24    Q.    (BY MR. BYROM)  I want to hand you what's been

10:45:57  25    marked as Exhibit 3 and ask you, first of all, have you

Jan Girouard & Associates, LLC    409.832.2721

1    further.

2        Q.    How do you want me to clarify it?  How can I

3    help you?

4        A.    (No response.)

11:16:52   5    Q.    How can I help you?

6                MR. TOWNSEND:  Can I meet and confer with

7    my client?

8                MR. BYROM:  Go ahead.

9                THE VIDEOGRAPHER:  Going off the -- off

11:17:04  10    the record at 11:17.

11                (RECESS FROM 11:17 A.M. TO 11:19 A.M.)

12                THE VIDEOGRAPHER:  Back on the record at

13    11:19.

14        Q.    (BY MR. BYROM)  Ms. Jones, we took a little

11:19:34  15    break there, I think, to help clarify this issue that

16    we've been talking about about wages.  And -- and, so,

17    my question to you is:  Do you now have an answer about

18    how many days that you think you're going to claim in

19    lost wages being a result of the Vincent Middle School

11:19:53  20    incident?

21        A.    Yes.

22        Q.    What's your answer?

23        A.    The current four days.

24        Q.    The four that are listed on --

11:20:00  25    A.    Four that's listed.

```
 1    move my vehicle, and I told her there was no place for
 2    me to move my vehicle.
 3          Q.   Was there a car stopped in front of you?
 4          A.   There's a car in front of me.  There's cars on
 5    the side of me.
 6          Q.   So, your testimony is you had nowhere to go.
 7          A.   Correct.
 8          Q.   What else -- tell me -- any -- anything else
 9    in that conversation?
10          A.   I had -- I had previously asked her to check
11    the car in front of me to see if there was anybody in it
12    because I saw the guy go into the building.
13          Q.   Okay.  So, that happened in this second
14    conversation.
15          A.   Yes.
16          Q.   All right.  Anything else that you can recall
17    about the second conversation you had with Officer
18    Spikes?
19          A.   She became more aggressive.
20          Q.   In what way?
21          A.   She was -- just started screaming and yelling.
22          Q.   What was --
23          A.   And that's when I picked up my phone to call
24    my husband, and he couldn't hear me because of her
25    screaming and yelling.
```

Jan Girouard & Associates, LLC   409.832.2721

1    Q.   What was she screaming and yelling?

2    A.   I don't recall.

3    Q.   I'm not trying to be funny here.  But you

4  don't have any hearing problems, do you?

12:35:11   5    A.   No, I don't.

6    Q.   Okay.  She's yelling and screaming in the

7  second conversation that you had?

8    A.   I think it probably was the second.

9    Q.   Okay.  She's yelling and screaming at -- and

12:35:27  10  screaming at you, but you didn't even know what she's

11  saying.

12    A.   I was trying to call my husband and had my

13  phone to my ear trying to get him to get me some

14  information.

12:35:37  15    Q.   What information were you looking for?

16    A.   The number for the BISD Police.

17    Q.   All right.  Did you tell him that there was a

18  police officer that was yelling at you?

19    A.   No, I did not.

12:35:47  20    Q.   Are you sure about that?

21    A.   Yes.

22    Q.   Did you roll up your car window?

23    A.   Yes.

24    Q.   When did you roll up your car window?

12:35:57  25    A.   When I was on the phone with my husband trying

Jan Girouard & Associates, LLC   409.832.2721

1    to talk to him.

2        Q.   And you're saying that, with the window up,

3    she was yelling so loudly that your husband couldn't

4    hear you?

12:36:06  5        A.   Correct.

6        Q.   What did he say she said?

7        A.   I don't think he -- he said anything about

8    what she said.

9        Q.   He's never told you what he heard her say?

12:36:15  10        A.   No.  He didn't hear her say anything as far as

11    I know because he kept saying "Who's screaming in the

12    back?"

13        Q.   What did you hear her say?

14        A.   I don't know.  I don't recall.

12:36:23  15        Q.   And are you sure this was in the second

16    conversation?

17        A.   I'm not sure if it's in the second

18    conversation.

19        Q.   Okay.  And that -- that's why I'm asking.  I'm

12:36:30  20    just trying to be clear about it.  Did you ever ask to

21    speak to her supervisor?

22        A.   No.

23        Q.   You had your driver's license with you, didn't

24    you?

12:36:43  25        A.   Yes.

1    Q.   Did you ever provide it to her?

2    A.   No.

3    Q.   Why not?

4    A.   I asked her what the problem was, and she

12:36:50  5  became more irate, and then she walked to the top of my

6    vehicle and radioed in.

7              MR. BYROM:  For purposes of the record,

8    I'm going to object that that's not responsive to my

9    question.

12:37:00 10    Q.   (BY MR. BYROM)  My question to you is:  Why

11   didn't you give her your driver's license?

12   A.   Because she walked away from me.

13   Q.   Is that the only reason you didn't give it to

14   her?

12:37:08 15    A.   Yes.

16   Q.   Did she ever tell you not to move your car?

17   A.   No.

18   Q.   Did you see her walk toward the front of your

19   car?

12:37:21 20    A.   Yes.

21   Q.   What was she doing?  Do you know?

22   A.   She was on her radio, and she was trying to

23   look at the tags.

24   Q.   Do you know why?

12:37:27 25    A.   No.

Jan Girouard & Associates, LLC    409.832.2721

1      A.    Uh-huh.

2      Q.    -- did she -- did Officer Spikes say anything

3    else to you at all?

4      A.    All I recall is when the other officer was

13:49:41  5    running to me, he said "Get on the ground.  Lie

6    facedown."

7      Q.    Okay.  I'm going to ask that question in a

8    second.  But the question I'm asking you now is:  Did

9    Officer Spikes say anything else to you?

13:49:53  10     A.    No.

11     Q.    Okay.  And you've just told me that Officer

12    Custer told you to lie down.

13     A.    Yes.

14     Q.    Did you comply with that?

13:49:59  15     A.    Yes.

16     Q.    Did you hesitate at all?

17     A.    No.

18     Q.    And you told me earlier that he had never told

19    you on previous occasions -- Officer Custer had never

13:50:18  20    told you on previous occasions the same type of

21    information that Officer Spikes did when she said

22    "You're not supposed to come in that direction."

23     A.    Yes.

24     Q.    Correct?

13:50:26  25     A.    Correct.

Jan Girouard & Associates, LLC   409.832.2721

1    A.    Yes.

2    Q.    When did they actually take the handcuffs off

3  you?

4    A.    When they decided to switch handcuffs.

14:51:26  5    Q.    Okay.  And who was it who decided to switch

6  handcuffs?

7    A.    The motorcycle cop and another cop.  And when

8  I got out the car -- they told me to get out the car and

9  turn face the car.  They put a second pair of handcuffs

14:51:41  10  on me.  Then they had a conversation on what pair of

11  cuffs to put on me.

12    Q.    Okay.  And they -- did they talk about why one

13  pair was better or worse than the other pair?

14    A.    They said that they needed to put her set of

14:51:54  15  cuffs on me.

16    Q.    They needed to put Officer Spikes' set of

17  cuffs?

18    A.    Yes.

19    Q.    Okay.  And did they say why?

14:52:01  20    A.    No.

21    Q.    Okay.  Did you -- prior to having the

22  handcuffs changed, had you asked any -- well, let me ask

23  you this:  Were the handcuffs uncomfortable?

24    A.    They were.

14:52:09  25    Q.    Had you asked either of the officers or any of

1    the officers to remove the handcuffs or loosen them?

2         A.    There was nobody around for me to ask.

3         Q.    Okay.  After the handcuffs were changed, were

4    they better or worse in terms of comfort?

14:52:21  5         A.    They were worse.

6         Q.    Okay.  And did you ask anybody to -- to loosen

7    the handcuffs or remove them at that point?

8         A.    No, I did not.

9         Q.    But you could have asked the officers when

14:52:31  10   they put them on, correct?

11        A.    No, I don't think I could have asked anybody

12   for anything.

13        Q.    I'm -- and I agree you may not want to, but

14   you were physically able to ask the officers because

14:52:44  15   they were standing right there.

16        A.    I was physically able to talk, yes.

17        Q.    Okay.  And -- and, again, when were the --

18   when were the handcuffs eventually taken off, the second

19   pair?

14:53:06  20        A.    When they finally decide which pair to put on

21   me.

22        Q.    Right.  And then they put a different pair on

23   you, correct?

24        A.    No.  I had two sets on me at one time.

14:53:16  25        Q.    You had two sets on you.

```
 1        Q.    Okay.  And who was it you said took you to the

 2   jail?

 3        A.    It was Spikes on the passenger's side and

 4   another officer on the left in the driver seat.  And I

 5   don't recall his name.

 6        Q.    Can you describe him briefly for me?

 7        A.    He was a heavyset, Caucasian male, almost

 8   balding.

 9        Q.    Okay.  The officer you referred to before as

10   the motorcycle officer, motorcycle cop, was that the

11   officer who was standing over by the tree initially?

12        A.    Yes.

13        Q.    Okay.  Do you personally know of anyone else

14   who has been handcuffed for any situation by the

15   Beaumont ISD Police Department?

16        A.    No.

17        Q.    Do you know of any -- personally know of

18   anybody else who's been arrested by the Beaumont ISD for

19   any --

20        A.    No.

21        Q.    Have you ever talked to anybody who said that

22   they had been handcuffed or arrested by the Beaumont ISD

23   Police Department?

24        A.    No.

25        Q.    Have you ever talked to anybody who said that
```

14:54:15 — line 5
14:54:25 — line 10
14:54:49 — line 15
14:54:57 — line 20
14:55:04 — line 25

1    they had been subjected to excessive force by a Beaumont

2    ISD Police Officer?

3           A.    No.

4           Q.    Do you have any personal knowledge of any

14:55:15  5    situation like yours that happened because of a Beaumont

6    ISD Police Officer?

7           A.    No, not like my situation.

8           Q.    Okay.  Do you have any personal knowledge

9    of -- of slightly different situations?  You hesitated

14:55:34  10   there; so, I -- you were thinking of something.

11          A.    I have had people after this incident that

12   have said things to me.

13          Q.    What people have said things to you?

14          A.    Just people in passing.

14:55:48  15   Q.    And do you remember who they were?

16          A.    No, I don't.

17          Q.    Were they people that you knew before this

18   incident?

19          A.    No.

14:55:52  20   Q.    Okay.  And what did they tell you about

21   incidents that might have happened?

22          A.    I really too much didn't pay any attention,

23   you know.  I -- I just listened to what they had to say,

24   and I -- I never retained anything.

14:56:06  25   Q.    Okay.  So, these were strangers who came up to

1    "encouraged misconduct by failing to adequately

2    supervise, discipline, and/or train."  Do you see where

3    it says that at the top of the next page?

4        A.    Yes.

14:59:47  5        Q.    What -- how did BISD encourage misconduct by

6    failing to adequately supervise, discipline, or train?

7        A.    I don't know their --

8        Q.    Okay.  Do you know of any situations where you

9    think -- other than your own situation, do you know of

14:59:59  10   any situations where you think that Beaumont -- Beaumont

11   ISD failed to adequately supervise its police officers?

12        A.    No, I don't.

13        Q.    Other than your own situation, do you know of

14   any situations where the Beaumont ISD failed to

15:00:14  15   adequately discipline its police officers?

16        A.    No, I don't.

17        Q.    Other than your own situation, do you know of

18   any situations where you think the Beaumont ISD failure

19   to train -- failed to train -- adequately train its

15:00:30  20   police officers?

21        A.    I don't know what their training requirements

22   are.

23        Q.    Do you have any personal knowledge of any

24   training that Officer Spikes had or didn't have with

15:00:40  25   regard to --

1    A.    No, I don't.

2    Q.    -- police matters?

3    A.    No, I don't.

4    Q.    Okay.  Do you have any idea what training

15:00:45  5  Officer Custer had or didn't have with regard to police

6    matters?

7    A.    No, I don't.

8    Q.    Do you have any idea or any knowledge of any

9    training that any of the officers involved in the event

15:00:55  10  had or didn't have with regard to police matters?

11    A.    No, I don't.

12    Q.    Take a look at section H on Damages.  And

13    Mr. Byrom's already asked you a lot about damages; so, I

14    just have a couple of questions about some things that

15:01:10  15  are in here.  This is paragraph 23.  And it says,

16    "Defendant's violations of plaintiff's civil rights

17    caused her to sustain in varying degrees" -- and then A

18    says, "Physical harm during and after the events in

19    issue."  What physical harm did you suffer as a result

15:01:27  20  of the violation of your rights?

21    A.    My wrists were sore from the cuffs; and when I

22    was on the ground, my knee got scraped.

23    Q.    Okay.  Other than that, any other physical

24    harm?

15:01:41  25    A.    No.

1    Q.    It talks about physical pain, disability.  Did

2  you suffer any disabilities as a result of this

3  incident?

4    A.    No.

15:01:51   5    Q.    Talks about disfigurement.  Did you suffer any

6  disfigurement as a result of any of the incidents --

7    A.    No.

8    Q.    -- involved in this lawsuit?

9    A.    No.

15:02:00   10    Q.    B talks about "Emotional and mental harm

11  during and after the events in issue, including fear,

12  humiliation, and mental anguish, which plaintiff is

13  certainly certain to continue to suffer to some degree

14  for some time into the future."  Tell me about the

15:02:18   15  emotional and mental harm that you've suffered as a

16  result of the events that we've been talking about

17  today.

18    A.    Well, stressful; and then I had to report to

19  my boards.

15:02:34   20    Q.    Which boards is that?

21    A.    Board of Nursing.

22    Q.    Okay.  Did anything happen as a result of you

23  reporting that to the Board of Nursing?

24    A.    They have to -- I have to submit a letter to

15:02:46   25  them telling who my legal counsel was and then update

Jan Girouard & Associates, LLC    409.832.2721

1    them on if any charges were brought up against me.  And

2    then once those charges was dropped, then I have to -- I

3    had to write them a letter letting them know that those

4    charges were dropped; and then they sent me a letter

15:03:10    5    back telling me that they weren't taking any action

6    against me.

7        Q.    Okay.  So, you submitted all that information

8    to the nursing board.

9        A.    Yes.

15:03:17    10       Q.    And they have sent you a letter saying that,

11   as far as they're concerned, this is a closed matter?

12       A.    Yes.

13       Q.    Okay.  Other than what you've told us, how

14   else did you suffer emotional or mental harm as a result

15:03:32    15   of the incidents we've talked about today?

16       A.    This -- the stress of this.  You know, my

17   Boards -- not knowing, you know, what the outcome would

18   be.  I would have to take off and go talk to counsel

19   about what the plans was, potentially even having to go

15:03:53    20   in front of a Grand Jury.

21       Q.    Okay.  I'm not going to ask you how stressful

22   it was to talk to counsel but --

23            MR. TOWNSEND:  It wasn't.

24       Q.    (BY MR. GILBERT)  How are you doing today?  Is

15:04:03    25   it still stressful, this incident, or --

Jan Girouard & Associates, LLC    409.832.2721

```
 1        A.   Still emotional.
 2        Q.   Still emotional?  Do you think about it every
 3   day or is it something that just comes into your mind
 4   when -- when things come up like this deposition?
 5        A.   When these things come up, I don't sleep at
 6   night.
 7        Q.   Okay.  Did you sleep last night?
 8        A.   (Shakes head side to side.)
 9        Q.   Paragraph C says, "The reasonable value of any
10   health care expenses reasonably needed and actually
11   obtained."  And I think we've already determined you
12   didn't actually obtain any --
13        A.   Right.
14        Q.   -- health care, correct?
15        A.   Correct.
16        Q.   Okay.  I'm going to skip D for a second.  E
17   says, "Reasonable value of any property damage or
18   destroyed."  What property did you have that was damaged
19   or destroyed as a result of this incident?
20        A.   I no longer wear that outfit --
21        Q.   You no longer --
22        A.   -- that I wore that day.
23        Q.   Oh, the outfit you were wearing that day?  All
24   right.  Other than the outfit -- now, that wasn't
25   actually damaged or destroyed --
```

1    THE STATE OF TEXAS:

2    COUNTY OF JEFFERSON:

3        I, DIANNA L. EDWARDS, a Certified Shorthand
     Reporter in and for the State of Texas, hereby certify
4    that the foregoing testimony was given before me after
     the Witness had been first duly sworn.

5
         I further certify that this deposition was typed
6    under my direction and is a complete and correct
     transcript of the proceedings; and that it is being
7    filed with the Court in accordance with the Stipulation
     of Counsel contained in this deposition.

8
         I further certify that I am neither attorney for,
9    related to, nor employed by any of the parties to the
     lawsuit in which this deposition was taken.  Further, I
10   am neither related to nor employed by any attorney of
     record in this cause; nor do I have a financial interest
11   in the matter.

12       GIVEN UNDER MY HAND AND SEAL OF OFFICE this 12th
     day of December, 2014.

13

14

15   _____
     DIANNA L. EDWARDS, Texas CSR 3584
16   Expiration Date:  12-31-15
     Jan Girouard & Associates
17   Firm Registration No. 99
     550 Fannin, Suite 108
18   Beaumont, Texas  77701
     (409) 832-2721

19

20

21

22

23

24

25