Exhibit 4

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF TEXAS
2                   BEAUMONT DIVISION

3    CHRISTINE JONES                |
                                    |
4    VS.                            |  CIVIL NO. 1:14CV00103
                                    |
5    TAMARA SPIKES AND              |  JUDGE KEITH GIBLIN
     BEAUMONT INDEPENDENT           |
6    SCHOOL DISTRICT POLICE         |
     DEPARTMENT                     |
7
     ****************************************************
8

9
              ORAL AND VIDEOTAPED DEPOSITION OF
10
                     MATTHEW CUSTER
11
                   November 21, 2014
12

13   ****************************************************

14      ORAL AND VIDEOTAPED DEPOSITION OF MATTHEW CUSTER,

15   produced as a witness at the instance of the plaintiff,

16   and duly sworn, was taken in the above styled and

17   numbered cause on November 21, 2014, from 9:06 a.m. to

18   10:31 a.m., before Tonya Jackson, CSR-CRR, in and for

19   the State of Texas, reported by machine shorthand

20   recording, at the law offices of Bush Lewis, 595

21   Orleans, Suite 500, Beaumont, Texas, pursuant to the

22   Federal Rules of Civil Procedure and the provisions

23   stated on the record or attached therein.

24

25

1   doing that -- that's what lawyers do.

2       A.   I can't hear what they're saying.  I can just

3   hear something.

4            No, sir.

5       Q.   You would not have opened fire on Officer

6   Spikes if you thought that she was unlawfully shooting

7   at Mrs. Jones?

8            MR. BYROM:   Objection, form.

9       A.   No, sir.

10      Q.   (By Mr. Lewis) Why would that be?

11      A.   I do not -- I cannot speculate on her reasoning

12  for open fire.  I can't second-guess another officer's

13  decision at the time it takes place.

14      Q.   Did Officer Spikes appear to have trouble

15  standing or walking when you arrived at the scene at

16  Vincent Middle School that day?

17      A.   Not that I recall.

18      Q.   How many civilian parents and students do you

19  estimate were in the area outside Vincent Middle School

20  at the time that you and Officer Spikes had your weapons

21  drawn?

22      A.   I couldn't even begin to guess.  There was --

23  had to be at least 20.  Probably more.

24      Q.   Well, school had let out, correct?

25      A.   Yes, sir.

```
 1    but I wasn't sure.  I just wanted to make sure.
 2              Did Mrs. Jones ask to not be cuffed?
 3        A.    I don't recall.
 4        Q.    Do you recall her saying that the cuffs really
 5    weren't necessary?
 6        A.    I don't recall.
 7        Q.    You indicated that -- well, let me ask that.
 8    I'm not sure that's in the report.
 9              Once Mrs. Jones laid on the pavement, did you
10    holster your weapon?
11        A.    Yes, sir.
12        Q.    When is it appropriate for an officer to
13    holster a drawn weapon?
14        A.    When the officer feels the scene is secure
15    enough to holster.
16        Q.    Do you agree that a gun is a weapon of deadly
17    force?
18        A.    Yes, sir.
19        Q.    Is an officer ever justified in using deadly
20    force on a person unless the officer reasonably believes
21    there is a substantial risk the person will cause death
22    or serious bodily injury to the officer or another if
23    arrest is delayed?
24              MR. BYROM:  Objection, form.
25              MS. BROUSSARD:  Objection, form.
```

1          So, this particular day you were not on your

2   motorcycle; you were in your personal truck?

3      A.   I had actually gotten off and was headed home

4   when the call for assistance went out.

5      Q.   And what kind of truck do you have?  What color

6   is it?

7      A.   Blue Ford F -- well, it was a blue Ford F-150

8   SuperCrew.

9      Q.   Did you perform an investigation of this

10  incident?

11     A.   No, sir.

12     Q.   Did you interview any witnesses?

13     A.   No, sir.

14     Q.   Did you interview Mrs. Jones?

15     A.   No, sir.

16     Q.   Did you hear Mrs. Jones say anything at the

17  scene that you remember?

18     A.   Not that I recall.

19     Q.   Would it be appropriate, in your opinion, for

20  an officer to draw a handgun outside of a school with

21  students, parents, and school personnel present and pace

22  back and forth in the road with the gun drawn while a

23  school employee talked to the driver with whom the

24  officer had an issue?

25     A.   No, sir.

1    Has there ever been a sign that you recall

2  prohibiting a left turn into the Vincent driveway there?

3    A.    No, sir.  That's one of the reasons I had so

4  much trouble with parents.

5    Q.    Would it be fair to say that to your knowledge

6  neither the City of Beaumont or BISD has done anything

7  to get a sign put up there or to get any kind of

8  regulation or law passed prohibiting left turns?

9    A.    I know they have placed "no parking" signs from

10 this driveway (indicating) down to the corner to try to

11 ensure the street remaining open.

12   Q.    Okay.  But they didn't have "no left turn"

13 signs?

14   A.    I don't think anybody has asked for them.

15   Q.    Okay.  And is it your opinion that officer --

16 do you have an opinion whether or not Officer Spikes has

17 the authority to decide that drivers can't make a lawful

18 left turn into that driveway?

19        MR. BYROM:  Objection, form.

20   A.    My opinion -- I mean, I did it when I was

21 there; and the majority of the parents liked it because

22 they were out of there quicker.  Do I have the authority

23 to do it?  We can make temporary traffic adjustments as

24 necessary to ensure the orderly flow of traffic.

25   Q.    (By Mr. Lewis) And would you make that

1    A.    Correct.

2    Q.    The -- could you explain to me what type of

3    communications the BISD school officers had back in May

4    of 2013?

5    A.    We have department radios, and I believe we had

6    campus radios.

7    Q.    Help me out -- well, first off, has it changed

8    any since then?

9    A.    Not that I'm aware of.

10    Q.    Could you explain to me how the campus radio

11    works?

12    A.    Several of the campuses -- Ozen, West Brook,

13    Vincent, I believe Marshall -- have small radios that

14    are strictly on-campus communications.

15    Q.    Okay.  So, that would be like the

16    administrators talking to each other at the school.

17    A.    Correct.

18    Q.    Would the police officers have those?

19    A.    Yes, sir.

20    Q.    Okay.  And that's so that they can be in

21    contact with the administrators?

22    A.    Correct.

23    Q.    When you showed up this day, I'm assuming that

24    you didn't have the campus radio with you.

25    A.    No, sir.  Each campus has specific radios.   In

1    other words, Ozen's radios work at Ozen, West Brook's

2    work at West Brook, Vincent's radios work at Vincent,

3    Central's work at Central.

4        Q.    And you were telling me earlier you hadn't been

5    working at Vincent that day.

6        A.    Correct.

7        Q.    Okay.  Do you know if Officer Spikes had a

8    radio that day?

9        A.    I don't know.

10        Q.    Okay.  Well, tell me about the -- and that --

11    the campus radio would not go to the police dispatcher;

12    is that correct?

13        A.    Correct.

14        Q.    Now, did the BISD Police Department back then

15    have its own dispatcher?

16        A.    Yes, sir.

17        Q.    And where would that dispatcher be located?

18        A.    I believe in '13 the dispatcher was out at

19    Thomas Stadium.  I don't remember the exact day they

20    moved out there.  After we got out of our double-wide

21    trailer, they put dispatch out at Thomas Stadium.

22        Q.    Okay.  And tell me how the radio communication

23    works in the police department.  Is it on all the time,

24    or do you have to push the mic?

25        A.    You got to push the -- you got to key up.

1     Q.    (By Mr. Lewis) Well, let me ask it another way.

2     A.    Okay.

3     Q.    Could I get you to look at page 85 of the

4  materials that were produced and look at Policy

5  07-44/005 and read that for us?  Out loud, if you would,

6  please.

7     A.    Okay.  (Reading) An officer's good faith will

8  not alone justify an invalid arrest.

9     Q.    Do you agree with that policy?

10    A.    Yes, sir.

11    Q.    But at the same time, if you're on the scene

12  and an officer asks your assistance in making an arrest,

13  unless you have reason to doubt that the arrest is

14  valid, the policy is that you assist that officer,

15  right?

16    A.    Correct.

17    Q.    And that's what happened in this case, right?

18    A.    Correct.

19    Q.    And when you're making an arrest, it's the

20  policy of both the BISD P.D. and law enforcement in

21  general that you have to inform the person being

22  arrested, unless it's impractical, that you intend to

23  take them into custody and the reason that you're going

24  to take them into custody?

25    A.    I would assume, I mean, when you place

1   handcuffs on somebody and tell them they're under

2   arrest.

3       Q.   Well, that's not what I'm asking.  When you're

4   arresting someone --

5       A.   Uh-huh.

6       Q.   -- you have to tell them, "I am taking you into

7   custody" or "I am arresting you, and I am arresting you

8   for" whatever the crime is that you're charging them

9   with, right?

10      A.   I don't know any other department's policies.

11  Like I said, I know that when I -- like if I arrest you,

12  I mean, "Mr. Bush, you're under arrest for the offense

13  of driving while intoxicated."

14      Q.   I'm glad you're arresting Bush instead of

15  Lewis.

16              MR. BYROM:  There you go.

17      A.   I mean, I'm not exactly sure.  I know how I

18  operate and how I've operated for 20 years.

19      Q.   (By Mr. Lewis) Let me get you to read the BISD

20  policy that's on pages 87 and 88, Policy 07-48/005,

21  about inform arrestee.  If you can please read that out

22  loud for us.

23      A.   (Reading) When not impractical, the officer

24  shall inform the person being arrested of the following

25  factors:  That the officer intends to take him into

1    custody and the reason for the arrest.

2        Q.    And is it your understanding that's not just

3    the policy of the police department, that in fact that's

4    the law in general, isn't it?

5        A.    I'm not sure as far as law.  Like I said, I

6    know how I've operated for 20 years; and that's -- to me

7    that's common sense in law enforcement.  You don't just

8    walk up and put cuffs on somebody and take them to jail

9    and not tell them anything.

10       Q.    Well, first you have to tell them "I'm

11   arresting you" or "I'm taking you into custody."  Then

12   you tell them why, right?

13       A.    That's what I say.  I mean, that's -- like I

14   said, you don't just walk up to somebody and cuff them

15   and throw them in the car and take them to jail and not

16   tell them anything.

17       Q.    And you would agree that a gun is a deadly

18   weapon, right?

19       A.    Yes, sir.

20       Q.    And will you agree that the policy of the BISD

21   Police Department and law enforcement in general is that

22   lawful and proper force is restricted to using only the

23   force that's necessary to control and terminate unlawful

24   resistance?

25       A.    Correct.

1    Q.    And to preclude any other physical attack

2    against a police officer or anyone else, right?

3    A.    Correct.

4    Q.    I'm going to ask you if you would read the

5    requirements for use of force on page 101 of the

6    BISD P.D. materials, Policy 06-63002, the requirements

7    of force.

8    A.    Excuse me.   (Reading document.)

9    Q.    Could I get you to read that out loud for us?

10   A.    002 or 003?   And I need the rest of it because

11   it stops at No. 1 there.

12   Q.    No, 002.

13   A.    Oh, okay.   It says (reading) before an officer

14   may use force against any suspect, the officer must have

15   probable cause to arrest that suspect and manifest his

16   purpose to arrest and identify himself as a peace

17   officer unless the officer reasonably believes that the

18   suspect already knows his purpose and identity or unless

19   the officer cannot reasonably make that information

20   known to the suspect and give the reason for the arrest

21   unless impractical.

22   Q.    Would that require Officer Spikes to tell

23   Mrs. Jones that she was under arrest before she drew her

24   weapon?

25   A.    Depending on the totality of the circumstances,

```
 1   no, sir.
 2        Q.   And do you agree that the policy of the BISD
 3   Police Department now and back when this incident
 4   occurred in May of 2013 was that an officer apply only
 5   the force that is necessary and they have to exhaust all
 6   other lesser force before they apply the next one?
 7        A.   I would agree that no force other than what is
 8   needed to overcome the resistance is used.
 9        Q.   Well, you have an escalating policy on the use
10   of force, do you not?
11        A.   Correct.
12        Q.   You start with the lowest level and work your
13   way up or down depending on how --
14        A.   Correct.
15        Q.   -- you look at it, right?
16        A.   Correct.
17        Q.   And the first one is the officer's presence,
18   right?
19        A.   Yes, sir.
20        Q.   The second is verbal commands?
21        A.   Uh-huh.
22        Q.   And the third is physical strength and skills,
23   which is just doing whatever you do physically without
24   using any weapons, right?
25        A.   Correct.
```

1      Q.    The next is chemical agents such as mace or

2    pepper spray, right?

3      A.    Correct.

4      Q.    And then finally authorized baton, right?

5      A.    Correct.

6      Q.    And, last, an authorized service revolver or

7    other firearm?

8      A.    Correct.

9      Q.    And, of course, officers can't fire warning

10   shots.

11     A.    Correct.

12     Q.    Despite what you see on T.V., that's not

13   allowed in law enforcement, is it?

14     A.    No, sir.

15     Q.    And law enforcement officers can't position

16   themselves in the direct path of a moving vehicle to

17   stop it, can they?

18     A.    It's not smart; but no, sir, they shouldn't.

19     Q.    And you can't put yourself in the path of a

20   moving vehicle and then use deadly force saying that you

21   were at risk because the vehicle was coming at you, can

22   you?

23     A.    Correct.

24     Q.    In fact, there is a BISD policy about that,

25   marked in yellow toward the bottom of the page.

1          I'm sorry.  I didn't read the page number out

2    loud there?

3        A.    Page 74, BISD000103.

4        Q.    Am I correct in how I interpreted that statute,

5    that officers are prohibited from placing themselves in

6    front of a moving vehicle to stop it and they can't use

7    deadly force to stop that vehicle after they place

8    themselves in front of it?

9               MR. BYROM:  Objection, form.

10       A.    Says (reading) furthermore, no officer shall

11   position themselves in the direct path of any moving

12   vehicle in an attempt to stop the vehicle.  Positioning

13   oneself in the direct path of any moving vehicle in an

14   attempt to stop a vehicle will not justify the use of

15   deadly force at a fleeing vehicle, recklessly fleeing

16   vehicle, or otherwise dangerously driven vehicle.

17       Q.    (By Mr. Lewis) So, if Mrs. Jones was fleeing in

18   her vehicle, Officer Spikes would not be authorized to

19   draw her weapon and shoot at her, would she?

20               MR. BYROM:  Objection, form.

21               MS. BROUSSARD:  Objection, form.

22       A.    If she had placed herself in the path of a

23   vehicle?  No.

24       Q.    (By Mr. Lewis) I'm not -- I'm not asking -- I'm

25   saying that if the vehicle was fleeing recklessly, she

54

```
 1    could not draw her weapon and shoot at the vehicle,

 2    could she?

 3                   MR. BYROM:   Objection, form.

 4                   MS. BROUSSARD:   Objection, form.

 5         Q.   (By Mr. Lewis) Under this policy.

 6         A.    Under that policy, if she had placed herself in

 7    the direct path of a vehicle, no.

 8         Q.    Well, let's make sure.

 9              If we go back to Policy 7-64/004, prohibited

10    use of firearms, it says (reading) officers shall not

11    discharge their firearms under the following

12    circumstances.  And it lists six items; and the fourth

13    item is (reading) at a fleeing vehicle, recklessly

14    fleeing vehicle, or otherwise dangerously driven

15    vehicle.

16              That's separate and apart, is it not, from the

17    not placing yourself in front of a --

18         A.    Correct.

19         Q.    Okay.  So, the policy is that a BISD Police

20    Department officer cannot shoot at a fleeing vehicle.

21         A.    Can't shoot a moving car, yes, sir.

22         Q.    And on page 104 there is a policy on drawing

23    firearms, and it is Policy 7-64005.  It says (reading)

24    justification for the use of deadly force must be

25    limited to what reasonably appears to be the facts known
```

1    or perceived by an officer at the time they decide to

2    use deadly force.  Officers may draw or display a

3    firearm when they have reason to fear for their personal

4    safety or the safety of others.

5         Did I read that correct?

6    A.   Yes, sir.

7    Q.   And when an officer has reasonable time for

8    consideration, the officer should never use deadly force

9    when it appears that an innocent person might be

10   injured, correct?

11   A.   Correct.

12   Q.   And, of course, all law enforcement -- well,

13   let me ask that another way.

14        Has there ever been any law enforcement

15   employer that you have worked for that did not have the

16   policy that officers provide maximum security for all

17   firearms in their custody?

18   A.   Yes, sir, an officer is responsible for weapon

19   retention and --

20   Q.   You don't want somebody else to get ahold of

21   your gun.

22   A.   Correct.

23   Q.   Do you agree that law enforcement officers

24   should not intervene to stop an individual from

25   exercising First Amendment rights just because the

1    Q.    Okay.  Would she have had the microphone?

2    A.    Yes, sir, similar to this.  Not this exact one.

3    Q.    And would she have had "police" on each

4    shoulder?

5    A.    Yes, sir.

6    Q.    Have you ever had anybody, when you're dressed

7    that way, tell you they don't know you're a police

8    officer?

9    A.    Had several people say we're rent-a-cops but --

10   Q.    Because you work for the school?

11   A.    Yes, sir.

12   Q.    Okay.  But has anybody misunderstood that

13   you're a peace officer?

14   A.    Like I said, several people don't believe we're

15   actual police.

16   Q.    I got you.  I got you.  You certainly are

17   dressed like a police officer.

18   A.    Yes, sir.

19   Q.    And that was the way that Tamara Spikes was

20   dressed that day?

21          MR. LEWIS:  Objection, form.

22   A.    To the best of my memory, yes, sir.

23   Q.    (By Mr. Byrom) Okay.  You also note in your

24   report that you did talk to Mrs. Jones' husband.

25   A.    Yes, sir.

1    Q.    Okay.  And you had parents that you had those

2   kind of problems with?

3    A.    Correct.

4    Q.    And she wasn't one of them.

5    A.    Correct.

6    Q.    And have you ever had to unholster your weapon

7   when you were involved in directing traffic at any of

8   the schools?

9    A.    No, sir.

10    Q.    Have you ever had to unholster your weapon in

11   any other situations while working for the BISD Police

12   Department?

13    A.    When I was on graveyards, several times.

14    Q.    Okay.  And would that be when you would be

15   called out to school property because there was a report

16   something had occurred?

17    A.    Checking open doors, alarms, assisting the City

18   of Beaumont Police Department in some of these traffic

19   stops.

20    Q.    Okay.  So, those are situations where it's an

21   unknown situation or potential threat.

22    A.    Correct.

23    Q.    And on this particular occasion, if you had

24   arrived at the school and Officer Spikes had not had her

25   weapon drawn, would you have drawn your weapon --

1          A.    No.

2          Q.    -- based on what you saw?

3                So, it was the fact that she had her weapon

4    drawn that caused you to draw yours?

5          A.    Correct.

6          Q.    That's all I have.  Thank you very much.

7                           REEXAMINATION

8    BY MR. BYROM:

9          Q.    Just a couple other things.

10               You did come up and draw, as you've --

11         A.    Correct.

12         Q.    -- just described?

13               You didn't ever point your gun at Mrs. Jones,

14   did you?

15         A.    No.

16         Q.    What do you do with it?

17         A.    It's in what's called the "low ready," and

18   basically -- I'm not going to draw but you have the

19   weapon down and finger is not on the trigger and you're

20   ready to react if you need to.  It's less reaction time

21   than having to (demonstrating).

22         Q.    And that's per policy and procedure as well,

23   the low ready and the --

24         A.    Yes, sir.

25         Q.    And Tamara Spikes' gun was in low ready as

84

1   COUNTY OF JEFFERSON    )

2   STATE OF TEXAS       )

3      I hereby certify that the witness was notified on

4   __November 25__ , 2014, that the witness has 30 days or

5   (XXX days per agreement of counsel) after being notified

6   by the officer that the transcript is available for

7   review by the witness and if there are changes in the

8   form or substance to be made, then the witness shall

9   sign a statement reciting such changes and the reasons

10  given by the witness for making them;

11      That the witness' signature (was) was not returned as

12  of __December 17, 2014__ .

13      Subscribed and sworn to on this, the __18th__ day of

14  __December__ , 2014.

15

16

17                  _Tonya Jackson_

                TONYA JACKSON, Texas CSR No. 4898

18             Expiration Date: 12/31/14

                Jan Girouard & Associates

19             Firm Registration No. 99

                550 Fannin, Suite 108

20             Beaumont, Texas 77701

                (409) 832-2721

21

22

23

24

25