IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| CHRISTINE JONES | § | |
| | § | CIVIL ACTION NO. 1:14-CV-00103 |
| VS. | § | |
| | § | Judge Keith Giblin |
| TAMARA SPIKES and | § | |
| BEAUMONT INDEPENDENT | § | |
| SCHOOL DISTRICT POLICE | § | |
| DEPARTMENT | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANT BEAUMONT INDEPENDENT SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

1.    Plaintiff, Christine Jones, brought a § 1983 claim against Tamara Spikes ("Spikes") and claims against Beaumont Independent School District Police Department ("BISD") in the 136th Judicial District Court, Jefferson County, Texas. (Doc.1-2, Page ID#35)

2.    On August 7, 2014, Jones filed her Amended Complaint in the Eastern District of Texas, Beaumont Division. (Doc.19)

3.    On January 2, 2015, BISD filed its Motion for Summary Judgment. (Doc. 48)

4.    The depositions taken in the case to date have been of: Plaintiff, Christine Jones; Dispatchers Janet Flanagan and Jada Day; and BISD Officers Matthew Custer and Donald Jackson.

5.    Depositions are being scheduled for the following key witnesses: Defendant Tamara Spikes; BISD Officers Danny Moore, Eric Payne, and Sergeant Hall; Former BISD Chief of Police Clydell Duncan; and witness Davita Douglas.

6.    Plaintiff files this Response to BISD's Motion for Summary Judgment.  Plaintiff submits this response explaining that BISD's motion for summary judgment should be

denied because sufficient evidence exists to show:

A.    Spikes' actions violated clearly established statutory or constitutional rights of which a reasonable person in her situation would have known. Spikes' actions were objectively unreasonable in light of clearly established law at the time of the incident;

B.    Spikes unlawfully seized and arrested Jones;

C.    BISD's customs, policies, and/or practices led to constitutional violations against Jones; and

D.    BISD's failure to supervise, discipline, and/or train Spikes led to constitutional violations against Jones.

## II. STATEMENT OF FACTS

7.    On May 2, 2013, Jones pulled into the Vincent Middle School driveway to pick up her daughter from school. (Ex.1 ¶ 2).  There were cars already lined up on the right hand side of the school's driveway, so Jones pulled in through the left hand side of the driveway. (Ex.1 ¶ 3)  There was a space on the right hand side, but she could not fit her vehicle in that space.  (Ex.1 ¶ 3 & Ex. 3, Jones Depo. 107:24-108:7).  There was a vehicle directly behind her and a gray vehicle a few car lengths ahead of her.  (Ex.1 ¶ 3 & Ex. 2A-B).  The driver in the gray vehicle had exited his car and entered the school building.  (Ex.1 ¶ 3).

8.    While Jones waited in her vehicle, a lady came to her driver's side window and said, "They don't want you pulling in from the left hand side." (Ex.1 ¶ 4). There were no signs or any traffic laws prohibiting such left hand turns. (Ex. 4, Custer Depo. 30:1-14).  The lady did not advise Jones she was a police officer, and Jones did not know she was a police officer. (Ex. 3, Jones Depo. 97:1-98:13, 99:4-7).  As Officer Custer admitted, many people do not think the BISD police officers are actual police (Ex. 4, Custer Depo. 68:6-15) and, in addition to police carrying radios, administrators at the Vincent Middle School campus

had radios of their own. (Ex. 4, Custer Depo. 32:2-33:3). The school also had a public safety officer, a non-police officer that was a security guard. (Ex. 7, Jackson Dep. 27:14-25). All Jones could see was a name tag that said, "Spikes." (Ex. 1 ¶ 4; Ex. 3, Jones Depo. 98:10-13). Spikes was very irritated. (Ex. 1 ¶ 4; Ex. 3, Jones Depo. 98:25-99:7).

9.      Spikes told Jones to pull up. (Ex.1 ¶ 6) Jones told Spikes there was nobody in the gray car because the driver had gone into the building. *Id.* Jones asked Spikes if she would go look in the vehicle to make sure the driver was not there. *Id.* Spikes did not acknowledge what Jones had told her, and she walked away toward the back of Jones' vehicle. *Id.*

10.     Spikes came back up to Jones' vehicle and asked her again to pull up. (Ex.1 ¶ 7) Jones told her she did not want to pull up too close to the gray vehicle since the driver was not in it, and she did not want to get trapped in behind him. *Id.*

11.     Spikes then asked Jones for her license. (Ex.1 ¶ 8 & Ex. 3, Jones Depo. 111:1-15). Jones asked her if there was a problem. *Id.* Jones was unable to give her driver's license to Spikes because Spikes walked away from her vehicle. (Ex. 3, Jones Depo. 111:1-15). Spikes walked to the side of Jones' vehicle to look at the vehicle identification number. (Ex.1 ¶ 8). She then walked toward the front of the vehicle to look at the license plate. *Id.* Spikes went to the rear of Jones' vehicle, and then made her way back to the front *side* of the vehicle. (Ex.1 ¶ 8-9 & Ex. 2C)

12.     At that time, the traffic in the driveway began moving. (Ex.1 ¶ 10) Jones told Spikes she could pull over to the side because the gray vehicle and the truck next to it had moved. (*Id.* & Ex. 3, Jones Depo. 113:16-114:6). Jones notified Spikes she was about to pull into the open spot on the side. *Id.* Jones began to pull forward. *Id.* Spikes was not standing

in front of Jones' vehicle, but stuck her leg out, and Jones stopped.  *Id.* Jones pointed to the right side of the driveway and told Spikes that she was going to move her car to the side. (Ex. 3, Jones Depo. 113:16-114:6).  Jones' vehicle did not touch Spikes.  (Ex.1 ¶ 10) Jones turned her head to make sure it was clear for her to pull forward to her right.  (Ex.1 ¶ 10 & Ex. 3, Jones Depo.115:2-13)   While still on the front left *side* of Jones' vehicle, Spikes hollered that Jones had hit her.  *Id.*  Jones did not think she hit Spikes and Spikes was not knocked to the ground.  *Id.*  Spikes remained at the front side of Jones' vehicle. *Id.*

13.    Contrary to Spikes' written statements, the video shows that, as Jones began to move to the open spot to her right, Jones turned her wheels to the right and away from Spikes. (Ex. 2 E&F). Jones pulled forward into the open spot in order to get out of the way of the vehicles behind her.  (Ex.1 ¶ 11 & Ex. 2 E&F). Jones does not think she hit Spikes. (Ex. 3, Jones Depo. 196.4-196.11).  Spikes claims Jones' left outside mirror hit her.  (Ex. 7, Jackson Depo. 29:22-30:6).   Jones attempted to get out of her vehicle when Spikes came to her window with her gun pointing at Jones' head.   (Ex.1 ¶ 11 & Ex. 2G-M)

14.    With her gun to Jones' head, Spikes first words were, "I'm going to shoot, I'm going to fire my gun."  (Ex.1 ¶ 12 & Ex. 3, Jones Depo. 121:10-123:2).  With her gun pointed at Jones' head, Spikes began hollering at Jones to get out of the car. *Id.*

15.    Jones began to get out of her vehicle as police officers arrived on the scene.  (Ex.1 ¶ 13)   Officer Custer arrived on the scene and drew his weapon only because he saw Officer Spikes had her weapon drawn. (Ex. 4, Custer Depo. 76:10-77:1).   Jones was ordered  to her knees and then to lay face down.  (Ex.1 ¶ 13) Jones complied with the officers' instructions. (Ex. 3, Jones Depo. 86:2-22). Officers Spikes and Custer handcuffed

Jones. (Ex. 4, Custer Depo. 13:1-8)  An officer put a knee in her back as they handcuffed her and brought her to a police car. (Ex.1 ¶ 13, Ex. 2 O-P)

16.     While the event took place, children from the middle and elementary schools were walking around.  (Ex.1 ¶ 14, Ex. 2 G-O, Ex. 4, Custer Depo. 11:18-23)   Many of the kids were in the line of fire, and Jones heard Mrs. Douglas, the Attendance Clerk at the school, attempt to get the kids inside.  *(*Ex.1 ¶ 14*)*  Jones' daughter saw her mother on the ground getting handcuffed and hauled away. *(*Ex.1 ¶ 14 & Ex. 2 O-P) Her daughter's friends saw the event happen. *Id.*

17.     Jones suffered abrasions and pain on her knees and wrists.  (Ex.1 ¶ 15)  Her back was sore from the officer putting a knee into it. *Id.*  Jones, a registered nurse, was  required to report the arrest to the Board of Nursing.  (Ex.1 ¶ 16) Jones lost wages due to missing work because of the event. (Ex. 3, Jones Dep. 33:17-20)   The event caused Jones emotional pain, depression and anxiety.  (Ex.1 ¶ 17 and Ex. 3, Jones Depo. 31:23-32:13) During the event, she feared for her life.  (Ex.1 ¶ 17).  In her life, Jones never had someone point a gun at her head while yelling that they were going to shoot her. *Id.*  She had never been involved in any kind of altercations. *Id.*  Up to that day, the only law enforcement issues she ever had were minor traffic tickets. *Id.*

18.     As Jones sat in the police car, she asked the police officers what she had done. (Ex. 7, Jackson Dep. 28:17-20). She had not been put under arrest or notified of charges against her. (Ex. 7, Jackson Dep. 28:25-29:5). Spikes conferred with Officer Jackson and her supervisor, Sergeant Hall, to see if she could charge her with anything.  (Ex. 7, Jackson Dep. 29:5-16). Spikes did not claim that Jones had steered into her. (Ex. 7, Jackson Dep. 32:15-20).   Jackson indicated that he would not have charged Jones with aggravated

assault. (Ex. 7, Jackson Dep. 61:1-23). Spikes and BISD caused criminal charges to be filed against Jones for an alleged felony aggravated assault against a public servant and a misdemeanor failure to identify by giving false or fictitious information. (Ex.1 ¶ 18)  Both the criminal charges were subsequently dismissed without trial because of insufficient evidence to support the claims against Jones. *Id.*

BISD Customs and Practices Do Not Follow Polices

19.    The BISD police manual is compiled by the BISD police department. (Ex. 5, Policies p.BISD000028). The policy states it is binding upon all sworn personnel of the BISD police department.    (Ex. 5, Policies p.BISD000031) If a question arises concerning the rules, regulations, or other matters not covered in the manual, the police officer should bring the question to the attention of her supervisor. *Id.* The policies are issued by the Chief of Police. (Ex. 5, Policies p.BISD0000032).

BISD Customs with regard to Excessive Force and Seizure:

20.    BISD police officers are prohibited from using unnecessary violence against any person. (Ex. 5, Policies p.BISD000044). BISD law enforcement officers are not allowed to position themselves in the direct path of a moving vehicle to stop it, and cannot put themselves in the path of a moving vehicle and then use deadly force saying they were at risk because the vehicle was moving toward them. (Ex. 5, Policies p.BISD000103-104).

21.    A BISD officer must use the least intrusive method when intervening in disorderly conduct situations. (Ex. 5, Policies p.BISD000112).  BISD officers may only draw or display a firearm when they have reason to fear for their personal safety or the safety of others. *Id.* An officer should never use deadly force when it appears that an innocent person might be injured. *Id.* Deadly force, as defined by BISD, is the force that is intended,

6

or in the manner of its use or intended use, is capable of causing death or serious bodily injury. (Ex. 5, Policies p.BISD000100).

22.     A gun is a weapon of deadly force. (Ex. 4, Custer Depo. 17:16-18, and Ex. 5, Policies, p.BISD000100).   BISD Police officers are required to apply only the force that is necessary and they have to exhaust all other lesser force before they apply the next level of force. (Ex. 4, Custer Depo. 51:2-52:23 & Ex. 5, BISD Policies, BISD000101-102). The lowest level of force is officer presence, followed by, in order, verbal commands; physical strength and skill; chemical agents; authorized baton; and authorized service revolver. *Id.* To the extent a BISD officer has reasonable time for consideration, she shall *never* use deadly force when it appears likely that an innocent person may be injured.  (Ex. 5, Policies p.BISD000104).

23.     BISD Officer Custer testified that it is not appropriate for an officer to draw a handgun outside of a school with students, parents and school personnel present and pace back and forth in the road with the gun drawn while a school employee talked to the driver with whom the officer had an issue.  (Ex. 4, Custer Depo. 25:19-25)  Spikes, who after putting herself in the path of a vehicle, jumped to a threat of the highest level of force with innocent civilians in the line of fire based on her accusation that the vehicle was moving towards her, in direct violation of BISD polices,(Ex. 5, BISD Policies, BISD000101-102). When Custer arrived on the scene, he drew his weapon because he believed Spikes was operating within the customs and polices of the BISD Police Department. (Ex. 4, Custer Depo. 5:17-7:10).  Based on his years of experience with BISD, Jackson stated that policies were customarily not followed. (Ex. 7, Jackson Dep. 46:5-47:15). As Jackson testified, "the department do not take initiative to make sure that they do the right things."

7

*Id.*

Unlawful Seizure and Arrest

24.    An officer violates policies if she knowingly or willfully misrepresents any matter, signs any false statement or report, or gives false testimony before any court, grand jury, board, or commission.  (Ex. 5, Policies p.BISD000043).  BISD police officers are prohibited from directing malicious prosecution against any person. (Ex. 5, Policies p.BISD000044)

25.    When making an arrest, it is the policy of BISD Police Department to inform the person being arrested that they intend to take them into custody and the reason for taking them into custody.   (Ex. 4, Custer Depo. 47:19-50:1 & Ex. 5, Policies BISD000087-88). BISD defines probable cause as the total set of apparent facts and circumstances based on reasonably trustworthy information which would warrant a prudent person to believe that a particular person has committed some offense against the law.   (Ex. 5, Policies p.BISD000068). An officer's good faith will not alone justify an invalid arrest.  (Ex. 5, Policies p.BISD000085).

26.    Spikes never notified Jones she was under arrest or she was being charged with a crime.  As Officer Custer testified, "you don't just walk up to somebody and cuff them and throw them in the car and take them to jail and not tell them anything." (Ex. 4, Custer Depo. 49:2-16)    Spikes never notified Jones what charges were being brought against her or why she was being detained.   (Ex. 3, Jones Depo. 16:23-17:13) Officer Custer did not recall anyone ever notifying Jones that she was under arrest.  (Ex. 4, Custer Depo. 15:1-20).  Officer Jackson testified that Jones had been put in the police car, but not put under arrest or notified of charges against her.  (Ex. 7, Jackson Dep. 28:25-29:5). Jackson recalled being asked by Spikes and their supervisor, Sergeant Hall, on what to do.  (Ex.

7, Jackson Dep. 29:5-16). Jackson advised Hall, their supervisor, that he would not arrest her for aggravated assault. (Ex. 7, Jackson Dep. 61:1-23). He advised them that the charge that would fit would be aggravated assault, if there was intent. *Id.*

27.    In her sworn declaration, Spikes fails to mention whether she ever notified Jones she was under arrest. (Doc. 48-2, p.1-4). Spikes only mention of arrest is that, "at some point" she claims for the first time that she contacted her supervisor, Sergeant Payne, to ask whether she should arrest Jones, yet she fails to indicate when. (Doc. 48-2, p.4). Jones did not find out the charges against her until after she had been booked at the jail, and it was not Officer Spikes that informed her. (Ex. 3, Jones Depo. 50:12-51:19). Spikes did exactly what Officer Custer testified an officer does not do: walk up to Jones, cuff her, throw her in the car and not tell her anything. Based on her own testimony, her supervisor was aware of the situation and advised her at some point, after the fact, that Jones should be arrested. (Doc. 48-2, p.4). Without intent to assault, there cannot be an assault charge. (Ex. 4, Custer Depo. 38:19–39:12). Spikes filed a lawsuit seeking a monetary award against Jones claiming Jones hit her negligently rather than intentionally well before the criminal charges against Jones were dismissed. (Ex. 8, Petition; Ex. 11, Motion to Dismiss ). Spikes was aware there was no intent, yet seized and brought charges on Jones anyway.

<u>Failure to train and supervise officers.</u>

28.    Officer Jackson testified that, during his time with the department, there was a custom within the department to not follow policies, especially when it came to training and supervision. (Ex. 7, Jackson Dep. 71:2-16, 67:24-68:23). In fact, in his time there, he was never given or told about any of the policies. (Ex. 7, Jackson Dep. 46:5-47:15). He noted

that many of the BISD officers assigned to train new officers lacked the experience necessary to train new officers. (Ex. 7, Jackson Dep. 63:10:-66:9). In Jackson's experience, the BISD police department ignored proper procedures by putting new officers with people who were not qualified to train them. *Id.* It was common practice that training was not the same for every officer: it may be two to six weeks, or no training at all. (Ex. 7, Jackson Dep. 67:24-68:23) Many Field Training Officers, including Eric Payne, were not licensed or certified to train new officers. *Id.* Officer Payne claims to have trained Spikes. (Doc. 48-3, p.2). Officer Payne lacked sufficient experience or certification in law enforcement to train Spikes. (Ex. 7, Jackson Dep. 64:8:-20).

29.    In promoting supervisors, BISD had a custom of using officers without experience to supervise and train officers. (Ex. 7, Jackson Dep. 63:10:-66:9). Officer Payne, the officer claiming to have trained and supervised Spikes, had never worked on the streets or been a patrol officer arresting people, yet was promoted to a supervisor and Field Training Officer. *Id.*

30.    Spikes was not disciplined over this incident. (Ex. 4, Custer Depo. 6:20-7:10). BISD did not perform an investigation of anything Spikes did during the incident. *Id.* This is an example of actual procedures and customs in the BISD police department as far as accountability and supervision.

Spikes' Inconsistences

31.    Contrary to what the video shows (Ex. 2 E&F), Spikes, in her sworn declaration, states Jones turned the steering wheel towards her. (Doc. 48-2, p.3). After Jones pulled up, Spikes' declaration states that Jones was digging in her purse, so she thought she had a gun. (Doc. 48-2, p.3). Jones did not reach in her purse. (Ex. 3, Jones Depo. 50:12-

51:19). In her report shortly after the incident, Spikes states she had drawn her weapon *before* she even noticed Jones had a purse on her driver seat. (Ex. 9, BISD0002-3). The video shows Spikes with her gun drawn and stalking behind Jones' vehicle while a school employee talks with Jones and apparently Spikes perceives no threat from Jones and Spikes does not intervene to "protect" the employee. (Ex. 6, Video). When Officer Custer arrived, he did not see any indication that Jones had a weapon. (Ex. 4, Custer Depo. 12:22-13:14).

32.    Spikes statement indicates she and Officer Custer had difficulties getting Jones to comply with their commands. (Doc. 48-2, p.3). Officer Custer testified that Jones complied with their commands and got down on the ground. (Ex. 4, Custer Depo. 13:17–14:13)

33.    Spikes states she was injured during the event. (Doc. 48-2, p.3). When asked at the scene, Spikes told the firemen she was not hurt. (Ex. 3, Jones Depo. 153:24-154:9). The video shows Spikes walking around without any difficulty after being allegedly hit by Jones' vehicle. (Ex. 6, Video). Officers Jackson and Custer testified that she did not appear injured. (Ex. 7, Jackson Dep. 30:7-14 & Ex. 4, Custer Depo. 60:8-9)

34.    After Jones had been booked, Spikes filled out an Arrest Affidavit. (Ex. 10, BISD0011). In the affidavit, she again stated Jones turned into her, and she swears that there was probable cause for aggravated assault against a public servant and failure to identify. (Ex. 10, BISD0011). Without intent to assault, there cannot be an assault charge. (Ex. 4, Custer Depo. 38:19–39:12).    On September 19, 2013, Spikes filed a lawsuit seeking a monetary award against Jones claiming Jones was negligent. (Ex. 8, Petition). Spikes' claims against Jones are based on negligence, not the intentional tort of assault. (Ex. 8, Petition).    On November 20, 2013, Jones was called to trial in the matter of the

charges of assault against a public servant (Ex. 11, Motion to Dismiss) and the charges were dismissed.  As a defendant in this case, Spikes claims that Jones intentionally assaulted her.  However, as a plaintiff seeking monetary relief from Jones, Spikes claims no intent on Jones' part, only negligence.

Surveillance video of the scene is incomplete.

35.     The video of the incident is a surveillance video that pans between views. (Ex. 6, Video). Much of the incident between Spikes and Jones was not captured on the video because of the back and forth panning of the camera. *Id.* Some periods of the incident where Spikes has her gun drawn on Jones are not shown. (Ex. 3, Jones Depo. 170:16-23). The video does show the period of time where Jones begins to pull forward into the open spot. (Ex. 2 E-F). The video shows Jones' wheels are not turned at Spikes, as Spikes claims, but turned away from Spikes and to the right and that Jones is looking to the right where her vehicle is headed and not somewhere to the left of Jones' vehicle. *Id.* The video shows Spikes put her foot out in front of Jones' vehicle. (Ex. 2 C). The video shows portions of the event when Spikes does have her gun drawn (Ex. 2 G); with her gun drawn but the direction of where she is pointing the gun is concealed by the vehicle (Ex. 2 H-J); and with her gun drawn and a school administrator and children present (Ex. 2 J-K).

36.     Dispatch records show that Spikes arrived at Vincent Middle School for traffic duty at 15:40 and only eight minutes later (at 15:48) had managed to escalate a minor traffic dispute into a drawn gun situation and created so much commotion that BISD police department emergently dispatched seven officers to the scene to assist Spikes in handling an unarmed, non-confrontational, quiet parent.  (Ex. 12, Day Depo. 48:8-17; Ex. 1 ¶ 2-14).

### III. ARGUMENT AND AUTHORITIES

<u>Video Evidence Does Not Reveal the Entire Event</u>

37.    With regard to video evidence, defendant cites *Poole v. City of Shreveport*, 691 F.3d 624 (5th Cir. 2012), a case where a police vehicle camera captured video of a person actively resisting arrest and subsequently being tasered by a police officer after the police officer could not subdue the person. *Id.* at 629. (There was no resistence by Jones even claimed in this case by Spikes).

38.    Unlike the video in *Poole,* the video evidence attached to this motion does not show the entire alleged excessive force actions of the police officer. Portions of the interactions between Spikes and Jones are not caught on camera, and these missing portions contain actions by Spikes that plaintiff contends are factually relevant to the claims she has made against defendants. The surveillance video of the incident does show Officer Spikes stepping in front of Jones' vehicle, Jones turning her wheel away from (and not toward) Spikes as she begins to pull forward, Spikes stalking Jones' vehicle with her gun drawn as children are present, and periods where Spikes has her gun drawn but the direction she is pointing it is concealed by plaintiff's vehicle.

<u>Summary Judgment Standard of Review</u>

39.    Although summary judgment is proper in a case in which there is no genuine dispute of material fact, this is not a case in which the Court should grant summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

40.    The party moving for summary judgment has the initial burden of demonstrating that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514,

91 L.Ed.2d 202 (1986). Defendant cannot rely on conclusory statements to establish that plaintiff has not presented evidence on an essential element of her claim. Rather, defendant must demonstrate the absence of a genuine factual dispute. *See Celotex Corp.*, 477 U.S. at 324-25. Only if defendant meets its burden is plaintiff required to respond by summary-judgment proof to show a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(e)(3).

41.     In order to avoid summary judgment, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *See Matsushita Elec. Indus. Co. v. Zenith Radio* Corp., 475 U.S. 574, 585-86; *Anderson*, 477 U.S. at 257.

42.     In determining whether there is a genuine dispute of material fact that prevents summary judgment, a court must consider all evidence in the light most favorable to plaintiff as the nonmovant. *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1236-37 (10th Cir. 2002). The court must also resolve all reasonable doubts about the facts in favor of plaintiff as the nonmovant. *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 455-56 (5th Cir. 2005).

43.     Jones relies on the following argument and authorities, as well as the evidence attached to this motion, to respond to defendant's motion for summary judgment. The discussion and standards discussed below address:    (A) Spikes' actions violated clearly established statutory or constitutional rights of which a reasonable person in her situation would have known. Spikes' actions were objectively unreasonable in light of clearly established law at the time of the incident; (B) Spikes unlawfully seized and arrested Jones; (C) BISD's customs, policies, and/or practices led to constitutional violations against

Jones; and (D) BISD's failure to supervise, discipline, and/or train Spikes led to constitutional violations against Jones.

A.  <u>Spikes unlawfully used excessive force: Her actions violated clearly established statutory or constitutional rights of which a reasonable person in her situation would have known. Spikes' actions were objectively unreasonable in light of clearly established law at the time of the incident</u>

44.    Other jurisdictions have ruled that "police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir.1996). Holding a gun to a person's head and threatening to pull the trigger is a use of deadly force.  *McDonald by McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir. 1992). It has been held that an officer pulling a gun out on a woman, with children present, pursuant to a warrant, without suspecting any of the suspects were armed, is excessive force.  *Christian v. Orr,* CIV.A. 08-2397, 2011 WL 710209 (E.D. Pa. Mar. 1, 2011) aff'd as amended, 512 Fed. Appx. 242 (3d Cir. 2013). It has also been held that for an unidentified police officer to brandish his revolver eighteen inches from a person's head and then threaten to shoot is conduct that shocks the conscience so as to deprive plaintiff of constitutional rights.  *Black v. Stephens*, 662 F.2d 181, 189 (3d Cir. 1981).  Clearly, pulling a gun in the situation of an unarmed, non-threatening, and seemingly non-dangerous parent seated in an unmoving car in the presence of many other parents and minor students is a threat of deadly force and extremely excessive.

45.    To succeed on an excessive force claim, a plaintiff bears the burden of showing "(1) an injury (2) which resulted directly and only from the use of force that was excessive to the need and (3) the force used was objectively unreasonable." *Glenn v. City of Tyler*, 242

15

F.3d 307, 314 (5th Cir.2001) (quoting *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir.2000)).

<u>Jones Suffered an Injury</u>

46.    An injury does not need to be "significant" to support an excessive force claim. *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir.2001).  Substantial psychological injuries along with bruising are sufficient enough injuries to demonstrate the violation of a clearly established constitutional right.  *Flores* at 398 *citing Dunn v. Denk*, 79 F.3d 401, 402 (5th Cir.1996).

47.    Evidence attached to this response shows injuries resulting from the actions of Spikes.  Jones suffered abrasions and pain in her knees and wrists, as well as an injury to her back. The most serious injuries Jones suffered are emotional and psychological. She had never experienced anyone pointing a gun at her head while threatening to shoot her. She was in fear for her life. Weighed against the authorities, Jones injuries are significant enough to support an excessive force claim.  Additionally, Spikes criminalized Jones' non-criminal conduct.

<u>Jones Injury Resulted Directly and Only from the Use of Force That Was Excessive to the Need</u>

48.    The Supreme Court, in *Graham v. Connor*, established three factors for determining whether a particular use of force was "excessive to the need":

    a)    the severity of the crime at issue;
    b)    whether the suspect posed an immediate threat to police officers or civilians; and
    c)    whether the suspect was actively resisting arrest or attempting to evade arrest by fleeing the scene.

*Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

The "Graham factors" remain the guiding framework for judging whether an officer's use of force was excessive to the need. *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir.2013); *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir.2009).

*First Graham Factor:  Severity of the Crime at Issue*

49.    The first factor to be addressed is the severity of the crime at issue. There was no crime committed in this case and both Spikes and BISD should have recognized this. Jones was improperly charged with aggravated assault against a public servant and a misdemeanor failure to identify by giving false or fictitious information after Spikes had drawn her weapon, removed Jones from her vehicle, cuffed her, and placed her in a patrol car because Spikes had put herself and BISD police department in an untenable position and were compelled to justify their prior actions.  Jones was unclear of Spikes role of a police officer. As Officer Custer testified, many people do not know that BISD police officers are actual officers. BISD also has school security officers who are not official police officers.  Spikes never identified herself as an officer. Spikes asked for Jones' driver's license, but Spikes walked away from Jones before she could give her license to Spikes. Spikes never advised Jones she had committed a crime. Evidence attached to this response indicates Jones did not hit Spikes with her vehicle, or, if there was any contact with Jones' outside mirror, it was incidental and unintended.  Contrary to Spikes' claims, the video evidence shows Jones turned her vehicle *away* from Spikes in order to pull to the open parking space. Spikes' suit against Jones over the incident was based on Jones negligently hitting her; not intentionally. Without the intent, there can be no crime of assault.  Jones pulled forward, as she had been instructed to do by Spikes. She notified Spikes she was about to pull into the newly opened parking spot on the right, turned her

wheels away from Spikes, pulled into the open parking spot, and stopped her vehicle. Jones had committed no crime. Even after Jones was handcuffed and placed in a patrol car, Spikes and the other officers did not know if she had committed an offense at all, let alone one severe enough to have a gun pulled on her and her life threatened. Jones did not commit (nor was it alleged she committed) an offense severe enough to have a gun pulled on her and pointed at her head while threatened to be shot. She did not commit an offense requiring her to be pulled out of her car at gunpoint in front of her children, handcuffed, and sent to jail.

*Second Graham Factor:  Whether the suspect posed an immediate threat to police officers or civilians*

50.    Analyzing the second *Graham* factor, Jones posed no immediate threat to police officers or civilians. As discussed above, she had not committed a crime. She was in the line at the school to pick up her daughter who attended the middle school. She was unarmed, and her vehicle was surrounded by other vehicles containing parents who were also there to pick up their children. Jones advised Spikes she would pull up, and she did just that. Jones had pulled over into the open parking space and *stopped* her vehicle. At no point was she a threat to police officers or civilians, and she most certainly was not a threat when Spikes decided to pull her gun on Jones and threaten to shoot her.  Jones posed no threat to anyone.

*Third Graham Factor:  Whether the suspect was actively resisting arrest or attempting to evade arrest by fleeing the scene.*

51.    Jones was not resisting arrest or attempting to flee, as she was not notified she was even under arrest until after she had been jailed. There is no evidence to indicate Spikes thought Jones was going to flee the scene. There is no evidence that Spikes notified Jones

at the scene that she was under arrest. Jones' vehicle was boxed in when Spikes first asked her to move up. There were cars all over the driveway, so even if Jones wanted to flee, the traffic would have prevented it. When a space on the side opened up, she did as Spikes had instructed her and pulled over to park her car.  Not surprisingly, she was afraid to get out of her car with a woman pointing a gun at her and threatening to kill her. Jones was not actively resisting arrest or attempting to evade arrest by fleeing the scene. Jones complied with the commands to get out of her vehicle.  Prior to exiting her vehicle, Jones was seated in a stopped vehicle waiting for her child to come out of a school.

The Force Spikes Used was Objectively Unreasonable

52.    The objective reasonableness of a particular use of force is highly fact-and context-specific. *Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir.2005) ("To determine the objective reasonableness of an officer's use of force, 'we pay careful attention to the facts and circumstances of each particular case[.]' ") (quoting *Gutierrez v. City of San Antonio*, 139 F.3d 441, 447 (5th Cir.1998)). It must be judged in light of the information available to the officer at the time. *Graham*, 490 U.S. at 397; see also *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

Spikes Threatened the Use of Deadly Force

53.    The use of a gun to threaten a person with imminent bodily injury is aggravated assault under the Texas Penal Code.  Tex. Pen. Code Ann. § 22.02(a)(2). "Deadly force" is defined as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." Tex. Pen. Code § 9.01(3). A peace officer is justified in using deadly force in the course of an arrest if he reasonably believes that there is a substantial risk that the person to be arrested will cause

death or serious bodily injury to the officer or another if the arrest is delayed. Tex. Pen. Code § 9.51(c)(2). Using force "carrying with it a substantial risk of causing death or serious bodily harm" is "deadly force." *Flores v. City of Palacios*, 381 F.3d 391, 401 (5th Cir. 2004)

54.     There is no evidence that Spikes reasonably believed Jones would cause death or serious bodily injury to her or another.  Jones had parked her vehicle, was at a school, and her vehicle was surrounded by other vehicles. She was unarmed, and had complied with Spikes' instructions to move her vehicle. Spikes used force or the threat of force (pulling a gun and threatening to shoot) that had a substantial risk of causing death or serious bodily harm to Jones (and others). Arguably, Spikes unlawfully used deadly force in seizing Jones.  At a minimum, Spikes used the threat of deadly force.

55.     When an officer uses deadly force, the "objective reasonableness" balancing test is constrained.  It is objectively unreasonable to use deadly force "unless it is necessary to prevent [a suspect's] escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Flores* at 399 quoting *Garner*, 471 U.S. at 3, 105 S.Ct. 1694.

56.     The force Spikes used (pointing a deadly weapon and threatening to shoot) could be considered deadly and the situation did not require the use of deadly force. Even if it does not rise to the level of deadly force, in weighing the evidence against the *Graham* factors, Spikes obviously used force by threatening deadly force that was excessive to the need.

        Spikes Used Unlawful Excessive Force

57.     The standard is an objective one – whether the use of force was "'objectively

reasonable' in light of the facts and circumstances confronting [the officer]" at the time force was employed. *Graham*, 490 U.S. at 397. In such an analysis, the subjective intent of the defendant in question plays no meaningful role. *Poole v. City of Shreveport*, 691 F.3d 624, 630 (5th Cir.2012) ("Officers' subjective intent is irrelevant [to qualified immunity]."). "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 491 U.S. at 397.

58.    As BISD Officer Custer testified, a firearm is a deadly weapon. Deadly force, as defined by BISD, is the force that is intended, or in the manner of its use or intended use, is capable of causing death or serous bodily injury. Her use of force by threatening to shoot Jones was objectively unreasonable because neither she nor other officers believed Jones had the required intent to have committed the crime.  Spikes did not believe that Jones posed a threat of imminent danger yet she went to the highest use of force and threatened Jones with a deadly weapon.

59.    Analyzing Spikes' actions based on the facts and circumstances confronting her at the time force was employed, the information available to Spikes at the time of the incident was as follows:  Jones was in line, along with other parents, to pick up her daughter at school;  Jones was unable to pull up because the person in the car in front of her had gone into the school;  The line was filled with other vehicles waiting to pick up their children;  When a spot was made available ahead of Jones, Jones notified Spikes she was going to move up, and did so; Spikes had not notified Jones of any violations; There were many children running around the scene; After Jones pulled forward a few car lengths, she pulled to the side, parked in the open space and then parked her vehicle; Jones was not fleeing,

she was not threatening Spikes or anyone else; and there were no signs Jones was armed.

60.    Analyzing Spikes' actions in light of the facts confronting her, at the time, Spikes did not know if Jones had even committed a criminal violation. Even if Spikes felt Jones had committed a violation that required arrest, she chose the most life threatening method available to her. She pulled a gun and threatened another human being's life.  As she pointed her gun at Jones, children could be seen directly in her line of fire. Even just drawing her handgun was objectively unreasonable.   As BISD Officer Custer admitted, it is inappropriate to *draw* a handgun outside of a school with students, parents, and school personnel present and pace back and forth with the gun drawn. When viewed from the objectiveness of her fellow officer, her actions were unreasonable.   No officer other than Custer drew a weapon.  The only reason Custer even drew a firearm was because Spikes had already drawn her weapon.

61.    Spikes' actions unmistakably shock the conscious, even though that is not the necessary standard.   Whether Spikes' actions were objectively reasonable is highly fact-and context-specific, *Tarver v. City of Edna.*   This response outlines more than sufficient evidence to allow a jury to comfortably find that Spikes' actions were objectively unreasonable.

B.    Spikes unlawfully seized and arrested Jones: She did not have reasonable suspicion and probable cause to detain or arrest Jones.

62.    A person is seized by an officer if "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Flores*, 381 F.3d at 396 *citing Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

63.    The Fourth Amendment touchstone against unreasonable search and seizure is

reasonableness. *See, e.g. United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). The Supreme Court's "dual inquiry for evaluating the reasonableness of an investigative stop" examines: (1) "whether the officer's action was justified at its inception," and (2) whether the actions were "reasonably related in scope to the circumstances which justified interference in the first place." *Sharpe*, 470 U.S. at 682, 105 S.Ct. 1568 (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. 1868).

64.  The Fourth Amendment adjective "unreasonable" imports a command of proportionality to that Amendment's jurisprudence. *Brown v. United States*, 590 A.2d 1008, 1013 (D.C. 1991). The greater the restriction on the seized individual's liberty, the more substantial the justification for the restriction must be. *Id.* "A lesser intrusion, on the other hand, requires a correspondingly lesser showing." *Id*.

65.  While seizing and arresting Jones, Spikes drew her handgun and threatened Jones with bodily harm. Part of the basis for seizing Jones was that she would not move her vehicle and failed to identify herself. (Doc. 48, p.23). These arguments both fail because (a) Jones could not move her vehicle because she had no place to move it to; and (b) when she attempted to provide Spikes with her driver's license, Spikes walked away. Spikes also claims Jones allegedly hit her with her vehicle. (Doc. 48, p.23). This argument fails because, even if Spikes was hit by Jones' mirror, Spikes had placed herself in its path. Jones advised Spikes she was pulling into the open parking spot to comply with Spikes' command. Spikes cannot put herself in a position to get hit by a vehicle, tell someone to move the vehicle, and then claim to have the authority to arrest someone for hitting her. Spikes' actions were unjustified and unrelated to circumstances of the situation.

66.  "The probable cause requirement protects fundamental liberty interests which must

be jealously guarded, lest their erosion bring a tear to the eye of the lady who stands guard in New York Harbor." *Brown*, 590 A.2d at 1013. Good faith on the part of the arresting officer is not enough, *Henry v. United States*, 361 U.S. 98, 101, 80 S. Ct. 168, 171, 4 L. Ed. 2d 134 (1959), nor may probable cause be predicated on a hunch. *Lathers v. United States*, 396 F.2d 524, 531 (5th Cir.1968)

67.    The Fourth Amendment secures the right to be free from arrest without probable cause. *DeLeon v. City of Dallas*, 345 F. App'x 21, 23 (5th Cir. 2009)(*Citing Daniel v. Ferguson*, 839 F.2d 1124, 1129 (5th Cir.1988). "The Supreme Court has defined probable cause as the facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir.2009) (internal quotation marks and citations omitted). Probable cause cannot exist where the affidavit supporting a warrant contains material false statements or omissions that are deliberate falsehoods or evidence a reckless disregard for the truth. *Deleon at 23(Citing Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)).

68.    A reasonable officer would have known its violates the Fourth Amendment to deliberately provide false material information in an affidavit in support of a warrant or arrest. *See Hart v. O'Brien*, 127 F.3d 424, 448–49 (5th Cir.), abrogated on other grounds by *Kalina v. Fletcher*, 522 U.S. 118, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997).

69.    Spikes seized and arrested Jones based on material false statements and omissions that were deliberately untruthful. Spikes never notified Jones she was under arrest or that she was being charged with a crime. Jones sat in the back of the patrol car

and asked the officers what she had done wrong. As Jones asked that question, Spikes was asking the same question of her supervisors.

70.    Sergeant Hall did not know what to do, so he asked Officer Jackson who said he would not charge Jones with assault. At the scene, Spikes did not tell Jackson that Jones swerved into her. At some point in time after the incident, Officer Payne advised Spikes to arrest Jones. Spikes then filed an affidavit stating Jones intentionally swerved her vehicle into her.  The video evidence shows this to be untrue and was available for review.

71.    There is no assault without intent.  After she signed her sworn arrest affidavit indicating Jones *intended* to hit her, Spikes filed a lawsuit seeking damages from Jones claiming Jones *negligently* hit her.  Spikes seized and brought charges on Jones knowing no intent existed.

72.    Probable cause is the facts and circumstances sufficient to warrant a prudent person in believing that the suspect has committed, is committing, or is about to commit an offense. Jones had not and was not going to commit an offense.  Probable cause cannot exist where the affidavit supporting a warrant contains material false statements or omissions that are deliberate falsehoods or evidence a reckless disregard for the truth. Spikes was not truthful when she filled out the arrest affidavit. After losing her composure, Spikes overreacted and escalated the situation by pulling her gun and threatening to shoot a woman who was in line at an elementary school to pick up her daughter.  Spikes wanted to protect herself by claiming she was justified. The inconsistencies with her stories, as well as the evidence attached to this response, are sufficient to allow a jury to comfortably find that Spikes lacked probable cause and unlawfully seized and arrested Jones.

C.     BISD's customs, policies, and/or practices led to constitutional violations against Jones

73.    "[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir.2001) (quoting *Monell v. Dep't of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

74.    A custom or policy can stem from a policy statement formally announced by an official policymaker. *Zarnow v. City of Wichita Falls*, Tex., 614 F.3d 161, 168 (5th Cir.2010). Alternatively, a custom or policy can be demonstrated through a " 'persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.' " *Id.* at 168–69 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984)).

75.    The BISD police manual is compiled by the BISD police department and states that it is binding on all sworn personnel of the BISD police department.  The policies are issued by the Chief of Police.

76.    If followed, the BISD police manual policies would have prevented the constitutional violations against Jones.  Officer Jackson testified the problem is that the custom is not to follow the policies.

77.    Even if Spikes was hit by Jones' vehicle, her reactions were in direct contrast to BISD polices.  BISD police officers are prohibited both from using unnecessary violence against any person and from positioning themselves in the direct path of a moving vehicle

to stop it.  An officer cannot put herself in the path of a moving vehicle and then use deadly force saying they were at risk because the vehicle was moving toward them. It is the policy to not draw a weapon when innocent people may get hurt, such as outside of a school with students, parents and school personnel present.

78.    Spikes did not like the way Jones was reacting to her. Spikes continued to escalate the conversation. When Jones pulled forward as directed by Spikes, Spikes was already frantic and failed to control her actions. As a BISD officer, Spikes was required to use the least intrusive method. Spikes was deficiently trained and supervised.  The customary practice at BISD was to not follow policies.  Jackson explained that BISD does not take the initiative to make sure officers do the right things.

79.    Spikes was too poorly trained to know what to do after she pulled Jones from her vehicle.  After discussions with others, Spikes decided to arrest Jones.  A concerted effort by Spikes and her supervisors ultimately created an affidavit based on untruthful statements. Spikes actions were ratified by the acceptance of BISD supervisors based on the culture and customs in the BISD police department.

80.    Sufficient evidence exists to show that BISD and the Chief of Police are the policymakers who came up with the official BISD polices and procedures. Evidence attached to this response shows the custom of BISD is to not follow those polices which was a moving force causing the constitutional violations against Jones. Therefore, the Court should deny defendant's motion with respect to the claims that BISD's customs, policies, and/or practices led to constitutional violations against Jones.

D.    BISD's failure to supervise, discipline, and/or train Spikes led to constitutional violations against Jones

81.    The plaintiff proves a § 1983 claim for failure to supervise or train by showing:  "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir.1998). An official acts with deliberate indifference when the official is both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and draws the inference. *Id*. at 912. To establish deliberate indifference, "a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation." *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir.2003) (internal quotation omitted).

82.    Governmental liability under § 1983 attaches where a deliberate choice to follow a course of action is made from among various alternatives by governmental policymakers. *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (internal quotation and alteration omitted). A city can be liable under § 1983 for failure to train when a failure to train reflects a deliberate or conscious choice by a municipality.

83.    Officer Jackson testified that there was a custom within the department to not follow policies, especially when it came to training and supervision. Many BISD officers assigned to train new officers lacked in experience. Training would range from none to six weeks, varying from officer to officer.  Jackson said the BISD police department ignored proper procedures by putting new officers with people who were not qualified to train them. Many Field Training Officers, including Eric Payne, were not licensed to train new officers. Officer

Payne claims to have trained Spikes, but lacked sufficient experience in law enforcement to train Spikes.

84.    Officer Jackson witnessed BISD's custom of promoting supervisors lacking the proper law enforcement experience required to supervise and train officers.  Officer Payne, the officer claiming to have trained and supervised Spikes, had never worked on the streets or been a patrol officer arresting people, yet was promoted to a supervisor and Field Training Officer.

85.    Officer Jackson's testimony evidences customs and practices demonstrating a pattern of inadequate training and supervision which was obvious to him while he worked there and obviously likely to result in a constitutional violation:

> "it's like vicarious liability.  You -- you're trained to teach the person policies, procedures, laws, things to keep them safe, to keep the district or the employer that you work for out of -- out of liability and litigation to making sure that the person you're training, your trainee, is doing the proper procedures, whether they are in your presence or out of your presence, whether they're in the training program or out of the training program.  And, to me, the district -- the school district, police department, they ignore proper procedures in -- sometimes in putting off new officers with people who are not qualified to train them"
> (Ex. 7, Jackson Dep. 65:4-16)

86.    Jones has provided sufficient evidence to show a genuine dispute of material fact that, (1) Spikes' supervisor failed to adequately train and supervise her; (2) a causal link exists between the failure to train or supervise and the violation of the Jones' rights; and (3) the failure to train or supervise amounts to deliberate indifference by BISD. Therefore, the Court should deny defendant's motion for summary judgment with respect to the claims for failing to properly train, supervise, or discipline Spikes.

## IV. CONCLUSION

87.    Jones has provided more than sufficient evidence that, when evaluated using the relevant authorities, establishes the existence of a genuine factual dispute such that a reasonable jury could return a verdict for plaintiff on the issues. The evidence shows Spikes used unlawful excessive force when seizing Jones because her actions violated clearly established statutory or constitutional rights of which a reasonable person in her situation would have known. Spikes' actions were objectively unreasonable in light of clearly established law at the time of the incident. The evidence shows Spikes unlawfully seized and arrested Jones. Jones has provided more than sufficient evidence showing BISD's customs, policies, and practices led to constitutional violations against Jones; and that BISD's failure to supervise, discipline, and/or train Spikes led to constitutional violations against Jones.  In responding to issues defendant raised in its motion, Jones has provided enough evidence, when considered in the light most favorable to Jones as the nonmovant,  to overcome BISD's motion for summary judgment.  However, plaintiff would urge the court to defer ruling on this motion until depositions are complete and plaintiff has the opportunity to supplement this response with additional facts.

## V. PRAYER FOR RELIEF

88.    Based on the evidence, authorities, and arguments presented in this response, plaintiff asks that the court enter an order denying defendant's motion for summary judgment.  In the alternative, plaintiff asks the court to defer ruling on the motion until depositions are complete and plaintiff has the opportunity to supplement this response.

Respectfully submitted,

BUSH LEWIS, PLLC
595 Orleans Street, Suite 500
Beaumont, TX 77701
409/835-3521
409/835-4194 (Fax)

By: _____

       Kenneth W. Lewis
       Ken.L@bushlewis.com
       Texas Bar #12295300
       Stephen L. Townsend
       Stephen.T@bushlewis.com
       Texas Bar #24071539

ATTORNEYS FOR PLAINTIFF

CERTIFICATE OF SERVICE

     I certify that a true and correct copy of the above and foregoing has been served on all counsel of record through the Court's electronic filing system, this 19th day of January, 2015.

_____
Kenneth W. Lewis