Exhibit 3

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

CHRISTINE JONES          )
                         )
        Plaintiff,       )
                         )
VS.                      )   C.A. NO. 1:14-CV-00103
                         )
TAMARA SPIKES AND BEAUMONT   )
INDEPENDENT SCHOOL DISTRICT  )
POLICE DEPARTMENT        )
                         )
        Defendants.      )

**************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

CHRISTINE BRADLEY JONES

December 4, 2014

**************************************************

        ORAL AND VIDEOTAPED DEPOSITION of CHRISTINE BRADLEY

JONES, produced as a witness at the instance of the

Defendant, and duly sworn, was taken in the above-styled

and numbered cause on the 4th of December, 2014, from

10:11 a.m. to 3:16 p.m., before Dianna L. Edwards, CSR

in and for the State of Texas, reported by machine

shorthand at the offices of BUSH LEWIS, P.L.L.C., 595

Orleans Street, Suite 500, Beaumont, Texas, pursuant to

the Federal Rules of Civil Procedure and the provisions

stated on the record or attached hereto.

1    Spikes was a police officer.

2         A.    Yes.

3         Q.    And is that -- papers were served on you in

4    the case where you are a defendant?

10:26:42  5    A.    Yes.

6         Q.    Okay.  Not -- not specifically this case that

7    we're here about today but another case in Beaumont.

8         A.    Yes.

9         Q.    Okay.  And you understand that at -- that at

10:27:01  10   this time there's two different cases going on, right?

11        A.    Yes.

12        Q.    Okay.  And in the other case is when -- when

13   you were served with those papers is the first time you

14   were able to -- to determine that Officer Spikes was a

10:27:13  15   police officer.

16        A.    Yes.

17        Q.    Did you doubt that she was a police officer?

18        A.    I never thought that she was a police officer.

19        Q.    Never heard that she was?

10:27:33  20   A.    Never heard that she was.

21        Q.    Did you believe she was a police officer?

22        A.    No, I did not.

23        Q.    So, from May the 3rd of 2013 until you were

24   served with papers, you had no understanding that

10:27:47  25   Officer Spikes was a police officer.

1    A.    Correct.

2    Q.    You were arrested and taken to jail.

3    A.    Correct.

4    Q.    Do you know what you were charged with?

10:27:57  5    A.    I was never verbally told what I was being

6    charged with even after I asked what I was being charged

7    with.

8    Q.    Okay.  At the police station were you told?

9    A.    No.

10:28:09  10    Q.    Did you ever know what charges were being

11    considered against you?

12    A.    When I got booked, that's when I found out

13    what the charges were.

14    Q.    And what were the charges when you got booked?

10:28:23  15    Do you remember?

16    A.    It was a misdemeanor and a felony assault.

17    Q.    Okay.  Felony assault of a police officer?

18    A.    It just said felony assault.

19    Q.    When -- when Officer Spikes -- and we'll talk

10:28:38  20    more about this in a minute.  But when she had her gun

21    out, you didn't know she was a police officer?

22    A.    No.

23    Q.    Did you believe her to be a police officer at

24    that time?

10:28:52  25    A.    No.

1    A.    Yes.

2    Q.    Have you sought any counseling for that?

3    A.    No.

4    Q.    Have you sought counseling even -- well, first

10:42:31 5    of all, let me ask this way.  You haven't sought any

6    counseling from a licensed psychologist or psychiatrist,

7    correct?

8    A.    Correct.

9    Q.    Have you had to take any medication because of

10:42:39 10    it?

11    A.    No.

12    Q.    Have you talked to any other kind of counselor

13    as a result of the incident we're here about today?

14    A.    Could you clarify that?

10:43:01 15    Q.    Sure.  Have -- have you talked to any other

16    counselor as a result of any incident that occurred at

17    Beaumont ISD on or about May the 3rd of 2000 -- May the

18    2nd or 3rd of 2013?

19    A.    I would say as far as counselor -- as for

10:43:53 20    paying a counselor, to see someone, no.

21    Q.    Okay.  You haven't paid to see anybody?

22    A.    No.

23    Q.    Okay.  Sometimes people talk to a -- a friend

24    or a pastor or somebody like that.  Anything like that

10:44:09 25    that you've done?

          A.    Not necessarily a pastor or a friend, just my
personal dealings with God.

          Q.    Okay.  Let me ask it another way, and I hope
this will clarify it for you.  You haven't talked to
anybody -- any professional about your emotional issues.

          A.    No.

          Q.    Okay.  Based on what you've told me, it sounds
to me like you haven't incurred any medical, emotional,
psychological expense as a result of what happened at
Beaumont ISD at Vincent in May of 2013.  Am I right?

          A.    No.

          Q.    Okay.  What?

          A.    There's emotional.

          Q.    What I was asking you -- you haven't paid any
money to anybody for treatment of any kind.

          A.    No, I have not paid any money.

          Q.    Okay.  I did see what has been produced as
a time detail --

          A.    Uh-huh.

                MR. BYROM:  Let's make this an exhibit.

                (EXHIBIT NO. 3 MARKED.)

                MR. BYROM:  Do you -- this is your --
here you go, Steve.

          Q.    (BY MR. BYROM)  I want to hand you what's been
marked as Exhibit 3 and ask you, first of all, have you

33

1   ever seen that document?

2        A.   Yes.

3        Q.   What is that document that is Exhibit 3?

4        A.   My time sheet.

10:46:05  5        Q.   All right.  Your time sheet at your -- from

6   your employer?

7        A.   Correct.

8        Q.   Did you obtain those from the employer?

9        A.   Correct.

10:46:13 10        Q.   What does this Exhibit 3 tell us in this case?

11   What information is in -- is contained?

12        A.   The -- the days that I took off, the day that

13   I was -- had to call in to my job because I was in jail.

14        Q.   Okay.  How many days did you miss based on the

10:46:45 15   events that occurred in May of 2013 at Vincent Middle

16   School?

17        A.   I do not know.

18        Q.   Well, are -- are you going to make a claim

19   that you lost wages because of this?

10:46:58 20        A.   Yes.

21        Q.   Do you know how much?

22        A.   I provided this sheet with the days, but I

23   have not counted them up specifically myself.

24        Q.   All right.  Then -- then we're going to have

10:47:14 25   to do it this way.  If you would look at that document,

50

1    A.    No.

2    Q.    Do you know if they have guns?

3    A.    No.

4    Q.    So, you don't know anything about Beaumont ISD

11:21:50    5    Policemen uniforms?

6    A.    No.

7    Q.    Do you know any Beaumont ISD Policemen?

8    A.    No.

9    Q.    Have you ever talked with any Beaumont ISD

11:21:58    10    Policemen prior to May of 2013?

11    A.    Other than saying "Hi."

12    Q.    Okay.  You told me earlier that you weren't

13    told by anybody what you were charged with until you

14    were at -- was that at the police station?

11:22:20    15    A.    At the jail.

16    Q.    At the jail?

17    A.    (Nods head up and down.)

18    Q.    And they told you that you were being charged

19    with felony assault?

11:22:30    20    A.    Yes.

21    Q.    But they didn't give you any more information

22    than that?

23    A.    No.

24    Q.    Who was it that said that?  Do you remember?

11:22:37    25    A.    No.

Q.   It wasn't Officer Spikes?

A.   No.

Q.   Was there another officer that went with y'all to the police station?

11:22:45   A.   Yes.

Q.   Do you know who that is?

A.   No.

Q.   Was it that other officer that told you what the charge was?

11:22:52   A.   No.

Q.   Did they also tell you that you were charged with failure to identify?

A.   No.

Q.   Anything besides felony assault?

11:23:20   A.   Let me back up.  You said "they."  Who you mean by "they."

Q.   Well, you said you were told by somebody at the jail.

A.   At the jail.

Q.   So, that's who I'm talking about right now.

A.   That's who we talking about, the jail?

Q.   Yes.

A.   Yes.  The jail told me that I was being charged with a misdemeanor and felony assault.

11:23:37   Q.   Did they tell you what the misdemeanor was?

```
 1          A.    Correct.
 2          Q.    But I also hear in what you're saying that --
 3    that when they gave you instructions, you complied.
 4          A.    Yes.
 5          Q.    They said "Get on your knees"; you got on your
 6    knees.
 7          A.    Yes.
 8          Q.    And then they said "facedown"; you got
 9    facedown.
10          A.    Yes.
11          Q.    Did you ever say anything to them?
12          A.    Yes.
13          Q.    What did you say?
14          A.    When he came behind my back, he knocked my
15    phone and my keys out of my hand.  And he stripped my
16    keys, and my phone fell on the ground, and I asked him
17    to please pick up my phone.
18          Q.    Did you ever say anything else to him?
19          A.    No.
20          Q.    Did you immediately comply with their
21    instructions, or did they have to help you?
22          A.     I complied with their instructions.
23                THE VIDEOGRAPHER:  We've got about five
24    minutes left on this tape.
25                MR. BYROM:   Okay.
```

12:09:20  5
12:09:25 10
12:09:33 15
12:09:46 20
12:09:59 25

1    Q.    And was your vehicle where you have it marked

2    with your initials and the arrow on Exhibit 6 when you

3    first saw Ms. Spikes -- Officer Spikes?

4    A.    Yes.

12:24:01    5    Q.    Tell me what you saw when you first saw her?

6    What did you see?

7    A.    She approached my window, and she tells me

8    that, you know, "They don't want y'all turning in from

9    the left-hand side."

12:24:18    10    Q.    Okay.  And you've said it with -- I don't know

11    any other way to say it but attitude.

12    A.    Yes.

13    Q.    Is that a fair way to say it?

14    A.    Yes.

12:24:28    15    Q.    Okay.  Did she walk up to you?

16    A.    All I can say is when I turned to look, she

17    was there.

18    Q.    All right.  So, you didn't actually see her

19    coming to you.  She was right there at the window?

12:24:41    20    A.    Right.

21    Q.    How far is that from you?

22    A.    She was right there at my window.

23    Q.    What did she -- what did she have on?

24    A.    I didn't notice what she had on.

12:24:51    25    Q.    What did you notice?

1    A.    I noticed her attitude.

2    Q.    Okay.

3    A.    And --

4    Q.    And --

12:25:01  5    A.    I looked to see -- I'm like "Who is this?"

6    And I looked and saw the name tag said "Spikes."

7    Q.    Okay.

8    A.    That's the only thing I -- I was able to

9    identify on her.

12:25:13 10    Q.    How else besides -- besides seeing her name

11    tag, what else did you see about her clothing?

12    A.    I didn't notice anything else about her

13    clothing.

14    Q.    Was she wearing a blue uniform?

12:25:24 15    A.    I didn't notice.

16    Q.    And you didn't notice that it was a police

17    uniform?

18    A.    I didn't notice.

19    Q.    Now you know it was a police uniform, right?

12:25:32 20    A.    Yes.

21    Q.    Did you notice her badge?

22    A.    I didn't notice a badge.

23    Q.    Did you notice any gun?

24    A.    I didn't notice a gun.

12:25:40 25    Q.    Even without seeing all that, did you have any

1    question in your mind that she was a police officer?

2          A.    Her attitude was like aggression, and I

3    just -- I didn't know who she was.

4          Q.    So, is it your testimony under oath that at

12:25:58  5    the time you first saw Officer Spikes at your window you

6    did not know she was a police officer?

7          A.    Correct.

8          Q.    Was your window up or down?

9          A.    It was partially, midway.

12:26:15 10          Q.    Was it down when you first saw her, or did you

11    roll it down to talk to her?

12          A.    It was down when I drove in.

13          Q.    Okay.  You drove in with it that way?

14          A.    Yes.

12:26:24 15          Q.    How long had you been driving with your window

16    partially open?

17          A.    Since I left home.

18          Q.    Now, this is a time of day when there are

19    multiple vehicles out there, right --

12:26:35 20          A.    Yes.

21          Q.    -- at this location in Exhibit 6?

22          A.    Uh-huh.

23          Q.    How many vehicles were out there?  Do you have

24    any idea?

12:26:41 25          A.    I don't know.

1          A.    I don't know.

2          Q.    Was it the next day or the next month or the

3     next year?

4          A.    It was within that time.

12:32:25  5     Q.    Did Officer Spikes ever ask you for your

6     driver's license or identification?

7          A.    She asked for my driver's license.

8          Q.    Was that during the first conversation or

9     after?

12:32:34  10    A.    No.   That was after.

11         Q.    Okay.   Let's just finish the first

12    conversation.   You've told me two things she said to

13    you; and you've told me twice you said "Okay," right?

14         A.    "Okay.   I understood what she was saying."

12:32:46  15    Q.    I'm sorry.   "Okay.   I understood."   And you

16    were telling her you understood what she was saying.

17         A.    Yes.

18         Q.    Is that the end of that first conversation?

19         A.    Yes.

12:32:55  20    Q.    Okay.   Did you move your car?

21         A.    No.

22         Q.    When did the second conversation occur?

23         A.    When she approached me.

24         Q.    Okay.   Did you see her walking toward the car?

12:33:06  25    A.    No.

| | | |
|---|---|---|
| | 1 | Q.   Again, she just appeared at the window? |
| | 2 | A.   Yes. |
| | 3 | Q.   Was your window still half open? |
| | 4 | A.   A little bit pulled up a little more. |
| 12:33:15 | 5 | Q.   Did you raise it on purpose? |
| | 6 | A.   I was getting chill. |
| | 7 | Q.   May the 2nd of 2013? |
| | 8 | A.   Yes. |
| | 9 | Q.   Was it cold that day? |
| 12:33:27 | 10 | A.   It was windy. |
| | 11 | Q.   At any time during all of this situation with |
| | 12 | Officer Spikes, did you call anybody on the telephone? |
| | 13 | A.   Yes. |
| | 14 | Q.   Who? |
| 12:33:42 | 15 | A.   My husband. |
| | 16 | Q.   Who else? |
| | 17 | A.   That's all I called. |
| | 18 | Q.   What did you tell your husband -- well, let -- |
| | 19 | let me get them in order.  I don't want to get out of |
| 12:33:50 | 20 | order.  Okay?  Tell -- we've had the first conversation. |
| | 21 | Now you're about to have a second one.  You look up. |
| | 22 | She's at your window. |
| | 23 | A.   Uh-huh. |
| | 24 | Q.   Tell me about that conversation. |
| 12:33:59 | 25 | A.   She proceeded to tell me that she wanted me to |

1    move my vehicle, and I told her there was no place for

2    me to move my vehicle.

3        Q.    Was there a car stopped in front of you?

4        A.    There's a car in front of me.  There's cars on

12:34:14  5    the side of me.

6        Q.    So, your testimony is you had nowhere to go.

7        A.    Correct.

8        Q.    What else -- tell me -- any -- anything else

9    in that conversation?

12:34:23  10        A.    I had -- I had previously asked her to check

11    the car in front of me to see if there was anybody in it

12    because I saw the guy go into the building.

13        Q.    Okay.  So, that happened in this second

14    conversation.

12:34:37  15        A.    Yes.

16        Q.    All right.  Anything else that you can recall

17    about the second conversation you had with Officer

18    Spikes?

19        A.    She became more aggressive.

12:34:45  20        Q.    In what way?

21        A.    She was -- just started screaming and yelling.

22        Q.    What was --

23        A.    And that's when I picked up my phone to call

24    my husband, and he couldn't hear me because of her

12:34:57  25    screaming and yelling.

111

```
 1        Q.    Did you ever provide it to her?

 2        A.    No.

 3        Q.    Why not?

 4        A.    I asked her what the problem was, and she

 5   became more irate, and then she walked to the top of my

 6   vehicle and radioed in.

 7              MR. BYROM:  For purposes of the record,

 8   I'm going to object that that's not responsive to my

 9   question.

10        Q.    (BY MR. BYROM)  My question to you is:  Why

11   didn't you give her your driver's license?

12        A.    Because she walked away from me.

13        Q.    Is that the only reason you didn't give it to

14   her?

15        A.    Yes.

16        Q.    Did she ever tell you not to move your car?

17        A.    No.

18        Q.    Did you see her walk toward the front of your

19   car?

20        A.    Yes.

21        Q.    What was she doing?  Do you know?

22        A.    She was on her radio, and she was trying to

23   look at the tags.

24        Q.    Do you know why?

25        A.    No.
```

12:36:50 (line 5)
12:37:00 (line 10)
12:37:08 (line 15)
12:37:21 (line 20)
12:37:27 (line 25)

1      Q.    All right.  And, so, you stopped?

2      A.    Yes.

3      Q.    At this point, where was she standing?

4      A.    In the front of my vehicle on the side.

12:38:46  5      Q.    When did you first -- well, was there a third

6   conversation before you moved your car or --

7      A.    No.

8      Q.    -- or just two?

9      A.    Just two.

12:38:57  10      Q.    All right.  When, in all this sequence of

11   events that we've been talking about, did you first move

12   your car after having it stopped here where you've drawn

13   it?

14      A.    The -- the -- your -- your question is to when

12:39:13  15   I first moved my vehicle?

16      Q.    Yeah, after -- after this second conversation.

17      A.    I would say the first time I moved my vehicle

18   is when I went to pull up because the car in front of me

19   had left and the car on the side of me had left.

12:39:28  20      Q.    Okay.  So, now you had room.

21      A.    I had room.

22      Q.    So, where were you going?

23      A.    In the side.  And I even said to her and

24   pointed to her, "I'm going to the side."

12:39:38  25      Q.    Do you know if she saw you?

            1       A.    Yes.

            2       Q.    How do you know that?

            3       A.    Because she moved her leg out the way.

            4       Q.    All right.   And that's when you pulled

12:39:46    5   forward?

            6       A.    Correct.

            7       Q.    Did you move your car more than once?

            8       A.    Yes.

            9       Q.    Tell me about that.

12:39:54   10       A.    When she put her leg in front of my vehicle,

           11   that's when I stopped.

           12       Q.    Okay.

           13       A.    And then when the -- I told her I was moving

           14   over, when I go to move over and I turned to look,

12:40:05   15   that's when she claims that I hit her.

           16       Q.    How far do you move the first time --

           17       A.    I had just barely --

           18       Q.    -- that you just described before you stopped?

           19       A.    -- took my foot off the brake.

12:40:14   20       Q.    Okay.   A foot?   I mean, do you know?

           21       A.    I don't know.

           22       Q.    Where was she in relation to your vehicle when

           23   you pulled forward a little bit?

           24       A.    On the side.

12:40:28   25       Q.    She was on the side.

```
 1          A.    At the front.
 2          Q.    The second time you move your vehicle, how far
 3    did you go?
 4          A.    I turned to look to make sure no one was
 5    moving up or coming on the side; and when I turned back,
 6    she's saying that I hit her.
 7          Q.    Where was your car when she said you hit her?
 8          A.    Still on the side where I'm at here
 9    (indicating).
10          Q.    Did you pull your car forward after the
11    incident?
12          A.    Yes.  I pulled it into the front where the
13    door is.
14          Q.    How far is that?
15          A.    I'm not sure.
16          Q.    So, after she said "You hit me," you moved
17    over to that spot?
18          A.    Yes.
19          Q.    When you pulled forward -- so, let me say this
20    again.  The first time you moved, you just moved barely,
21    right?
22          A.    I wouldn't even say barely.
23          Q.    You wouldn't even say barely?
24          A.    Yes.
25          Q.    Did you put your foot on the gas to move, or
```

12:40:43  5
12:41:01  10
12:41:10  15
12:41:54  20
12:42:09  25

1  yelled.

2       Q.   Do you have any idea why?

3       A.   No, I don't.

4       Q.   Do you have any reason that you can think of

12:46:50  5  why?

6       A.   No.

7       Q.   Now, at some point she pulled her gun out.

8       A.   Correct.

9       Q.   And in your declaration you say that she

12:47:09 10  pointed the gun at you and said "I'm going to shoot you"

11  or something like that.

12       A.   She said she was discharging her firearm.

13       Q.   Discharging her firearm.  Can I see No. 4,

14  please?

12:47:21 15       A.   (Complying.)

16       Q.   During all this time, is it still your

17  understanding -- you -- you still don't know she's a

18  police officer?

19       A.   I still don't know.

12:47:40 20       Q.   Okay.  She put the gun to your head?

21       A.   She points the gun right at me.

22       Q.   Well, this document said she put the gun to

23  your head.  Did she put the gun to your head?

24       A.   She had it pointed right at me.  I'm sitting

12:47:54 25  in my vehicle.

122

1    Q.    Is the window up?

2    A.    Yes.

3    Q.    How far away from the car is she?

4    A.    I don't know.  I know I could see her with the

12:48:04  5    gun pointed at -- directly at me.

6    Q.    And at that point, you can't tell she's a

7    police officer?

8    A.    Anybody with a gun you would wonder if they're

9    a police officer.

12:48:13  10    Q.    So, at that point might -- the first time you

11    realize she could be a police officer.  Is that your

12    testimony?

13    A.    I would say she had a gun, and she never

14    identified herself as an officer to me.

12:48:29  15    Q.    My question is:  Did you think she was a

16    police officer?

17    A.    No.

18    Q.    Did you think she was not a police officer?

19    A.    No.

12:48:37  20    Q.    You didn't think either way?

21    A.    I didn't think either way.

22    Q.    But your testimony is she pointed the gun in

23    your direction --

24    A.    Uh-huh.

12:48:47  25    Q.    -- and said she's going to discharge her

1    weapon; she's going to shoot you.

2         A.    Correct.

3         Q.    And that was through your side window that was

4    shut, and then she was standing in the -- far enough

12:49:02  5    away from the car that you couldn't have hit her.

6         A.    Correct.

7         Q.    How far away was she from the car?

8         A.    I don't know.

9         Q.    Still far enough away that you couldn't have

12:49:11  10    hit her.

11         A.    Yes.

12         Q.    All right.  Did you ever see her with the gun

13    held lower than pointed right at you?

14         A.    I don't recall because when I got out my

12:49:33  15    vehicle and the other officer comes running there and

16    told me to get on the ground, I just laid on the ground

17    with my face down.

18         Q.    Where was your car when Officer Spikes pointed

19    her gun at you?

12:49:46  20         A.    Right here by the door.

21         Q.    Okay.  So, she yelled "You hit me."

22         A.    Yes.

23         Q.    And then you drove over into that space?

24         A.    Yes.

12:49:57  25         Q.    Had she pointed the gun at you before you

1    Q.    Okay.

2    A.    And she points to him --

3    Q.    Okay.  So, she --

4    A.    -- to the window.

14:05:04  5    Q.    You didn't hear what she said.

6    A.    No, I did not.

7    Q.    Okay.  When was the next time you saw her?

8    A.    When I got out and walked to the car, she was

9    in the car with me.

14:05:14  10    Q.    Okay.  Did you hear her say anything?

11    A.    No.

12    Q.    Did you ever say anything to her?

13    A.    No.

14    Q.    After that time when you're in the car

14:05:23  15    together, did you ever see her again --

16    A.    No.

17    Q.    -- before H-E-B?

18    A.    No.

19    Q.    At the scene after you were up off the ground,

14:05:34  20    did you see her walking around?

21    A.    No.

22    Q.    You didn't see her move at all?

23    A.    No.

24    Q.    So, you couldn't say one way or the other

14:05:41  25    whether she appeared to be injured or not?

1      A.   No, because I was being walked across and put

2  into the back of that car.

3      Q.   But -- but you couldn't tell whether she was

4  injured or not?

14:05:50  5      A.   When she was in front of me, she was not.  The

6  fire department had come, and the firemen asked her was

7  she hurt, and she said "no" to him.

8      Q.   You heard her say that?

9      A.   I heard her say "no."

14:06:01 10      Q.   Okay.  Well, I asked you a while ago if you

11  heard her say anything.  When was that?

12      A.   Well, you asked me if I heard her say anything

13  else.

14      Q.   Okay.

14:06:08 15      A.   And I said I did not recall her saying

16  anything, but I did recall someone asking "What did

17  you" -- "What are you going to charge her with?"

18      Q.   Okay.  Well, when in all this sequence of

19  events did you hear her tell the fire department that

14:06:22 20  she was okay?

21      A.   When they put me in the back of the car.

22      Q.   Okay.  So, she told the fire department --

23  what you understood is she told the fire department she

24  was okay.  You had told an officer you were okay.

14:06:33 25      A.   I told him -- he asked if I was physically

```
  1    best I can since I think y'all were --
  2                   MR. BYROM:  What is it?
  3                   MR. TOWNSEND:  We -- we had a discussion,
  4    and I guess we weren't off the record.
14:43:03  5           MR. BYROM:  Oh, okay.
  6                   MR. TOWNSEND:  Well, I don't even
  7    remember what -- we were finding the spot on there; and
  8    she said -- well, I -- it's that point she's going to
  9    say -- she's going to say -- I don't remember exactly
14:43:17 10    what it was but --
 11                   MR. BYROM:  Okay.
 12                   MR. TOWNSEND:  -- something to the effect
 13    that --
 14                   MR. BYROM:  Well, let's just get back on.
14:43:22 15           THE VIDEOGRAPHER:  We're on.
 16        Q.   (BY MR. BYROM)  Okay.  Ms. Jones, I'd asked
 17    you to find the part in the video where you thought
 18    you -- the gun was being pointed at you or you saw the
 19    gun being pointed at you.  Where is that?
14:43:32 20       A.   It shows at 5:17, but the video doesn't show
 21    her walking towards me --
 22        Q.   Okay.
 23        A.   -- with the gun.
 24        Q.   Okay.  What I was asking you is:  Is there any
14:43:45 25    place on the video that it specifically shows her
```

Beginning of tape number 5.  Time is 3:14.

EXAMINATION

BY MR. TOWNSEND:

Q.   Ms. Jones, on the day of the incident, what

15:14:52  was your opinion then, on that day, on whether you hit

Officer Spikes?

MR. BYROM:  Objection; form.

A.   I -- I didn't hit Officer Spikes.  In watching

the video, she reacts as though she's been hit.

15:15:12  MR. TOWNSEND:  Okay.  That's -- that's

the only question I have.  I pass the witness.

REEXAMINATION

BY MR. BYROM:

Q.   Ms. Jones, tell me every piece of information

15:15:25  you have that would indicate that Ms. Spi -- that

Officer Spikes was not hit by your vehicle, every piece

of evidence you know.

A.   Every piece of evidence that I know?

Q.   That would indicate that she was not hit by

15:15:42  your vehicle.

A.   My mirror was still sticking out on the side;

and when I -- all I did was turn my head and turn

around, and she's already claiming that she got hit.

Q.   Anything else?

15:16:02  A.   No.

1  THE STATE OF TEXAS:

2  COUNTY OF JEFFERSON:

3      I, DIANNA L. EDWARDS, a Certified Shorthand
   Reporter in and for the State of Texas, hereby certify
4  that the foregoing testimony was given before me after
   the Witness had been first duly sworn.

5
      I further certify that this deposition was typed
6  under my direction and is a complete and correct
   transcript of the proceedings; and that it is being
7  filed with the Court in accordance with the Stipulation
   of Counsel contained in this deposition.

8
      I further certify that I am neither attorney for,
9  related to, nor employed by any of the parties to the
   lawsuit in which this deposition was taken.  Further, I
10 am neither related to nor employed by any attorney of
   record in this cause; nor do I have a financial interest
11 in the matter.

12     GIVEN UNDER MY HAND AND SEAL OF OFFICE this 12th
   day of December, 2014.

13

14

15     _Dianna Edwards_
       DIANNA L. EDWARDS, Texas CSR 3584
16     Expiration Date:  12-31-15
       Jan Girouard & Associates
17     Firm Registration No. 99
       550 Fannin, Suite 108
18     Beaumont, Texas  77701
       (409) 832-2721

19

20

21

22

23

24

25