Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

CHRISTINE JONES                |
                               |
VS.                            | CIVIL NO. 1:14CV00103
                               |
TAMARA SPIKES AND              | JUDGE KEITH GIBLIN
BEAUMONT INDEPENDENT           |
SCHOOL DISTRICT POLICE         |
DEPARTMENT                     |

*************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

MATTHEW CUSTER

November 21, 2014

*************************************************************

    ORAL AND VIDEOTAPED DEPOSITION OF MATTHEW CUSTER,

produced as a witness at the instance of the plaintiff,

and duly sworn, was taken in the above styled and

numbered cause on November 21, 2014, from 9:06 a.m. to

10:31 a.m., before Tonya Jackson, CSR-CRR, in and for

the State of Texas, reported by machine shorthand

recording, at the law offices of Bush Lewis, 595

Orleans, Suite 500, Beaumont, Texas, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record or attached therein.

1   Beaumont involving BISD Officer Tamara Spikes and a

2   parent named Christine Jones after Officer Spikes called

3   for assistance on the afternoon of May 2nd, 2013?

4        A.   Yes, sir.

5        Q.   Is Exhibit A a copy of the police report that

6   you prepared after that incident?

7        A.   It's a copy of my supplement, yes, sir.

8        Q.   Was there some other report besides the

9   supplement that you did?

10        A.   The arresting officer does the initial report.

11        Q.   Okay.  So, the supplement just means that it

12   was not done by the arresting officer, wrote by someone

13   else?

14        A.   Correct.

15        Q.   Were you accurate and truthful in that report?

16        A.   Yes, sir.

17        Q.   Did you in that report include what you thought

18   were the most important things that you observed and did

19   at the scene?

20        A.   Yes, sir.

21        Q.   You also observed, when you got to the scene,

22   that Officer Spikes had her gun drawn, correct?

23        A.   Yes, sir.

24        Q.   You also observed a black female, which you

25   later learned was Mrs. Jones, standing partially in the

1   driver's side of a white SUV vehicle next to Officer

2   Spikes and partially on the pavement, correct?

3       A.   Yes, sir.

4       Q.   Did you also hear Officer Spikes order the

5   black female to exit the vehicle and get on the

6   pavement?

7       A.   Yes, sir.

8       Q.   And can we agree that I can now call the black

9   female "Mrs. Jones" because you know that's who she is

10  now?

11      A.   Yes, sir.

12      Q.   Did you then draw your gun and also order

13  Mrs. Jones to get on the ground or the pavement?

14      A.   Yes, sir.

15      Q.   Was it your belief at that time that drawing

16  your weapon at that time, place, and situation was in

17  compliance with the customs and policies of the BISD

18  Police Department?

19      A.   Yes, sir.

20      Q.   Was it your belief that Officer Spikes having

21  her weapon drawn at that time and in that situation was

22  in compliance with the customs and policies of the BISD

23  Police Department?

24      A.   Yes, sir.

25      Q.   Were you ever disciplined for drawing your

1  weapon during that incident?

2      A.    No, sir.

3      Q.    Are you aware of any discipline of Officer

4  Spikes for drawing her weapon during that incident?

5      A.    No, sir.

6      Q.    Are you aware of there being any discipline or

7  investigation of Officer Spikes for anything she did

8  during the incident at Vincent Middle School on May 2nd,

9  2013?

10      A.    Not that I'm aware of.

11      Q.    Based on your training and experience in law

12  enforcement, what's your understanding of when it is

13  appropriate for an officer to draw a gun?

14      A.    In that situation, believing --

15      Q.    Well, excuse me.  I'm not asking about that

16  situation.  What I'm asking is:  When is it appropriate

17  in general for an officer to draw a gun?

18      A.    When in fear of their life of the lives of

19  others.

20      Q.    Did you draw your gun at the scene of the

21  incident on May 2nd, 2013, because you thought Officer

22  Spikes might have put Mrs. Jones at risk of the use of

23  unlawful deadly force?

24            MR. BYROM:  Objection, form.

25      A.    Can you rephrase that?

1   doing that -- that's what lawyers do.

2       A.   I can't hear what they're saying.   I can just

3   hear something.

4            No, sir.

5       Q.   You would not have opened fire on Officer

6   Spikes if you thought that she was unlawfully shooting

7   at Mrs. Jones?

8                 MR. BYROM:   Objection, form.

9       A.   No, sir.

10      Q.   (By Mr. Lewis) Why would that be?

11      A.   I do not -- I cannot speculate on her reasoning

12  for open fire.   I can't second-guess another officer's

13  decision at the time it takes place.

14      Q.   Did Officer Spikes appear to have trouble

15  standing or walking when you arrived at the scene at

16  Vincent Middle School that day?

17      A.   Not that I recall.

18      Q.   How many civilian parents and students do you

19  estimate were in the area outside Vincent Middle School

20  at the time that you and Officer Spikes had your weapons

21  drawn?

22      A.   I couldn't even begin to guess.   There was --

23  had to be at least 20.   Probably more.

24      Q.   Well, school had let out, correct?

25      A.   Yes, sir.

 1    Q.    And parents were picking up kids?

 2    A.    Yes, sir.

 3    Q.    And there was significant parent traffic there,

 4    correct?

 5    A.    Yes, sir.

 6    Q.    And there were kids standing under the awning

 7    and along the walk there, right?

 8    A.    Yes, sir.

 9    Q.    And how far was Mrs. Jones' vehicle from the

10    walk area where the students were?

11    A.    To the best of my memory, it was against the

12    curb.

13    Q.    Did you ever have any indication at the scene

14    that Mrs. Jones had any weapon before or after you drew

15    your weapon?

16            MR. BYROM:   Objection, form.

17    A.    My personal opinion, a vehicle can be

18    considered as a weapon.

19    Q.    (By Mr. Lewis) So, everybody that was picking

20    up a child that day had a weapon?

21    A.    I guess you could say that.

22    Q.    Other than her vehicle, did you see any

23    indication that Mrs. Jones had a weapon that day before

24    or after you drew your weapon?

25    A.    No, sir.

1    Q.    Did you see Mrs. Jones make any aggressive

2  movement toward Officer Spikes?

3    A.    No, sir.

4    Q.    Did you ever see Officer Spikes and Mrs. Jones

5  wrestle?

6    A.    Mrs. Jones was assisted to the ground by I

7  believe Officer Spikes and myself and secured with

8  handcuffs.

9    Q.    Did you ever see Officer Spikes and Mrs. Jones

10  wrestle?

11    A.    I would not call it wrestling, no, sir.

12    Q.    When you ordered Mrs. Jones to get on the

13  ground, she did so, correct?

14    A.    Not immediately, no, sir.

15    Q.    Could I get you to look at your report?

16    A.    Yes, sir.

17    Q.    About a fourth of the way down, you say that "I

18  drew my weapon and issued commands to get on the ground.

19  The female complied and laid down on the ground, at

20  which time I assisted Officer Spikes in securing the

21  female."

22    A.    Yes, sir.

23    Q.    Is that what you wrote?

24    A.    Yes, sir.

25    Q.    If you had had any trouble getting her to the

1    ground, you would have written it down, wouldn't you?

2        A.    Like I said, we assisted her to the ground.

3        Q.    Well, in your report you said that she

4    complied --

5        A.    Yes, sir.

6        Q.    -- and laid down, at which time you assisted

7    Officer Spikes.

8              Am I reading that correctly?

9        A.    Yes, sir.

10       Q.    And if you had had any problems getting her to

11   lay down, you would have written it in your report,

12   wouldn't you?

13       A.    Correct.

14       Q.    So, is it fair to assume there was no problem

15   getting her to comply with lying down?

16       A.    Other than having to issue multiple commands.

17       Q.    How long from the time you issued your first

18   command until she got on the ground do you think it was?

19       A.    I couldn't tell you.

20       Q.    Less than a minute?

21       A.    I don't recall.

22       Q.    Is it correct that you were not there when

23   Officer Spikes was allegedly assaulted with Mrs. Jones'

24   vehicle?

25       A.    Correct.

1    Q.    Did you ever hear Officer Spikes ask Mrs. Jones

2  to identify herself or furnish identification while you

3  were there?

4    A.    No, sir.

5    Q.    Did you ever tell Mrs. Jones she was under

6  arrest?

7    A.    I don't recall if it was me or Officer Spikes.

8    Q.    You don't recall -- do you recall whether

9  anybody told her she was under arrest?

10    A.    I feel quite sure somebody did whenever she was

11  placed in cuffs and taken to the patrol car.

12    Q.    Well, when you're getting her out of the

13  vehicle, did you tell her she was under arrest?

14    A.    I didn't, no, sir.

15    Q.    Do you recall hearing Officer Spikes say that?

16    A.    I don't recall.

17    Q.    Did you tell Mrs. Jones anything after you told

18  her to get out of the vehicle and get on the ground,

19  that you remember?

20    A.    Not that I recall.

21    Q.    You indicated that you assisted Officer Spikes

22  in securing the female.  You said, "I used two sets of

23  handcuffs and double locked both pair on the female's

24  wrist."  Could you explain what's meant by "double

25  locked"?

1    but I wasn't sure.  I just wanted to make sure.

2              Did Mrs. Jones ask to not be cuffed?

3    A.    I don't recall.

4    Q.    Do you recall her saying that the cuffs really

5    weren't necessary?

6    A.    I don't recall.

7    Q.    You indicated that -- well, let me ask that.

8    I'm not sure that's in the report.

9              Once Mrs. Jones laid on the pavement, did you

10   holster your weapon?

11   A.    Yes, sir.

12   Q.    When is it appropriate for an officer to

13   holster a drawn weapon?

14   A.    When the officer feels the scene is secure

15   enough to holster.

16   Q.    Do you agree that a gun is a weapon of deadly

17   force?

18   A.    Yes, sir.

19   Q.    Is an officer ever justified in using deadly

20   force on a person unless the officer reasonably believes

21   there is a substantial risk the person will cause death

22   or serious bodily injury to the officer or another if

23   arrest is delayed?

24              MR. BYROM:  Objection, form.

25              MS. BROUSSARD:  Objection, form.

25

1          So, this particular day you were not on your

2     motorcycle; you were in your personal truck?

3          A.   I had actually gotten off and was headed home

4     when the call for assistance went out.

5          Q.   And what kind of truck do you have?  What color

6     is it?

7          A.   Blue Ford F -- well, it was a blue Ford F-150

8     SuperCrew.

9          Q.   Did you perform an investigation of this

10    incident?

11         A.   No, sir.

12         Q.   Did you interview any witnesses?

13         A.   No, sir.

14         Q.   Did you interview Mrs. Jones?

15         A.   No, sir.

16         Q.   Did you hear Mrs. Jones say anything at the

17    scene that you remember?

18         A.   Not that I recall.

19         Q.   Would it be appropriate, in your opinion, for

20    an officer to draw a handgun outside of a school with

21    students, parents, and school personnel present and pace

22    back and forth in the road with the gun drawn while a

23    school employee talked to the driver with whom the

24    officer had an issue?

25         A.   No, sir.

1    Has there ever been a sign that you recall

2    prohibiting a left turn into the Vincent driveway there?

3    A.    No, sir.  That's one of the reasons I had so

4    much trouble with parents.

5    Q.    Would it be fair to say that to your knowledge

6    neither the City of Beaumont or BISD has done anything

7    to get a sign put up there or to get any kind of

8    regulation or law passed prohibiting left turns?

9    A.    I know they have placed "no parking" signs from

10   this driveway (indicating) down to the corner to try to

11   ensure the street remaining open.

12   Q.    Okay.  But they didn't have "no left turn"

13   signs?

14   A.    I don't think anybody has asked for them.

15   Q.    Okay.  And is it your opinion that officer --

16   do you have an opinion whether or not Officer Spikes has

17   the authority to decide that drivers can't make a lawful

18   left turn into that driveway?

19   MR. BYROM:  Objection, form.

20   A.    My opinion -- I mean, I did it when I was

21   there; and the majority of the parents liked it because

22   they were out of there quicker.  Do I have the authority

23   to do it?  We can make temporary traffic adjustments as

24   necessary to ensure the orderly flow of traffic.

25   Q.    (By Mr. Lewis) And would you make that

1    A.    Correct.

2    Q.    The -- could you explain to me what type of

3  communications the BISD school officers had back in May

4  of 2013?

5    A.    We have department radios, and I believe we had

6  campus radios.

7    Q.    Help me out -- well, first off, has it changed

8  any since then?

9    A.    Not that I'm aware of.

10    Q.    Could you explain to me how the campus radio

11  works?

12    A.    Several of the campuses -- Ozen, West Brook,

13  Vincent, I believe Marshall -- have small radios that

14  are strictly on-campus communications.

15    Q.    Okay.  So, that would be like the

16  administrators talking to each other at the school.

17    A.    Correct.

18    Q.    Would the police officers have those?

19    A.    Yes, sir.

20    Q.    Okay.  And that's so that they can be in

21  contact with the administrators?

22    A.    Correct.

23    Q.    When you showed up this day, I'm assuming that

24  you didn't have the campus radio with you.

25    A.    No, sir.  Each campus has specific radios.  In

1    other words, Ozen's radios work at Ozen, West Brook's

2    work at West Brook, Vincent's radios work at Vincent,

3    Central's work at Central.

4        Q.    And you were telling me earlier you hadn't been

5    working at Vincent that day.

6        A.    Correct.

7        Q.    Okay.  Do you know if Officer Spikes had a

8    radio that day?

9        A.    I don't know.

10       Q.    Okay.  Well, tell me about the -- and that --

11   the campus radio would not go to the police dispatcher;

12   is that correct?

13       A.    Correct.

14       Q.    Now, did the BISD Police Department back then

15   have its own dispatcher?

16       A.    Yes, sir.

17       Q.    And where would that dispatcher be located?

18       A.    I believe in '13 the dispatcher was out at

19   Thomas Stadium.  I don't remember the exact day they

20   moved out there.  After we got out of our double-wide

21   trailer, they put dispatch out at Thomas Stadium.

22       Q.    Okay.  And tell me how the radio communication

23   works in the police department.  Is it on all the time,

24   or do you have to push the mic?

25       A.    You got to push the -- you got to key up.

```
 1        A.    Yes, sir, if it's functioning.

 2        Q.    And the reason for that is you want to record

 3   exactly what's going on, right?

 4        A.    Correct.

 5        Q.    That way you don't have a dispute about it

 6   later, do you?

 7        A.    Correct.

 8        Q.    Have you ever been trained by the BISD Police

 9   Department in the use of the assault rifles that they

10   have?

11        A.    No, sir.

12        Q.    Do you know anything about those?

13        A.    Yes, sir.

14        Q.    Tell me what you know about those assault

15   rifles.

16        A.    We received some rifles from the military.

17   They have been locked in the safe, and that's where

18   they're at.

19        Q.    Would you agree with me that you can't have an

20   assaultive offense unless someone intended to assault

21   someone?

22                   MR. BYROM:   Objection, form.

23                   MS. BROUSSARD:   Objection, form.

24        A.    I believe -- I mean, somebody has to assault

25   somebody for there to be an offense.
```

1     Q.   (By Mr. Lewis) Well, if someone accidentally

2  bumps someone or accidentally strikes someone with a

3  vehicle, do you agree that that's not an assault?

4     A.   Not knowing what the intent of the person in

5  the vehicle is?

6               MR. BYROM:  Objection, form.

7     Q.   (By Mr. Lewis) Well, if it's an accident, that

8  would indicate that they didn't mean to do it, right?

9     A.   Correct.

10     Q.   And if it's an accident, it can't be an

11  assault, can it?

12     A.   Correct.

13     Q.   Officer Spikes prepared an affidavit for arrest

14  warrant in this case, and I'm -- I guess I'm somewhat

15  perplexed because it appears to me that this had to be

16  done after the arrest was already made.  So, my question

17  is:  Is it typical -- was it typical in the BISD Police

18  Department to complete an affidavit for arrest warrant

19  after an arrest?

20     A.   Standard practice, you arrest somebody, you

21  take them to county jail, you set them down on a bench.

22  The jail basically assumes custody at that point.  You

23  go into a separate room and type up your probable cause

24  affidavit.

25     Q.   Okay.  So, that's what probably happened in

1    Q.    (By Mr. Lewis) Well, let me ask it another way.

2    A.    Okay.

3    Q.    Could I get you to look at page 85 of the

4    materials that were produced and look at Policy

5    07-44/005 and read that for us?  Out loud, if you would,

6    please.

7    A.    Okay.  (Reading) An officer's good faith will

8    not alone justify an invalid arrest.

9    Q.    Do you agree with that policy?

10   A.    Yes, sir.

11   Q.    But at the same time, if you're on the scene

12   and an officer asks your assistance in making an arrest,

13   unless you have reason to doubt that the arrest is

14   valid, the policy is that you assist that officer,

15   right?

16   A.    Correct.

17   Q.    And that's what happened in this case, right?

18   A.    Correct.

19   Q.    And when you're making an arrest, it's the

20   policy of both the BISD P.D. and law enforcement in

21   general that you have to inform the person being

22   arrested, unless it's impractical, that you intend to

23   take them into custody and the reason that you're going

24   to take them into custody?

25       A.    I would assume, I mean, when you place

1  handcuffs on somebody and tell them they're under

2  arrest.

3      Q.    Well, that's not what I'm asking.    When you're

4  arresting someone --

5      A.    Uh-huh.

6      Q.    -- you have to tell them, "I am taking you into

7  custody" or "I am arresting you, and I am arresting you

8  for" whatever the crime is that you're charging them

9  with, right?

10      A.    I don't know any other department's policies.

11  Like I said, I know that when I -- like if I arrest you,

12  I mean, "Mr. Bush, you're under arrest for the offense

13  of driving while intoxicated."

14      Q.    I'm glad you're arresting Bush instead of

15  Lewis.

16              MR. BYROM:    There you go.

17      A.    I mean, I'm not exactly sure.    I know how I

18  operate and how I've operated for 20 years.

19      Q.    (By Mr. Lewis) Let me get you to read the BISD

20  policy that's on pages 87 and 88, Policy 07-48/005,

21  about inform arrestee.    If you can please read that out

22  loud for us.

23      A.    (Reading) When not impractical, the officer

24  shall inform the person being arrested of the following

25  factors:    That the officer intends to take him into

1    custody and the reason for the arrest.

2        Q.    And is it your understanding that's not just

3    the policy of the police department, that in fact that's

4    the law in general, isn't it?

5        A.    I'm not sure as far as law.  Like I said, I

6    know how I've operated for 20 years; and that's -- to me

7    that's common sense in law enforcement.  You don't just

8    walk up and put cuffs on somebody and take them to jail

9    and not tell them anything.

10        Q.    Well, first you have to tell them "I'm

11    arresting you" or "I'm taking you into custody."  Then

12    you tell them why, right?

13        A.    That's what I say.  I mean, that's -- like I

14    said, you don't just walk up to somebody and cuff them

15    and throw them in the car and take them to jail and not

16    tell them anything.

17        Q.    And you would agree that a gun is a deadly

18    weapon, right?

19        A.    Yes, sir.

20        Q.    And will you agree that the policy of the BISD

21    Police Department and law enforcement in general is that

22    lawful and proper force is restricted to using only the

23    force that's necessary to control and terminate unlawful

24    resistance?

25        A.    Correct.

1    Q.    And to preclude any other physical attack

2    against a police officer or anyone else, right?

3    A.    Correct.

4    Q.    I'm going to ask you if you would read the

5    requirements for use of force on page 101 of the

6    BISD P.D. materials, Policy 06-63002, the requirements

7    of force.

8    A.    Excuse me.    (Reading document.)

9    Q.    Could I get you to read that out loud for us?

10    A.    002 or 003?  And I need the rest of it because

11    it stops at No. 1 there.

12    Q.    No, 002.

13    A.    Oh, okay.  It says (reading) before an officer

14    may use force against any suspect, the officer must have

15    probable cause to arrest that suspect and manifest his

16    purpose to arrest and identify himself as a peace

17    officer unless the officer reasonably believes that the

18    suspect already knows his purpose and identity or unless

19    the officer cannot reasonably make that information

20    known to the suspect and give the reason for the arrest

21    unless impractical.

22    Q.    Would that require Officer Spikes to tell

23    Mrs. Jones that she was under arrest before she drew her

24    weapon?

25    A.    Depending on the totality of the circumstances,

1    no, sir.

2        Q.    And do you agree that the policy of the BISD

3    Police Department now and back when this incident

4    occurred in May of 2013 was that an officer apply only

5    the force that is necessary and they have to exhaust all

6    other lesser force before they apply the next one?

7        A.    I would agree that no force other than what is

8    needed to overcome the resistance is used.

9        Q.    Well, you have an escalating policy on the use

10   of force, do you not?

11       A.    Correct.

12       Q.    You start with the lowest level and work your

13   way up or down depending on how --

14       A.    Correct.

15       Q.    -- you look at it, right?

16       A.    Correct.

17       Q.    And the first one is the officer's presence,

18   right?

19       A.    Yes, sir.

20       Q.    The second is verbal commands?

21       A.    Uh-huh.

22       Q.    And the third is physical strength and skills,

23   which is just doing whatever you do physically without

24   using any weapons, right?

25       A.    Correct.

1    Q.    The next is chemical agents such as mace or

2    pepper spray, right?

3    A.    Correct.

4    Q.    And then finally authorized baton, right?

5    A.    Correct.

6    Q.    And, last, an authorized service revolver or

7    other firearm?

8    A.    Correct.

9    Q.    And, of course, officers can't fire warning

10   shots.

11   A.    Correct.

12   Q.    Despite what you see on T.V., that's not

13   allowed in law enforcement, is it?

14   A.    No, sir.

15   Q.    And law enforcement officers can't position

16   themselves in the direct path of a moving vehicle to

17   stop it, can they?

18   A.    It's not smart; but no, sir, they shouldn't.

19   Q.    And you can't put yourself in the path of a

20   moving vehicle and then use deadly force saying that you

21   were at risk because the vehicle was coming at you, can

22   you?

23   A.    Correct.

24   Q.    In fact, there is a BISD policy about that,

25   marked in yellow toward the bottom of the page.

1       Q.    Okay.

2       A.    I have never been an administrator and don't

3   really want to be one.

4       Q.    You mentioned the holster mark.  Did you see

5   any other indications that supported Mrs. Spikes'

6   story -- I mean, Officer Spikes?

7       A.    Not that I recall.

8       Q.    Okay.  Did you see any visible injuries on her?

9       A.    Not that I recall.

10      Q.    Okay.  Have we covered everything that you

11  recall about this incident?

12      A.    To the best of my memory.

13      Q.    Okay.  Thank you very much.  I appreciate your

14  time.

15                       EXAMINATION

16  BY MR. BYROM:

17      Q.    My name is Jim Byrom.  I met you for the first

18  time when I walked in --

19              THE VIDEOGRAPHER:  Sir, excuse me.  Can

20  you get a mic?

21              MR. BYROM:  Can I have a mic?  Can I have

22  somebody's microphone?

23              Thanks.  Let me start over.

24              Are you ready?

25              THE VIDEOGRAPHER:  Yes, sir.

1    Q.    Okay.  Would she have had the microphone?

2    A.    Yes, sir, similar to this.  Not this exact one.

3    Q.    And would she have had "police" on each

4    shoulder?

5    A.    Yes, sir.

6    Q.    Have you ever had anybody, when you're dressed

7    that way, tell you they don't know you're a police

8    officer?

9    A.    Had several people say we're rent-a-cops but --

10    Q.    Because you work for the school?

11    A.    Yes, sir.

12    Q.    Okay.  But has anybody misunderstood that

13    you're a peace officer?

14    A.    Like I said, several people don't believe we're

15    actual police.

16    Q.    I got you.  I got you.  You certainly are

17    dressed like a police officer.

18    A.    Yes, sir.

19    Q.    And that was the way that Tamara Spikes was

20    dressed that day?

21              MR. LEWIS:  Objection, form.

22    A.    To the best of my memory, yes, sir.

23    Q.    (By Mr. Byrom) Okay.  You also note in your

24    report that you did talk to Mrs. Jones' husband.

25    A.    Yes, sir.

1    Q.   Okay.  And you had parents that you had those

2  kind of problems with?

3    A.   Correct.

4    Q.   And she wasn't one of them.

5    A.   Correct.

6    Q.   And have you ever had to unholster your weapon

7  when you were involved in directing traffic at any of

8  the schools?

9    A.   No, sir.

10    Q.   Have you ever had to unholster your weapon in

11  any other situations while working for the BISD Police

12  Department?

13    A.   When I was on graveyards, several times.

14    Q.   Okay.  And would that be when you would be

15  called out to school property because there was a report

16  something had occurred?

17    A.   Checking open doors, alarms, assisting the City

18  of Beaumont Police Department in some of these traffic

19  stops.

20    Q.   Okay.  So, those are situations where it's an

21  unknown situation or potential threat.

22    A.   Correct.

23    Q.   And on this particular occasion, if you had

24  arrived at the school and Officer Spikes had not had her

25  weapon drawn, would you have drawn your weapon --

1    A.    No.

2    Q.    -- based on what you saw?

3          So, it was the fact that she had her weapon

4    drawn that caused you to draw yours?

5    A.    Correct.

6    Q.    That's all I have.  Thank you very much.

7                         REEXAMINATION

8    BY MR. BYROM:

9    Q.    Just a couple other things.

10         You did come up and draw, as you've --

11   A.    Correct.

12   Q.    -- just described?

13         You didn't ever point your gun at Mrs. Jones,

14   did you?

15   A.    No.

16   Q.    What do you do with it?

17   A.    It's in what's called the "low ready," and

18   basically -- I'm not going to draw but you have the

19   weapon down and finger is not on the trigger and you're

20   ready to react if you need to.  It's less reaction time

21   than having to (demonstrating).

22   Q.    And that's per policy and procedure as well,

23   the low ready and the --

24   A.    Yes, sir.

25   Q.    And Tamara Spikes' gun was in low ready as

84

```
 1   COUNTY OF JEFFERSON    )

 2   STATE OF TEXAS         )

 3       I hereby certify that the witness was notified on

 4   _November 25____, 2014, that the witness has 30 days or

 5   (xxx days per agreement of counsel) after being notified

 6   by the officer that the transcript is available for

 7   review by the witness and if there are changes in the

 8   form or substance to be made, then the witness shall

 9   sign a statement reciting such changes and the reasons

10   given by the witness for making them;

11       That the witness' signature (was) was not returned as

12   of _December 17, 2014____.

13       Subscribed and sworn to on this, the _18th_ day of

14   _December__, 2014.

15

16

17                    _Tonya Jackson_____
                      TONYA JACKSON, Texas CSR No. 4898
18                    Expiration Date:  12/31/14
                      Jan Girouard & Associates
19                    Firm Registration No. 99
                      550 Fannin, Suite 108
20                    Beaumont, Texas 77701
                      (409) 832-2721
21

22

23

24

25
```