# EXHIBIT 1

```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
                         BEAUMONT DIVISION

CHRISTINE JONES                 |
                                |
VS.                             | CIVIL NO. 1:14CV00103
                                |
TAMARA SPIKES AND               | JUDGE KEITH GIBLIN
BEAUMONT INDEPENDENT            |
SCHOOL DISTRICT POLICE          |
DEPARTMENT                      |
```

**************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

MATTHEW CUSTER

November 21, 2014

**************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF MATTHEW CUSTER, produced as a witness at the instance of the plaintiff, and duly sworn, was taken in the above styled and numbered cause on November 21, 2014, from 9:06 a.m. to 10:31 a.m., before Tonya Jackson, CSR-CRR, in and for the State of Texas, reported by machine shorthand recording, at the law offices of Bush Lewis, 595 Orleans, Suite 500, Beaumont, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached therein.

```
 1      Q.   And parents were picking up kids?
 2      A.   Yes, sir.
 3      Q.   And there was significant parent traffic there,
 4  correct?
 5      A.   Yes, sir.
 6      Q.   And there were kids standing under the awning
 7  and along the walk there, right?
 8      A.   Yes, sir.
 9      Q.   And how far was Mrs. Jones' vehicle from the
10  walk area where the students were?
11      A.   To the best of my memory, it was against the
12  curb.
13      Q.   Did you ever have any indication at the scene
14  that Mrs. Jones had any weapon before or after you drew
15  your weapon?
16              MR. BYROM:  Objection, form.
17      A.   My personal opinion, a vehicle can be
18  considered as a weapon.
19      Q.   (By Mr. Lewis) So, everybody that was picking
20  up a child that day had a weapon?
21      A.   I guess you could say that.
22      Q.   Other than her vehicle, did you see any
23  indication that Mrs. Jones had a weapon that day before
24  or after you drew your weapon?
25      A.   No, sir.
```

1    Q.   Did you see Mrs. Jones make any aggressive
2  movement toward Officer Spikes?
3    A.   No, sir.
4    Q.   Did you ever see Officer Spikes and Mrs. Jones
5  wrestle?
6    A.   Mrs. Jones was assisted to the ground by I
7  believe Officer Spikes and myself and secured with
8  handcuffs.
9    Q.   Did you ever see Officer Spikes and Mrs. Jones
10 wrestle?
11   A.   I would not call it wrestling, no, sir.
12   Q.   When you ordered Mrs. Jones to get on the
13 ground, she did so, correct?
14   A.   Not immediately, no, sir.
15   Q.   Could I get you to look at your report?
16   A.   Yes, sir.
17   Q.   About a fourth of the way down, you say that "I
18 drew my weapon and issued commands to get on the ground.
19 The female complied and laid down on the ground, at
20 which time I assisted Officer Spikes in securing the
21 female."
22   A.   Yes, sir.
23   Q.   Is that what you wrote?
24   A.   Yes, sir.
25   Q.   If you had had any trouble getting her to the

```
 1  ground, you would have written it down, wouldn't you?
 2       A.   Like I said, we assisted her to the ground.
 3       Q.   Well, in your report you said that she
 4  complied --
 5       A.   Yes, sir.
 6       Q.   -- and laid down, at which time you assisted
 7  Officer Spikes.
 8            Am I reading that correctly?
 9       A.   Yes, sir.
10       Q.   And if you had had any problems getting her to
11  lay down, you would have written it in your report,
12  wouldn't you?
13       A.   Correct.
14       Q.   So, is it fair to assume there was no problem
15  getting her to comply with lying down?
16       A.   Other than having to issue multiple commands.
17       Q.   How long from the time you issued your first
18  command until she got on the ground do you think it was?
19       A.   I couldn't tell you.
20       Q.   Less than a minute?
21       A.   I don't recall.
22       Q.   Is it correct that you were not there when
23  Officer Spikes was allegedly assaulted with Mrs. Jones'
24  vehicle?
25       A.   Correct.
```

1   Q.   Did you ever hear Officer Spikes ask Mrs. Jones
2   to identify herself or furnish identification while you
3   were there?
4   A.   No, sir.
5   Q.   Did you ever tell Mrs. Jones she was under
6   arrest?
7   A.   I don't recall if it was me or Officer Spikes.
8   Q.   You don't recall -- do you recall whether
9   anybody told her she was under arrest?
10  A.   I feel quite sure somebody did whenever she was
11  placed in cuffs and taken to the patrol car.
12  Q.   Well, when you're getting her out of the
13  vehicle, did you tell her she was under arrest?
14  A.   I didn't, no, sir.
15  Q.   Do you recall hearing Officer Spikes say that?
16  A.   I don't recall.
17  Q.   Did you tell Mrs. Jones anything after you told
18  her to get out of the vehicle and get on the ground,
19  that you remember?
20  A.   Not that I recall.
21  Q.   You indicated that you assisted Officer Spikes
22  in securing the female.  You said, "I used two sets of
23  handcuffs and double locked both pair on the female's
24  wrist."  Could you explain what's meant by "double
25  locked"?

1  　　　　So, this particular day you were not on your
2  motorcycle; you were in your personal truck?
3  　　A.　I had actually gotten off and was headed home
4  when the call for assistance went out.
5  　　Q.　And what kind of truck do you have?  What color
6  is it?
7  　　A.　Blue Ford F -- well, it was a blue Ford F-150
8  SuperCrew.
9  　　Q.　Did you perform an investigation of this
10 incident?
11 　　A.　No, sir.
12 　　Q.　Did you interview any witnesses?
13 　　A.　No, sir.
14 　　Q.　Did you interview Mrs. Jones?
15 　　A.　No, sir.
16 　　Q.　Did you hear Mrs. Jones say anything at the
17 scene that you remember?
18 　　A.　Not that I recall.
19 　　Q.　Would it be appropriate, in your opinion, for
20 an officer to draw a handgun outside of a school with
21 students, parents, and school personnel present and pace
22 back and forth in the road with the gun drawn while a
23 school employee talked to the driver with whom the
24 officer had an issue?
25 　　A.　No, sir.

1  A.  Correct.

2  Q.  The -- could you explain to me what type of
3 communications the BISD school officers had back in May
4 of 2013?

5  A.  We have department radios, and I believe we had
6 campus radios.

7  Q.  Help me out -- well, first off, has it changed
8 any since then?

9  A.  Not that I'm aware of.

10 Q.  Could you explain to me how the campus radio
11 works?

12 A.  Several of the campuses -- Ozen, West Brook,
13 Vincent, I believe Marshall -- have small radios that
14 are strictly on-campus communications.

15 Q.  Okay.  So, that would be like the
16 administrators talking to each other at the school.

17 A.  Correct.

18 Q.  Would the police officers have those?

19 A.  Yes, sir.

20 Q.  Okay.  And that's so that they can be in
21 contact with the administrators?

22 A.  Correct.

23 Q.  When you showed up this day, I'm assuming that
24 you didn't have the campus radio with you.

25 A.  No, sir.  Each campus has specific radios.  In

```
 1  other words, Ozen's radios work at Ozen, West Brook's
 2  work at West Brook, Vincent's radios work at Vincent,
 3  Central's work at Central.
 4      Q.  And you were telling me earlier you hadn't been
 5  working at Vincent that day.
 6      A.  Correct.
 7      Q.  Okay.  Do you know if Officer Spikes had a
 8  radio that day?
 9      A.  I don't know.
10      Q.  Okay.  Well, tell me about the -- and that --
11  the campus radio would not go to the police dispatcher;
12  is that correct?
13      A.  Correct.
14      Q.  Now, did the BISD Police Department back then
15  have its own dispatcher?
16      A.  Yes, sir.
17      Q.  And where would that dispatcher be located?
18      A.  I believe in '13 the dispatcher was out at
19  Thomas Stadium.  I don't remember the exact day they
20  moved out there.  After we got out of our double-wide
21  trailer, they put dispatch out at Thomas Stadium.
22      Q.  Okay.  And tell me how the radio communication
23  works in the police department.  Is it on all the time,
24  or do you have to push the mic?
25      A.  You got to push the -- you got to key up.
```

1   A.   Yes, sir, if it's functioning.

2   Q.   And the reason for that is you want to record
3   exactly what's going on, right?

4   A.   Correct.

5   Q.   That way you don't have a dispute about it
6   later, do you?

7   A.   Correct.

8   Q.   Have you ever been trained by the BISD Police
9   Department in the use of the assault rifles that they
10  have?

11  A.   No, sir.

12  Q.   Do you know anything about those?

13  A.   Yes, sir.

14  Q.   Tell me what you know about those assault
15  rifles.

16  A.   We received some rifles from the military.
17  They have been locked in the safe, and that's where
18  they're at.

19  Q.   Would you agree with me that you can't have an
20  assaultive offense unless someone intended to assault
21  someone?

22              MR. BYROM:  Objection, form.

23              MS. BROUSSARD:  Objection, form.

24  A.   I believe -- I mean, somebody has to assault
25  somebody for there to be an offense.

1  Q. (By Mr. Lewis) Well, if someone accidentally
2  bumps someone or accidentally strikes someone with a
3  vehicle, do you agree that that's not an assault?
4  A. Not knowing what the intent of the person in
5  the vehicle is?
6  MR. BYROM: Objection, form.
7  Q. (By Mr. Lewis) Well, if it's an accident, that
8  would indicate that they didn't mean to do it, right?
9  A. Correct.
10  Q. And if it's an accident, it can't be an
11  assault, can it?
12  A. Correct.
13  Q. Officer Spikes prepared an affidavit for arrest
14  warrant in this case, and I'm -- I guess I'm somewhat
15  perplexed because it appears to me that this had to be
16  done after the arrest was already made. So, my question
17  is: Is it typical -- was it typical in the BISD Police
18  Department to complete an affidavit for arrest warrant
19  after an arrest?
20  A. Standard practice, you arrest somebody, you
21  take them to county jail, you set them down on a bench.
22  The jail basically assumes custody at that point. You
23  go into a separate room and type up your probable cause
24  affidavit.
25  Q. Okay. So, that's what probably happened in

1  custody and the reason for the arrest.
2      Q.   And is it your understanding that's not just
3  the policy of the police department, that in fact that's
4  the law in general, isn't it?
5      A.   I'm not sure as far as law.  Like I said, I
6  know how I've operated for 20 years; and that's -- to me
7  that's common sense in law enforcement.  You don't just
8  walk up and put cuffs on somebody and take them to jail
9  and not tell them anything.
10     Q.   Well, first you have to tell them "I'm
11 arresting you" or "I'm taking you into custody."  Then
12 you tell them why, right?
13     A.   That's what I say.  I mean, that's -- like I
14 said, you don't just walk up to somebody and cuff them
15 and throw them in the car and take them to jail and not
16 tell them anything.
17     Q.   And you would agree that a gun is a deadly
18 weapon, right?
19     A.   Yes, sir.
20     Q.   And will you agree that the policy of the BISD
21 Police Department and law enforcement in general is that
22 lawful and proper force is restricted to using only the
23 force that's necessary to control and terminate unlawful
24 resistance?
25     A.   Correct.

1   Q.   Okay.
2   A.   I have never been an administrator and don't
3   really want to be one.
4   Q.   You mentioned the holster mark.  Did you see
5   any other indications that supported Mrs. Spikes'
6   story -- I mean, Officer Spikes?
7   A.   Not that I recall.
8   Q.   Okay.  Did you see any visible injuries on her?
9   A.   Not that I recall.
10  Q.   Okay.  Have we covered everything that you
11  recall about this incident?
12  A.   To the best of my memory.
13  Q.   Okay.  Thank you very much.  I appreciate your
14  time.

                        EXAMINATION
16  BY MR. BYROM:
17  Q.   My name is Jim Byrom.  I met you for the first
18  time when I walked in --
19           THE VIDEOGRAPHER:  Sir, excuse me.  Can
20  you get a mic?
21           MR. BYROM:  Can I have a mic?  Can I have
22  somebody's microphone?
23           Thanks.  Let me start over.
24           Are you ready?
25           THE VIDEOGRAPHER:  Yes, sir.

```
 1      Q.    Okay.  Would she have had the microphone?
 2      A.    Yes, sir, similar to this.  Not this exact one.
 3      Q.    And would she have had "police" on each
 4   shoulder?
 5      A.    Yes, sir.
 6      Q.    Have you ever had anybody, when you're dressed
 7   that way, tell you they don't know you're a police
 8   officer?
 9      A.    Had several people say we're rent-a-cops but --
10      Q.    Because you work for the school?
11      A.    Yes, sir.
12      Q.    Okay.  But has anybody misunderstood that
13   you're a peace officer?
14      A.    Like I said, several people don't believe we're
15   actual police.
16      Q.    I got you.  I got you.  You certainly are
17   dressed like a police officer.
18      A.    Yes, sir.
19      Q.    And that was the way that Tamara Spikes was
20   dressed that day?
21            MR. LEWIS:  Objection, form.
22      A.    To the best of my memory, yes, sir.
23      Q.    (By Mr. Byrom) Okay.  You also note in your
24   report that you did talk to Mrs. Jones' husband.
25      A.    Yes, sir.
```