# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| CHRISTINE JONES | * | |
| | * | CIVIL ACTION |
| VS. | * | NO. 1:14-CV-00103 |
| | * | |
| TAMARA SPIKES AND BEAUMONT | * | Judge Keith Giblin |
| INDEPENDENT SCHOOL DISTRICT | * | |
| POLICE DEPARTMENT | * | |

*****************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
DAVID HALL

FEBRUARY 5, 2015

*****************************************************

ORAL AND VIDEOTAPED DEPOSITION of DAVID HALL, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 5th of February, 2015, from 2:06 p.m. to 3:26 p.m., before Kelly R. Kirkland, CSR in and for the State of Texas, reported by stenographic means, at the offices of Bush Lewis, PLLC, 595 Orleans Street, Suite 500, Beaumont, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

THE VIDEOGRAPHER: We're on the record at 2:06.

DAVID HALL,

having been first duly sworn, testified as follows:

14:08 EXAMINATION

BY MR. LEWIS:

Q. Would you tell us your name, please.

A. David Hall.

Q. And you understand that I am the attorney for

14:08 Ms. Jones, who has brought a lawsuit against the school district?

A. Yes, sir.

Q. The -- would you explain what your current condition -- position is?

14:09 A. Chief of police, BISD Police Department.

Q. And how long have you been the chief of police?

A. Since December 8th.

Q. And you were chosen to replace Chief Duncan?

A. Yes, sir.

14:09 Q. And would it -- is it your understanding that the interim school board at that point in time decided that Chief Duncan needed to be replaced?

A. Yes, sir.

Q. And did the interim board ask you what your

14:10 opinion was and how you wanted the police department to

move forward?

A. Yes.

Q. And did you indicate you wanted to restore the integ -- integrity of the police force?

14:10 A. I did.

Q. And did you also indicate you wanted to restore a sense of faith in the police force?

A. Yes.

Q. And did they indicate to you that they expected 14:10 you to change the culture of the police force?

A. And what -- and -- I mean, what are you meaning as far as the culture? That --

Q. Well, what would you consider the culture of the police force, if somebody asked you, "What is meant by 14:10 culture of the police force?"

A. I -- I would assume that they're talk -- talking about the officers that I have working for me.

Q. Do you remember your deposition being taken on January the 30th of this year in another case?

14:11 A. What -- on another case?

Q. Yes, sir.

A. Yes.

Q. Did -- did you -- were you asked whether or not the interim board wanted you to change the culture of the 14:11 police force, in that deposition?

A. I -- I don't remember.

Q. Okay. Did -- is it your goal to change the culture of the police force?

MS. KALCHTHALER: Objection, form.

14:12 A. My goal is to have the police to -- department be accountable for their actions.

Q. (BY MR. LEWIS) Did -- do -- do you also want there to be integrity in the police department?

A. Yes.

14:12 Q. And transparency?

MS. KALCHTHALER: Objection, form.

A. What else did you say? That --

Q. (BY MR. LEWIS) Do -- do you also want there to be some transparency in the police department?

14:12 MS. KALCHTHALER: Objection, form.

A. Define "transparency." I --

Q. (BY MR. LEWIS) Well, you do remember your deposition was taken in that other case on January the 30th?

14:13 A. I -- I do.

Q. Do you remember being asked, "And" -- "and they want you to change the culture of the police force at BISD, correct?"

A. Again, I -- I don't remember everything that was

14:13 asked.

Q. Okay. Let me get you to look on Page 9, beginning on Line 15. Would you read what that transcription shows?

A. It says, "And they want you to change the culture of the police force at BISD, correct?"

Q. And what did you answer?

A. I put "yes."

Q. Okay. And what was the next question they asked you?

A. It says, "By providing some integrity, right?"

Q. And what was your answer?

A. Well, yes -- or I put "right."

Q. Okay. Do you disagree with the answers that you gave on the 30th?

A. No, I don't.

Q. Okay. So those would still be true?

A. They'd still be true.

Q. Okay. And the police department answers to -- or the -- the police department for the school district answers to the Beaumont Independent School District, right?

MS. KALCHTHALER: Objection, form.

A. We answer to the superintendent.

Q. (BY MR. LEWIS) You -- yes -- you answer to the superintendent and at least indirectly to whoever is

is faced with negative influence from external stakeholders, which compromises the board's ability to effectively govern a district?"

A. Have I been told?

14:16 Q. Yeah.

A. No.

Q. Have you --

A. No.

Q. You weren't aware of that finding?

14:16 A. No.

Q. Would you agree, based on your observations, that prior to its replacement, that the elected school board for BISD was dysfunctional?

MS. KALCHTHALER: Objection, form.

14:16 A. I -- I -- I don't have an opinion on it.

Q. (BY MR. LEWIS) You would agree that the old elected school board was not the greatest school board --

MS. KALCHTHALER: Objection, form.

Q. (BY MR. LEWIS) -- would you not?

14:17 MS. KALCHTHALER: Same objection.

A. Ask the question again, please.

Q. (BY MR. LEWIS) Would you agree that the elected school board that was replaced by the appointed school board had some problems governing?

14:17 MS. KALCHTHALER: Objection, form.

MS. BROUSSARD: Objection, form.

A. I'd say that the -- that, in my opinion, they -- they needed to work together bet -- better.

Q. (BY MR. LEWIS) Do you remember in the -- the deposition that you gave on the 30th saying that, "Yeah, I would say that the old board probably wasn't the greatest board, some of the people"?

A. Yes.

Q. Would you agree with that?

A. Yes.

MS. KALCHTHALER: Objection, form.

Q. (BY MR. LEWIS) Would you agree that it's important for the police department of the BISD to protect the constitutional rights of citizens?

MS. KALCHTHALER: Objection, form.

A. Yes.

Q. (BY MR. LEWIS) In your opinion, does protecting the constitutional rights of citizens include not violating any constitutional rights?

MS. KALCHTHALER: Same objection.

A. Okay. Would you ask that question again, please.

Q. (BY MR. LEWIS) Sure.

Would you agree or disagree that protecting the constitutional rights of citizens includes not

violating those rights?

A. Yes.

Q. Since you became interim police chief, have you changed any of the written policies and pro -- procedures of the BISD Police Department?

A. I have not changed any policies yet, no.

Q. Do you intend to?

A. Yes.

Q. Do you know what policies you're thinking about changing?

A. Not right offhand. I couldn't tell you, but we have a lot of policies.

Q. A pretty thick booklet of them, right?

A. Right.

Q. And would you agree or disagree that the policies and procedures that a police department have are only as effective as their enforcement?

MS. KALCHTHALER: Objection, form.

Q. (BY MR. LEWIS) Or let me ask that another way, if -- if I could, Chief.

A better way to ask it might be, would you agree or disagree that policies and procedures that are not properly enforced are not very useful?

A. I would agree with that.

(Exhibit 1 marked.)

who work dispatch, including the supervisor, have testified that that's the case, would you have any reason to dispute it?

A. No, I would not.

14:23 Q. Does that sound reasonable to you?

A. Yes.

Q. Okay. And if we look down at the bottom of the printed part of the page where it says "Officers involved," what name is on there?

14:24 A. David Hall.

Q. That would be you, right?

A. Oh, that would be me.

Q. And am -- am I correct in understanding that if you were dispatched somewhere, that either you would call 14:24 over the radio and tell the dispatcher that you were en route or the dispatcher would actually talk to you when you were dispatched and have that information?

MS. KALCHTHALER: Objection, form.

A. They -- I mean, normally they do dispatch you, 14:24 not -- I mean, not all the time.

Q. (BY MR. LEWIS) Okay. Would it be your policy that when you're en route, you would notify dispatch and tell them you were en route?

MS. KALCHTHALER: Objection, form.

14:24 A. Not all the time.

Q. (BY MR. LEWIS) Okay.

A. I did not.

Q. And would you notify dispatch and tell them when you arrived somewhere?

14:25 MS. KALCHTHALER: Objection, form.

A. Not all the time.

Q. (BY MR. LEWIS) Okay. Is it your testimony as we sit here now that -- that you know or don't know where the time that's shown under "dispatch," "en route," and

14:25 "arrived" came from?

A. It looks like it -- it -- it -- I -- I don't remember being dispatched to this.

Q. Do you remember going to it?

A. Yes, I do.

14:25 Q. Oh. And would you have called in when you arrived there?

A. I might have told them I was out -- I was a sergeant at the time, so I -- I didn't do that all the time.

14:25 Q. Okay. Would you have told them when you left?

A. I might have told them I was 10-8.

Q. Okay.

A. And I might have done it at -- after I'd already left, you know. I might have been gone from the -- when

14:26 I told them that.

Q. Okay. So do you have any idea how they got the times that they entered here?

A. I -- I don't.

Q. Okay. Do you dispute those times?

14:26 A. I don't think I was there as long as what this shows, no.

Q. Can you tell me who you remember being there when you got there?

A. It was Officer Custer, Eric Payne, and

14:26 Danny Moore, and Officer Spikes.

Q. Did anybody arrive after you got there?

A. I -- I couldn't tell you.

Q. Was anyone left there when you left?

A. I think everybody was there when I left.

14:27 Q. Is there some policy that sergeants don't have -- didn't have to call in where they were and when they left?

MS. KALCHTHALER: Objection, form.

A. There wasn't a policy that said that we had to

14:28 check out, and they didn't have a policy that said we didn't have ...

Q. (BY MR. LEWIS) So the police department had no policy on sergeants checking in when they arrived and checking in when they left a scene?

14:28 MS. KALCHTHALER: Same objection.

A. Not to my knowledge.

Q. (BY MR. LEWIS) Did they have that for other officers?

MS. KALCHTHALER: Same objection.

14:28 A. I don't know if there is a policy on that, to tell you the truth. I -- I mean, I -- I don't know. That's -- it's just normal for officers to -- to check out and be dispatched and go 10-8.

Q. (BY MR. LEWIS) And -- and is that so the dispatchers will know where they were so they can note -- if -- if the need be, they can notify other officers about --

A. Yes.

Q. -- their location?

14:28 And it's also a safety reason, isn't it?

A. It is.

MS. KALCHTHALER: Objection, form.

Q. (BY MR. LEWIS) And that's because if you don't hear back from an officer and you get worried you need to send somebody, it's good to know where they last were, correct?

MS. BROUSSARD: Objection, form.

A. It is.

Q. (BY MR. LEWIS) Did you make any notes or write any report about this May 2nd, 2013 incident?

was available at dispatch?

A. True.

Q. And -- and -- and when we say "dispatch," we're talking about the police department dispatch that's out at the Educational Support Center that most of us call the football stadium, right?

A. Yes.

Q. So if somebody wanted to go look at it, they could just go out to dispatch and look at it --

A. They --

MS. KALCHTHALER: Objection, form.

Q. (BY MR. LEWIS) -- correct?

A. Yes.

Q. Is it your recollection that the security cameras, back in 2013, did not always work consistently?

MS. BROUSSARD: Objection, form.

A. Yes.

Q. (BY MR. LEWIS) Have you done any review at all about the May 2nd, 2013 incident at Vincent Middle School?

MS. KALCHTHALER: Objection, form.

A. Have I done any review?

Q. (BY MR. LEWIS) Yes, sir.

A. No, sir.

Q. As far as you know, has there been any police

department investigation of what happened that day beyond the criminal charges that were filed against Ms. Jones?

A. I'm -- I'm not aware of it.

Q. Okay. What type of records does the police department keep of the attendance of the employees?

14:46

MS. KALCHTHALER: Objection, form.

A. Number one, our -- our -- our secretary keeps a -- a record of their -- when they're off or when they're -- are at work, and --

14:47

Q. (BY MR. LEWIS) Well, is -- is that a -- on paper, or is that in a computer?

A. In the computer.

Q. And -- and when somebody's not there, does -- is there an indication of whether they're off, whether they're sick, or whether they're using some kind of leave?

14:47

A. Yes.

Q. So all that would be in -- in the computer and available to the police department?

14:47

A. Yes.

Q. So if I ask for a -- a copy of that on a police officer's record while they were a police officer for the BISD Police Department, that is something that could be gotten?

14:47

A. To my knowledge, yes.

Q. And -- and it would indicate, for every day that someone wasn't there, what the reason was, right?

A. What type of leave they're on, yes.

Q. Okay. And -- and it might just be a day off or vacation too, right?

A. It could be.

Q. Have you ever worked as the sergeant who was supervising Officer Spikes?

A. Yes, I was.

Q. When -- when was that?

A. I can't give you the dates. It's before I was chief and I supervised the --

Q. Was it before or after May of 2013?

A. I was supervising her in -- in May.

Q. Okay. And -- and tell me what -- what would be involved in being her supervisor.

A. Making sure she did, you know, her job properly, assist her with anything that she needed, you know, just everyday work, you know, just ...

Q. Did you ever ride with her in the field?

A. No, sir.

Q. Were you ever involved as a field training officer with her?

A. No, sir.

Q. How much review of her paperwork as her

supervising sergeant would you have been involved in?

A. As -- as far as what? I mean --

Q. Any -- review of any paperwork.

A. I -- I would review the -- some of her paperwork.

14:50

Q. What types of paperwork would you review?

A. I mean, if she had a problem with it. Normally, as -- as far as reports, they -- they were sent and okayed by our investigator.

14:50

Q. That would be the detective?

A. Yes.

Q. Okay. So you typically would not be reviewing criminal charges or reports about an incident?

A. Not necessarily, unless they had a problem with it.

14:51

Q. And from what you've told me, there -- there wasn't -- you weren't involved in reviewing any paperwork on the incident of May 2nd, 2013?

A. I -- I don't recall looking at any of this.

14:51

Q. And you don't recall giving any advice about what charges might or might not be filed?

A. I --

MS. KALCHTHALER: Objection, form.

A. I -- I wouldn't have gave any advice.

14:51

Q. (BY MR. LEWIS) Okay. Why -- why wouldn't you

have given any advice?

A. Because I -- I don't sway my officers what charges to file on. They're -- they're there. They know what charges to file on them. And I expect them to charge them -- charge them with the proper charges, and -- and that's why we have a detective.

Q. And so you leave it to the discretion of the police officer to determine the charges to file?

A. I do.

Q. And is the detective supposed to review the charges and decide if they're appropriate?

A. His job is to review them and make sure the charges are correct, yes.

Q. Okay. And is that -- so that the -- the detective's job would probably be not just to put together the evidence that -- that's been give -- gathered, but to also review the charges and make sure they're appropriate for that case?

MS. KALCHTHALER: Objection, form.

MS. BROUSSARD: Objection, form.

A. As far as I know our detective would not -- wouldn't tell the officers what charges to file, you know. He'll -- he'll file whatever charges they put --

Q. (BY MR. LEWIS) So --

A. -- and send it to the DA's office.

Q. So the -- the charges to be filed are left to the discretion of the police officer by -- in the BISD Police Department, correct?

A. Yes. That's correct.

14:53 Q. Okay. Have you understood my questions?

A. Sir?

Q. Have you understood my questions?

A. Yes, sir.

Q. Have I been fair with you?

14:53 A. Yes, sir.

MR. LEWIS: I'll -- I'll pass the witness.

MS. KALCHTHALER: If you could give us a -- we do have questions. I don't know if you do.

MS. BROUSSARD: We're going to reserve our

14:53 questions until trial.

MS. KALCHTHALER: If we can talk for just a moment --

MR. LEWIS: Sure.

MS. KALCHTHALER: -- beforehand. So if we

14:53 can take a quick break, and then I'll see if I've got any questions for him.

THE VIDEOGRAPHER: We're off the record at 2:51.

(Recess from 2:51 p.m. to 3:09 p.m.)

15:11 THE VIDEOGRAPHER: We're back on the record